Aaron D. Arnson (State Bar # 031322)
Trish Stuhan (State Bar # 027218)
Stephen B. Coleman (State Bar # 021715)
**PIERCE COLEMAN PLLC**
7730 East Greenway Road, Suite 105
Scottsdale, Arizona 85260
Tel. (602) 772-5506
Fax (877) 772-1025
Aaron@PierceColeman.com
Trish@PierceColeman.com
Steve@PierceColeman.com
*Attorneys for Defendant City of Phoenix*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Fund for Empowerment, *et al.*, | Case No.: CV-22-02041-PHX-GMS |
| Plaintiffs, | |
| v. | |
| City of Phoenix, *et al*., | |
| Defendants. | |

**DEFENDANT CITY OF PHOENIX'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

This Court should not entertain Plaintiffs' request to become an arbiter of homeless policy across the City of Phoenix (the "City"). The request for sweeping injunctive relief should be denied for five reasons: (1) the City is not conducting the "raids" or "sweeps" alleged by Plaintiffs; (2) the City's plans for an enhanced cleanup of the Human Services Campus downtown (the "HSC") are constitutional; (3) the City's procedures for handling abandoned property during the enhanced cleanups at the HSC are also constitutional; (4) Ninth Circuit precedent requires an *individualized assessment* prior to law enforcement action to enforce urban camping laws – not a *blanket injunction* that disregards whether there is in fact available shelter space for an individual; and (5) to the extent there were violations of Plaintiffs' rights, which the City disputes, the City's practices have changed and the request for injunctive relief is unnecessary.

At bottom, Plaintiffs' request for injunctive relief relies upon the declarations of individuals who claim to have suffered loss of property during cleanups in 2020 (and whose claims may well be time-barred).[1] Other individuals offer only generalized concerns without specific information to allow for independent review and corrective action, if indeed the acts occurred. The City disputes Plaintiffs' allegations that it violates the rights of the unsheltered.  Citations for camping violations have been minimized throughout the City, as the City has shifted its policy focus to the actual sheltering of individuals experiencing homelessness by investing millions of dollars in constructing shelters and in other solutions to alleviate the homelessness issue permanently. Indeed, contrary to Plaintiffs' allegations of mass arrests and citations, there have been a total of three camping arrests and three camping citations in the area in question since 2021. (Notably, none occurred in the year 2020, the

---

[1] Plaintiffs provided a declaration from an individual who claims to have witnessed a "raid" on December 7, 2022 (Doc. 17, ¶ 12). Because of the lateness of the hour in which this declaration was filed, Defendants have not yet had an opportunity to evaluate these allegations as of this filing. It suffices to say, however, that the declaration is totally lacking in foundation, and furthermore, the photograph of this purported "raid" appears to be two work trucks at a construction site, and not evidence of a "raid." This may be explored further during cross-examination.

1

year in which Plaintiffs allegedly suffered their constitutional injuries.)  The City requests injunctive relief be denied so that it may continue with its plans to increase sanitation services downtown (which is necessary to address serious public health and safety concerns) and exercise law enforcement decisions based on the individual circumstances at hand.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

Plaintiffs characterize the City as a monolith, focused on weaponizing local ordinances and statutes to target the unsheltered. This is patently false. The City has dedicated staff to develop homeless solutions that recognize the dignity and humanity of these individuals experiencing homelessness. The City has expended millions of dollars to increase resources for the unsheltered and roll out new programs and facilities in 2022. New shelters and housing solutions have been unveiled over the past year and are continuing to be opened in 2023. [*See* Declaration of Rachel Milne, Ex. A, ¶¶ 5-8]

Attached to this response are documents filed in Maricopa County Superior Court case *Freddy Brown, et al. v. the City of Phoenix*, Case No: CV2022-010439 (the "State Court Lawsuit"), which Plaintiffs allege, at least in part, spurred this action. Rather than work with the City, Plaintiffs and/or their representatives chose to file this lawsuit. The State Court Lawsuit focuses on concerns of a public nuisance in the City's downtown area and strikes at the heart of the issues in this case (albeit on the other side of the coin insofar as the plaintiffs in that action are seeking to compel the City to "abate" the nuisance – whether through mass relocations, arrests, or other compelled law enforcement actions the City is fighting against).

As part of the proceedings in the State Court Lawsuit, the plaintiffs request injunctive relief to demand nuisance abatement and conducted a full-day hearing on the request. Records in the State Court Lawsuit are, accordingly, directly on point to the issues in this case. The City submits three documents from the State Court Lawsuit to shed light on City practices: (1) the City's plan for conducting the HSC Enhanced Clean Up (the "Enhanced Clean Up Plan") [Declaration of Scott Hall, Ex. B, Attachment 2]; (2) the City's abandoned property procedure for the Enhanced Clean Up (the "Abandoned Property Procedure") [Ex.

A, Attachment 1]; and (3) law enforcement activities for the area Plaintiffs refer to as the "Zone."[2] [Declaration of Brian Freudenthal, Ex. C, Attachments 1-2] The transcript from the preliminary injunction hearing in the State Court Lawsuit pertaining to enforcement activities (the "State Court Transcript" or "TR") is attached as Ex. D to this response. Together, these documents with additional declarations from City personnel illustrate that the facts on the ground are vastly different than Plaintiffs' account. To be clear, if what Plaintiffs allege the City was doing was actually occurring, the City would agree with much of the Complaint. But the facts are not as Plaintiffs present.

As to the law, Defendants agree that the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution are implicated in any law enforcement or sanitation services focused on homeless encampment cleanups. The unsheltered have constitutional rights to be free from unreasonable searches and seizure, cruel and unusual punishment, and due process violations. What is disputed, however, are Plaintiffs' attempts to broadly extend Ninth Circuit precedent while ignoring the City's actual plans and procedures to conduct cleanups and store belongings for the unsheltered during sanitation services.

## Statement of Facts

The below Statement of Facts is filed to set the record straight regarding the City's use of resources to support homelessness solutions, the City's plans for the enhanced cleanup of the downtown area near the HSC building, the City's treatment of unsheltered individuals' property, and the status of law enforcement response in the downtown area at issue.

**A.** **The City Has Dedicated Substantial Resources to Advancing Homeless Solutions and Seeking Housing for Those Most in Need.**

Deputy City Manager Gina Montes was hired by the City in May of 2021 to focus on homeless solutions. Ms. Montes facilitated the creation of an Office of Homeless Solutions

_____

[2] The area Plaintiffs refer to as the "Zone" is discussed in Count Five of the Complaint. The Zone is described as an area in downtown Phoenix consisting of concrete, asphalt, and rocks unprotected from the sun. [Compl. at ¶ 173] Although no precise location of the Zone is provided in this action, in the separate State Court Lawsuit, the Plaintiffs refer to the Zone as an area near a social services campus run by nonprofit entities located roughly by 7th and 15th Avenues and Van Buren and Grant Streets in downtown Phoenix.

("OHS") which was formed on July 1, 2022. The OHS created ten new positions to assist in the administration of services. The OHS is charged with implementing a litany of programs and services for individuals experiencing homelessness [TR at 115:21-118:24, 123:13-19].

Ms. Montes and the OHS team are continuing to work on homeless solutions. There are simply not enough shelter beds to accommodate the current number of unsheltered in the City. [TR at 128:14-22] The Maricopa Association of Governments ("MAG") annually conducts a Point-in-Time ("PIT") count of the number of unsheltered individuals within the County, in which the City participates. [TR at 120:25-121:18] According to the most recent PIT counts, the City's unsheltered population has increased significantly over approximately the last decade, from 771 individuals in 2014 to 3,096 individuals in 2022. [TR at 122:4-23] The unsheltered population within Maricopa County has also increased significantly over that same period. [TR at 122:24-123:1] The PIT count of unsheltered individuals does not include the total homeless population, which is larger. [TR at 121:21-122:3]

The total number of shelter beds within the City has decreased over the last decade, from 3,624 shelter beds in 2015 to 3,219 in 2022, likely due primarily to a lack of funding and increased costs. [TR at 127:5-126:8; Ex. 51] The vast majority of those beds are occupied. [TR at 128:14-24] Of the 3,219 total beds, on the date of the PIT count, more than 2,900 were already occupied and were unavailable to be used by the remaining unsheltered population. [TR at 128:14-22] Shelter beds may also be set aside for certain populations, for example, victims of domestic violence, transitional housing for working homeless, shelters for families with school age children, COVID-19 response, foster children, and heat respite, limiting access to some shelter beds based on need. [TR at 130:19-133:23] However, the mere fact that there are not enough beds available for every unsheltered City resident on any given night does not mean that every shelter bed is always occupied. Indeed, there are vacancies in shelters nightly, and turnover happens routinely, meaning that beds become available for various uses should the City need to relocate somebody pursuant to its enforcement authority and consistent with the Constitution. Finding housing for unsheltered City residents is difficult, but the OHS is regularly working to identify housing options.

[Declaration of Gina Montes, Ex. E, ¶¶ 6-11]

To address increases in homelessness, the City developed strategies to protect public health and safety and respect the rights of homeless including:

a.    Forming outreach teams to contact individuals experiencing homelessness and direct them to shelters, treatment, or other services. [TR at 134:8-16]

b.    Identifying properties for construction of new shelter spaces. In 2022, the City opened a shelter for adults with approximately 200 beds on Washington Street. [TR at 134:17-25, 140:23-141:2]

c.    Approve funding for the design of both a congregate (sprung)[3] structure shelter and a non-congregate (modular) shelter that together will house approximately 250 individuals. [TR at 135:4-7, 135:17-21, 156:14-157:6, 158:24-159:8; Ex. 57]

d.    Opened a hotel with 117 rooms in November 2022 for the temporary housing of unsheltered individuals living in the area surrounding the Human Services Campus ("HSC"). [TR at 141:9-16]

e.    Prioritizing indoor shelter space during the summer months to address the risk of heat-related deaths and illness among the unsheltered population. [TR at 137:22-138:22, 165:20-23]

f.    Authorizing the expenditure of over $70 million dollars toward shelters and affordable housing solutions for unsheltered City residents. [TR at 141:2-8]; [Ex. E, ¶¶ 6-8]

g.    Cleaning streets and removing trash from the HSC area three times per week, according to an established schedule. [TR at 173:3-25]

h.    Planning enhanced cleanups of the rights of way and sidewalks in the areas around the HSC in December 2022. These enhanced cleanups will require power washing; the provision of heavy equipment such as street sweepers, front loaders, and dump trucks; coordination between City staff; notice to unsheltered individuals; and storage and disposal of property that is unattended or determined to be abandoned. [TR at 143:13-145:1, 148:6-

---

[3] A "sprung structure is a soft-sided building that can be erected for congregate housing more quickly than a stick built or other permanent form of building." [TR at 135:17-21]

5

20; 175:25-177:14]

     i.     Partnering with providers to offer services and increase capacity at shelters, including religious and nonprofit groups, to provide shelter operations, outreach, rapid rehousing, employment and job services, and other supportive services are provided by third parties on a contract basis. [TR at 118:16-24; 124:5-125:8]

     **B.**     **The City Performs Necessary Law Enforcement Services In and Near the Human Services Campus Downtown to Address Criminal Activity and Protect the Public.**

     While working on solutions for homelessness and housing options, the City also performs necessary law enforcement services. Commander Brian Freudenthal, who oversees the City's Downtown Operations Units, including the HSC campus area, testified during the State Court Lawsuit that the City has assigned seven officers and one sergeant to a specially dedicated "Shelter Team" to perform law enforcement functions at and in the area surrounding the HSC. This Shelter Team is a part of the Downtown Operations Unit, with the primary purpose to patrol for and respond to criminal activity, serve as a liaison with the HSC, and resolve issues with businesses in the area. [TR at 222:22-224:7] The Shelter Team, among many other things, responds to all calls for service; conducts proactive enforcement; responds to all medical calls within the area; and removes unsheltered individuals when trespassing on private property. [TR at 59:4-18, 225:4-8, 228:15-19] Commander Freudenthal has served in the HSC area for years. [TR at 221:6-22]

     Commander Freudenthal testified that police exercise discretion when handling calls for service involving homeless individuals. [TR at 230:13-16] Officers must use discretion to cite or arrest an individual; to enforce one ordinance instead of another; and may choose to enforce no ordinance at all depending on the facts. [TR at 230:17-231:5] The Department of Justice ("DOJ") initiated a pattern or practice investigation in August of 2021 examining, in part, how the City treats the possessions of people experiencing homelessness. [TR at 145:2-14] In response, the City stopped conducting any widespread cleaning activities of public property occupied by the unsheltered in January 2022.

C.    **The City Does Not Conduct "Raids" or "Sweeps" Targeting the Unsheltered.**

Many of the facts presented by Plaintiffs to the Court are just plain wrong. The City is not conducting "raids" or "sweeps" of homeless encampments as claimed. The declarations relied upon hearken back to 2020 in large part, with only vague information as to dates, times, or locations of the alleged violations. The City acknowledges that prior to January 2022, it cleaned public areas occupied by unsheltered individuals to address trash, waste, debris, public urination, defecation, and other health hazards. The City disputes the characterization that these were "3 a.m." raids, conducted without notice, and that the City intentionally destroyed personal property without cause. [*See* Ex. B, ¶¶ 12-20; Ex. E, ¶¶ 15-19] There is no City policy to conduct "raids" or "sweeps" of homeless encampments in the HSC area or anywhere else in the City. Nor does the City "send" unsheltered individuals to the HSC area. [Compl. at ¶ 178] Officers sometimes provide a courtesy ride to the HSC to an individual who is experiencing homelessness. [TR at 233:9-234:22] The Department's officers do not give people rides to the HSC area to camp or encourage someone to relocate to the HSC area. [TR at 233:21-235:17] This is simply where a vast majority of non-profit and supportive care services are located. [TR at 141:17-142:20] Citations for camping violations have also been minimized throughout the City and there have been no camping charges in the area in question in the last two years, as explained in Commander Freudenthal's declaration. [Ex. C]

<u>**Legal Standard**</u>

Plaintiffs have moved for a preliminary injunction enjoining: (1) the seizure and destruction of property of unsheltered individuals in the City; (2) the issuance of criminal or civil citations under Phoenix City Code §§ 23-30(A), 23-48.01, and related City or State laws; (3) the issuance of criminal or civil citations to individuals experiencing homelessness for sleeping in public spaces when no alternative spaces are available; and (4) sweeps in the City that require unsheltered individuals to physically move and dispossess them of their

property [Complaint at p. 23].[4] The Court should deny this broad request. Defendants agree that Plaintiffs have correctly represented the burden for seeking a preliminary injunction. *See Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008); *Nationwide v. Biweekly Admin, Inc. v. Owen*, 873 F.3d 716, 730 (9th Cir. 2017). All four factors weigh against granting an injunction.

*First*, Plaintiffs cannot show a strong likelihood of success on the merits because, factually, the City does not conduct the "raids" and "sweeps" complained of in the complaint. And, to the extent any such activities occurred in the past, they have since been stopped. Therefore, Plaintiffs' claims cannot support such sweeping injunctive relief. Further, to the extent Plaintiffs seek to enjoin the City's current enhanced cleanup plan, that plan complies with the law. Plaintiffs are not likely to succeed on the merits of the constitutional issues. *Second*, there is no possibility of irreparable harm where the proposed cleanup plan for the downtown area is constitutional. If the plan is not followed or in an individual case the City violated Plaintiffs' rights, a claim can be brought at that time, when it is ripe for review. The Court should not enjoin the City's necessary public works cleanup activities on the possibility that a City employee might not follow the plan diligently developed over the last year. Furthermore, monetary damages are available for the types of Section 1983 claims Plaintiff raise as theoretically possible. *Third*, the balance of hardships favors the City, which must have discretion to conduct essential law enforcement and public sanitation services. *Fourth*, public policy favors restraint over granting of injunctive relief. The Plaintiffs seek relief which is not supported by the facts or law presented.

---

[4] These same requests are set forth in the request for *permanent* injunctive relief, along with a request that the City be required to provide shade and other resources to individuals experiencing homelessness who reside in an area of the City Plaintiffs refer to as the "Zone." This response focuses on the request for *preliminary* injunctive relief, although there is a brief response below to the so-called "State-Created Danger" argument.

1

**Legal Argument**

2

**I.    PLAINTIFFS HAVE NOT SHOWN A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ANY OF THEIR CLAIMS AS THERE IS NO CONSTITUTIONAL VIOLATION TO ENJOIN.**

3

4

Plaintiffs' attempts to extend Ninth Circuit precedent in an unprecedented and

5

untenable manner must be rejected. Each of the constitutional issues are discussed below.

6

      **A.    Eighth Amendment Protections Against Cruel and Unusual Punishment Prohibit Blanket Bans on Enforcement of Urban Camping Ordinances Based on Bed Availability; Instead, Those Protections Require Individualized Assessments Prior to Enforcement.**

7

8

9

Underlying this case is a tenor that the City is weaponizing laws to target unsheltered

10

homeless individuals. That is false. The City agrees that municipalities cannot enact "status

11

crimes." Being homeless is <u>not</u> a crime. In contrast, "acts" such as drug use and public

12

intoxication are criminal activities. *Compare Robinson v. California*, 370 U.S. 660 (1962)

13

(overturning law which made status of narcotic addiction criminal offense) *with Powell v.*

14

*Texas*, 392 U.S. 514 (1968) (upholding conviction targeting being drunk in public).

15

Notwithstanding this status versus act distinction, criminal enforcement in practice is

16

complex. Factors including the *voluntariness or involuntariness* of the act must be examined.

17

Specifically, the Ninth Circuit expanded federal constitutional protections for

18

unsheltered homeless individuals in 2019, relying upon the Eighth Amendment prohibition

19

against cruel and unusual punishment. In *Martin v. City of Boise*, 920 F.3d 584 (9th Cir.

20

2019), the Ninth Circuit held that the Eighth Amendment prohibits, with limited exceptions,

21

the enforcement of criminal prohibitions against camping on public property when there isn't

22

enough shelter space in the jurisdiction. The Ninth Circuit reasoned that the Eighth

23

Amendment prohibited the state from punishing an involuntary act or condition which is the

24

consequence of one's status of being homeless. *Id.* at 616. More recently, on September 28,

25

2022, the Ninth Circuit issued *Johnson v. City of Grants Pass*, 50 F.4th 787 (9th Cir. 2022),

26

finding: "… that the City of Grants Pass cannot, consistent with the Eighth Amendment,

27

enforce its anti-camping ordinances against homeless persons for the mere act of sleeping

28

outside with rudimentary protection from the elements, or for sleeping in their car at night,

9

when there is no other place in the City for them to go." The decision expanded Eighth Amendment protections to *civil violations* (which the court found closely intertwined with criminal prosecution) and a right for *rudimentary protections from the elements*.[5]

Ultimately, this line of cases makes it clear that urban camping ordinances and statutes require careful consideration before any enforcement action can be taken. An individualized assessment is required. In the case at hand, although generally there is a shortage of shelter beds in the City of Phoenix and Maricopa County at large, the unsheltered population is not stagnant. Numbers fluctuate daily. In addition to whatever beds may become available on a given night, the City has been diligently working on improving shelter capacity through construction of new congregate shelters, temporary sprung shelters, hotels, and partnerships to increase housing options, among a litany of other efforts detailed in the above Statement of Facts. [*See also* Ex. E, ¶¶ 8-11] On any given night, there may be available bed capacity for some of the unsheltered population.

Prior to any criminal enforcement, officers must investigate the individual's circumstances and determine if there is shelter space available. The unsheltered have rights against cruel and unusual punishment but this right does not extend to wholesale enjoinment of camping ordinances or other acts that threaten public health and safety.

Indeed, *Martin* explicitly recognized cities may enforce time, place, and manner restrictions on public property and that homeless who do have access to shelter and choose not to use it are subject to enforcement. *Martin*, 920 F.3d at 617. There is no dispute as to the key constitutional issue or precedent although *as applied* the City contends that any broad request for injunctive relief flies in the face of the requirement for an individualized assessment of the circumstances before law enforcement action. Decisions about whether to criminally prosecute require case-specific analysis – not broad strokes based on misleading, incomplete, or inaccurate information.

---

[5] What qualifies as a "rudimentary protection from the elements" is unclear in practice, but the City believes the rudimentary protections the Ninth Circuit sought to protect include at minimum blankets, pillows, and cardboard boxes, which were at issue in the case, among potentially other objects depending on the case at hand.

**B.      Fourteenth Amendment Due Process Protections Generally Require Notice and Procedural Safeguards Prior to the Seizure of Private Property – The City's Plans and Procedures Comply with these Requirements.**

Plaintiffs are correct that the Fourteenth Amendment of the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Under the Fourteenth Amendment, the City cannot simply seize property and summarily dispose of it. None of this is disputed.

In the context of homeless encampment cleanups, the most on-point case in the Ninth Circuit is *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012). This case clarified that due process requires both notice and procedural safeguards to protect against property loss. That is exactly what the City has been developing when creating its policies and procedures for handling abandoned property and conducting enhanced cleanups. [*See* Ex. A, Attachment 1 and Ex. B, Attachment 2] This Court can—and should—review the plans. The City's policies comply with the Fourteenth Amendment.

**C.      Fourth Amendment Protections against Unlawful Seizures Do Not Extend to Ordinary Cleaning Activities and Abatement of Hazards.**

Plaintiffs' arguments on the Fourth Amendment largely replicate the Fourteenth Amendment, focusing again on *Lavan*. As above, there is no dispute from the City that a plan to seize and dispose of unsheltered individuals' properties without notice, regardless of condition or value, or abandonment, would violate the Fourth Amendment. The City disputes that this is occurring or that the City's current enhanced cleaning plans violate the Fourth Amendment. As explained in more detail below, notice and procedural safeguards are key – which is exactly what the City has developed.[6]

---

[6] Notably, although the City contends its plans and procedures are constitutional it recognizes that perceptions in the field may differ between the unsheltered and the police or cleaning crews. For example, the City may provide notice of an impending cleanup of City right-of-way, time to relocate, bins for storage, assist in moving people to a temporary staging area, and cleanup an area intending to keep property safe and then in the moment of cleaning face difficult decisions: Is a stack of papers – even, perhaps, an important legal document – covered in feces or illegal drug residue, or otherwise buried in garbage, unsanitary and warranting disposal as hazardous waste? Is there a risk important documents

11

**D.** **There is No Credible Evidence to Support Plaintiffs' Claims.**

Plaintiffs' evidence consists of statements from two individuals experiencing homelessness and homelessness advocates relying on vague assertions dating back to 2020. Despite knowing of the State Court Lawsuit, Plaintiffs ignore the evidence from that action of the myriad measures the City has taken to protect the rights of the unsheltered and instead, make a single, perfunctory reference to a Phoenix New Times article mentioning the City is preparing to conduct cleanings. Even putting aside issues regarding hearsay, foundation, and the overall competency of such "evidence," the article lends no support to Plaintiffs' position and, in fact, weighs against injunctive relief. The article states in pertinent part:

- The city has been drafting plans that it hopes will address previous concerns when it starts what it calls "enhanced" sweeps sometime next month.
- A Human Services Campus outreach team will assist people with moving their property if they struggle to do so on their own before and after a cleanup.
- Any unclaimed property that remains after a cleanup will be tagged and "clearly wrapped with caution tape," according to the city's protocols. After seven days, the city will declare the belongings abandoned and remove them. The tags will direct the owner of the belongings to the welcome center of the Human Services Campus, which is located in the Zone, to claim the property. Abandoned property removed from the Zone will be "stored in a closed, locked, storage container for an additional 30 days," according to the city.

Plaintiffs cannot seriously contend that this article is colorable evidence of impending constitutional violations, such that it establishes a strong likelihood of success on the merits, or otherwise tips the balance in favor of injunctive relief.

**II.** **THE POSSIBILITY OF IRREPARABLE HARM FAVORS THE CITY, NOT PLAINTIFFS, IF THE CITY IS FORCED TO FORGO ITS PLANS FOR ENHANCED CLEANINGS IN THE DOWNTOWN AREA.**

Injunctive relief requires more than generalized allegations and conjecture about what *may* happen. Here, the City has a demonstrated need to conduct cleanings downtown with real threats to public health if enjoined from taking action. Whereas, the possibility of harm

_____

may be destroyed in the cleaning process? Certainly, tough calls must be made. The City is charged with making these calls and has developed plans and procedures to provide guidance. If an individual alleges a violation of their rights in practice, as these procedures are tested, then that individual may have their day in court – but a wholesale injunction against necessary public sanitation activities is inappropriate.

1    to Plaintiffs is theoretical at best, and based on misunderstandings or misstatements

2    regarding the City's plans and procedures, lack of personal knowledge, unadulterated

3    speculation, and declarations alleging vague harms which less than a handful of the homeless

4    population supposedly experienced or observed years ago.

5          While Plaintiffs argue that constitutional violations are presumed to result in

6    irreparable harm, this rule is not absolute. In *Associated Gen. Contractors of California, Inc.*

7    *v. Coal. for Econ. Equity*, the Ninth Circuit acknowledged that courts must make a case-by-

8    case determination of whether a plaintiff "would be entitled to such a presumption." 950

9    F.2d 1401, 1412 (9th Cir. 1991). By illustration, the court cited to the Eleventh Circuit's

10   refusal "to presume irreparable injury from allegations of equal protection violations when it

11   found the primary damage that plaintiff asserted to be 'chiefly, if not completely,

12   economic.'" *Id.* at 1412, n.9. Here, the alleged harm consists of destruction of property

13   (something that may not even occur), which is economic in nature. In contrast, allowing

14   unsanitary conditions to persist would endanger the health and safety of the public as well as

15   *genuine risks to the unsheltered*.

16          **A.    The City Has the Authority to Conduct Essential Cleaning Activities.**

17          The police power derives from the protection of public health and safety. *See Berman*

18   *v. Parker*, 348 U.S. 26, 32 (1954). Cities are tasked with the sometimes-unenviable role of

19   legislating and enforcing laws to address nuisances, blight, insanitary conditions, and health

20   hazards that threaten residents. *See, e.g.*, A.R.S. § 9-240(B)(20)-(22); Charter of the City of

21   Phoenix, Ch. IV § 2. Due process rights are not violated by the seizure or destruction, under

22   the lawful exercise of police power, of property which is dangerous or a menace to the

23   public. 56 Am. Jur. 2d Municipal Corporations, Etc. § 384; *Hughes v. City of Phoenix*, 64

24   Ariz. 331, 332 (1946) (finding no violation for taking of vehicle constituting a nuisance).

25          The district courts have affirmed the necessity of municipal public health and

26   sanitation operations. For example, in *Shipp v. Schaaf*, 379 F. Supp.3d 1033 (N.D. CA.

27   2019), the City of Oakland adopted procedures concerning the removal of homeless property

28   and encampments from public right-of-way, parks, and city owned property. The United

States District Court for the Northern District of California found that *Martin's* holding did not extend to the circumstances in Oakland finding: (1) the City's decision to require Plaintiffs to temporarily vacate their encampment does not, by itself, implicate any criminal sanctions that would trigger Eighth amendment protections; and (2) nothing in the notice of temporary closure suggested that the City intended to issue criminal sanctions as part of the temporary closure operation. The court concluded that, "remaining at a particular encampment on public property is not conduct protected by *Martin*, especially when the closure is temporary in nature." *Id.* at 1037.

Similarly, in *Murray v. City of Philadelphia*, 481 F.Supp.3d 461 (E.D. Pa. 2020) the District Court for the Eastern District of Pennsylvania held, in relevant part, that residents of homeless encampments did not demonstrate likelihood of success on the merits of their claim that the city's potential seizure of property in the course of encampment dissolution would be unreasonable in violation of the Fourth or Fourteenth Amendment. There, the city provided notice and instituted safeguards to protect against property loss. The city represented that it would follow these practices with respect to residents' property. Indeed, the city posted written notices at the encampment informing residents that their occupancy was unlawful and that they must leave the location and remove their personal property by a certain date. The notices stated that the city would store personal property for 30 days and would consider stored property not retrieved within 30 days to be abandoned. When encampment residents did not vacate by the deadline, the city sent additional notices and emphasized that it intended only to dissolve the encampments and was not seeking to impose civil or criminal penalties. The court concluded that the city had a significant interest in exercising its police powers to ensure the health and welfare of residents. Officials had reasonably determined that the encampments posed health and safety risks to encampment residents and community members. Plaintiffs did not provide evidence indicating how the city could ameliorate these risks without dissolving the encampments.

As in *Murray*, Plaintiffs are not likely to succeed on constitutional claims challenging fundamental public health and safety and sanitation services – the City's plans are

1  Constitutional and within the police powers of the City. [*See* Ex. A, ¶¶ 13-15]

2  **B.   The City Has the Authority to Make Individualized Assessments**
3  **regarding Enforcement of Criminal Statutes and Ordinances.**

4      There are no grounds to stop enforcement of laws that serve the public interest when

5  appropriately coupled with shelter space and social services. *Martin*, 920 F.3d at 617 n.8.

6  Cleanups of public right-of-way and property are essential to protect public health and safety

7  and the avoidance of disease, as explained above in *Shipp*. Any order which wholly enjoins

8  the City's ordinances, state law, and provides that the City cannot conduct cleaning activities

9  to abate health hazards, serves only to complicate the homelessness crisis, not protect the

10 unsheltered. The City must retain the ability to enforce public health laws to protect all

11 residents, including the unsheltered.

12     Will there be difficult decisions that may have to be made by law enforcement and

13 street cleaning crews conducting cleanups? Almost certainly. Should the Court enjoin the

14 City's efforts to clean up its downtown area due to the *possibility* of harm? Absolutely not.

15 Particularly not where the City has developed plans and procedures that plainly comply with

16 the Ninth Circuit's precedent regarding the rights of the unsheltered. *See Shipp*, 379 F. Supp.

17 at 1039 ("Discovery in this case regarding the City's past conduct, or evidence concerning

18 future 'clean and clear' operations, may succeed in demonstrating that the City does not, in

19 fact, comply with its own policies. The Court will consider such evidence if it emerges. On

20 the present record, however, Plaintiffs have not met their burden of showing either a serious

21 question going to the merits or a likelihood of future harm.").

22     The Plaintiffs are simply wrong to tie the ability to enforce camping laws to whether

23 the number of shelter beds on any given night matches the number the unsheltered on the

24 streets. The Ninth Circuit does not require this stark result. The City can and does conduct

25 individualized assessments and weighs shelter options before making enforcement decisions.

26 Plaintiffs advocate for a sweeping prohibition that would eviscerate the well-crafted

27 limitations of *Martin* (which permit enforcement of camping and sleeping ordinances when

28 shelter is available). Under Plaintiffs' misreading of the law, if the City has 1,000 beds and

the homeless population is 1,001, the City is subject to blanket prohibition against enforcement even if 500 of the beds are unused. Such a result is untenable. The City must retain discretion to provide basic sanitation services.

### C.   The City Is Not Creating any Danger for the Unsheltered.

Plaintiffs' Complaint raises the State-Created Danger doctrine, although it is not touched upon in their Motion for Preliminary Injunction. Even if it is a viable claim, which the City disputes, to prevail Plaintiffs would have to show that: (1) state actors created or increased danger to plaintiff and (2) state actors acted with deliberate indifference. *Brazda v. City of Reno*, 105 F.3d 664 (9th Cir. 1997). Deliberate indifference requires: "defendant have actual knowledge of, or willfully ignore, impending harm, i.e., the defendant knows that something is going to happen but ignores the risk and exposes someone to it." *Id.*

The City has not taken any actions to *cause* danger to the unsheltered. The City does not bus people into the area, distribute tents, or otherwise encourage people to camp. Simply offering "courtesy rides" to residents seeking social services at the HSC is insufficient to create danger – indeed – the assistance helps people access critical care services. Moreover, the City is diligently working to provide resources to the unsheltered. The City recognizes the danger of heat in Arizona and opened heat respite shelters in response. The City continues to develop housing facilities with air conditioning (as opposed to the unstructured campgrounds the plaintiffs in the State Court Lawsuit seek). There is no "deliberate indifference" by the City. [Ex. E, ¶¶ 11-14]

### III.   PLAINTIFFS HAVE NOT SHOWN THE POSSIBILITY OF IRREPARABLE HARM IF THE CITY IS ALLOWED TO CONTINUE WITH ITS PLANS TO CONDUCT ENHANCED CLEANUPS AND LAW ENFORCEMENT ACTIONS TAILORED TO INDIVIDUAL CIRCUMSTANCES.

The City's current enhanced cleanup plan is in compliance with law, as explained above. To avoid repetition, there is no possibility of irreparable harm where the proposed plan is constitutional. If the plan is not followed or in an individual case the City violates Plaintiffs' rights, a claim can be brought at that time. *See Shipp*, 379 F. Supp. at 1039. The court should not enjoin the City's necessary public works cleanup activities on the *possibility*

16

a City employee might not follow the plan diligently developed over the last a year – which as explained above would only allow unsanitary conditions to persist that would endanger the health and safety of the public. *See Murray*, 481 F. Supp. 3d at 471.

## IV.   THE BALANCE OF HARDSHIPS FAVORS THE CITY WHO MUST HAVE THE DISCRETION TO CONDUCT ESSENTIAL LAW ENFORCEMENT AND PUBLIC SANITATION SERVICES.

The balance of hardships favors the City who must have discretion to conduct essential law enforcement and public sanitation services. Notably, the City does not dispute the plaintiffs' claim in the State Court Lawsuit that there are public health concerns downtown – there are. The City has worked to create the Enhanced Clean Up Plan and Abandoned Property Procedure to address sanitation concerns.

## V.   PUBLIC POLICY FAVORS THE CITY.

In *Kahler v. Kansas*, 140 S. Ct. 1021 (2020), Justice Kagan expounded on the "paramount role of the States in setting 'standards of criminal responsibility.'" *Id.* at 1028. In exploring due process requirements for criminal cases, Justice Kagan noted that judges simply aren't equipped to dictate "rigid" constitutional rules when criminal law reflects a "constantly shifting adjustment" of ethical commitments and practical limitations. *Id.* "Within broad limits, *Powell* thus concluded, 'doctrine[s] of criminal responsibility' must remain 'the province of the States.'" *Id.* Sweeping injunctive relief flies in the face of *Powell v. Texas*, 392 U.S. 514 (1968), which upheld convictions based on the act of being drunk in public, against this exact kind of rigid rule that belies the facts on the ground. Plaintiffs are correct that the City cannot – nor would it – conduct mass arrests of unsheltered individuals occupying public property near the HSC campus. [Ex. C, ¶¶ 8-30] However, public policy does not go so far as to bar *any* enforcement action. If there is available shelter space, cleaning must occur to address sanitation hazards, and if the person simply refuses to relocate even temporarily, the City must have the discretion to enforce its laws.

## CONCLUSION

For the foregoing reasons, the City respectfully requests the Court deny the Motion for Preliminary Injunction.

RESPECTFULLY SUBMITTED this 9th day of December 2022.

**PIERCE COLEMAN PLLC**

By: /s/ Aaron D. Arnson
    Aaron D. Arnson
    Trish Stuhan
    Stephen B. Coleman
    7730 East Greenway Road, Suite 105
    Scottsdale, Arizona 85260
    *Attorneys for Defendant City of Phoenix*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 9, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

American Civil Liberties Union
Foundation of Arizona
Benjamin L. Rundall
Jared G. Keenan
Christine K. Wee
brundall@acluaz.org
jkeenan@acluaz.org
cwee@acluaz.org

Snell & Wilmer, LLP
Edward J. Hermes
Deliah R. Cassidy
ehermes@swlaw.com
dcassidy@swlaw.com

Dickinson Wright PLLC
Brian J. Hembd
Cameron C. Stanley
bhemgd@dickinsonwright.com
cstanley@dickinson-wright.com
Attorneys for Plaintiffs

By: /s/ Mary Walker

18