IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fund for Empowerment, et al., | No. CV-22-02041-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs Fund for Empowerment, Faith Kearns, and Frank Urban's ("Plaintiffs") Motion for Preliminary Injunction (Doc. 2). For the reasons below, the motion is granted in part and denied in part. However, nothing in this Order precludes the City from conducting its enhanced cleanup plans in the area known as "the Zone," as outlined in its procedures and the briefings in this case.

## BACKGROUND

Plaintiff Fund for the Empowerment ("FFE") is an incorporated nonprofit charity operating in Maricopa County that provides advocacy, programming, and resources to the county's unsheltered population. Plaintiffs Faith Kearns and Frank Urban are chronically unsheltered individuals who reside in Maricopa County. Together, Plaintiffs have filed this action against the City of Phoenix; Chief Jeri Williams, the Chief of the Phoenix Police Department, in her official capacity; Interim Chief of the Phoenix Police Department, Michael Sullivan, in his official capacity; Entities I-X, political subdivisions of the state of

Arizona; and Officers John and Jane Does 1–75, in their individual capacities. The claims in Plaintiffs' Motion for Preliminary Injunction (Doc. 2) assert violations of their Fourth, Eighth, and Fourteenth Amendment rights.

Plaintiffs' Fourth and Fourteenth Amendment claims arise from Defendants' practice, which allegedly targets unsheltered individuals in Phoenix and results in the indiscriminate destruction of their property. In the challenged practice, City police and/or other personnel approach unsheltered individuals and perform warrant checks, while city employees prepare to clear out any property from the area. Unsheltered individuals like Ms. Kearns and Mr. Urban then have a limited amount of time to collect their personal belongings. Any items they cannot collect in time are allegedly destroyed. Ms. Kearns and Mr. Urban claim that they were personally been subjected to this practice on multiple occasions from 2019 to 2020. On some occasions, Ms. Kearns and Mr. Urban claim that the Phoenix Police Department has "inexplicably confiscate[d] and destroy[ed] . . . their[] Arizona IDs, bank cards, tents, blankets and bedding, medications, clothing, and even a birth certificate." (Doc. 2 at 3.) Plaintiffs also provide witness statements demonstrating more recent instances of the practice; one witness states he saw Phoenix police engage in the conduct at issue as recently as December 7, 2022. (Doc. 26 at 2.) Plaintiffs claim that these practices occur throughout the City of Phoenix.

The City's practices were a primary source of discussion at the Preliminary Hearing conducted on December 14, 2022.[1] Plaintiffs filed their Motion for Preliminary Injunction in part because the City plans to conduct an "enhanced cleaning" of the area known as "the Zone" on December 16, 2022. The Zone is a homeless encampment located near 12th Avenue and Madison which, at its largest, held over a thousand unsheltered residents. (Doc. 2 at 5.) At the Hearing, Phoenix's Director of the Office of Homeless Solutions, Rachel Milne, testified to the City's plan for conducting enhanced cleanings in the Zone.

---

[1] Because significant portions of the testimony at the preliminary injunction hearing were not represented in the briefings, the Court discusses testimony elicited at the hearing frequently throughout this Order. In doing so, it references the unofficial transcript produced by the Court Reporter at the hearing. At the time of issuing this Order, however, no official transcript has been requested or made.

Ms. Milne said that pursuant to its plan, the City provided occupants of the Zone two weeks' notice of the cleaning via flyers and planned to offer support services for individuals to move their belongings ahead of the cleaning. The City's enhanced cleaning plan also includes an abandoned property procedure, which requires the City to tag items left in the Zone during the enhanced cleanings and leave them in place for seven days. If the property is not claimed after seven days, the City may remove the property and maintain it for at least 30 days in a secure location for retrieval. (Doc. 18-1 at 6.)

However, in their Motion for Preliminary Injunction, Plaintiffs also challenged Defendants' practices throughout the City. The City explained that the enhanced cleaning plan and the abandoned property procedure apply exclusively to cleanings conducted within the Zone. Defendants offered the testimony of the City's Director of the Office of Homeless Solutions, Scott Hall, on this point. According to Mr. Hall, outside of the enhanced cleaning procedures to be used in the Zone, the City does not have: a policy for determining whether unsheltered persons' property is abandoned, a time period for which it holds any class of unsheltered persons' property after it is seized, or a policy for notifying individuals that their property has been seized. Mr. Hall testified that shortly after the City has seized the unsheltered person's property, the City destroys the property. However, Mr. Hall also stated that when the City seizes identifying documents or materials, it attempts to contact the individuals. If, however, the City cannot contact them, it destroys the documents or materials. Mr. Hall did not know long the City would hold these documents before destroying them. Plaintiffs' Fourth and Fourteenth Amendment claims thus challenge the City's practices outside of the Zone and the City's new written procedures for cleanings inside the Zone.

Plaintiffs' Eighth Amendment claims involve two city ordinances, Phoenix City Code Section 23-30(A) ("Camping Ban") and Phoenix City Code Section 23-48.01 ("Sleeping Ban") that criminalize camping and sleeping outside. In relevant part, the Camping Ban states, "[i]t shall be unlawful for any person to camp in any park or preserve, or in any building, facility, or parking lot or structure, or on any property adjacent thereto,

that is owned, possessed and controlled by the City." Phoenix City Code Section 23-30(A). According to the City, camping is defined as using:

> real property of the City for living accommodation purposes such as sleeping activities, or making preparations to sleep, including the laying down of bedding for the purpose of sleeping, or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities.

*Id.* § 23-30(B).

Likewise, the relevant portion of the Sleeping Ban states, "[i]t shall be unlawful for any person to use a public street, highway, alley, lane, parkway, sidewalk or other right-of-way, whether such right-of-way has been dedicated to the public in fee or by easement, for lying, sleeping or otherwise remaining in a sitting position thereon." Phoenix City Code Section 23-48.01. Defendants allegedly rely on these statutes to cite unsheltered individuals, move them into the Zone, and destroy their property, which according to Plaintiffs, "actively criminalize[s] homelessness." (Doc. 2 at 3.)

## DISCUSSION

### I. Legal Standard

When seeking a preliminary injunction, plaintiffs must establish that: (1) they are likely to succeed on the merits of their claims, (2) they will suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips supports a preliminary injunction, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit applies a "sliding scale" or "serious questions" approach to the *Winter* factors. Thus, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### II. *Winter* Factors

#### A. Likelihood of Success on the Merits

### 1. Eighth Amendment Claims

The Eighth Amendment prohibits the government from inflicting "cruel and unusual punishments," and places "substantive limits on what can be made criminal and punished as such." U.S. Const. amend. VIII; *Ingraham v. Wright*, 430 U.S. 651, 667 (1977) (cleaned up). The Ninth Circuit has interpreted these substantive limits in a way that suggests Plaintiffs are highly likely to succeed on the merits of their Eighth Amendment claims. In *Martin v. City of Boise*, the City of Boise, like the City of Phoenix, "[had] a significant and increasing homeless population" and lacked sufficient shelter space to accommodate a substantial portion of its unsheltered population. 920 F.3d 584, 604 (9th Cir. 2019). And, the *Martin* plaintiffs, like FFE's constituents, were unsheltered individuals who received citations under two Boise city ordinances. *Id.* at 606. The first, Boise City Code § 9-10-02, made it a misdemeanor to use "any of the streets, sidewalks, parks, or public places as a camping place at any time." *Cf.* Phoenix City Code Section 23-30(A) ("It shall be unlawful for any person to camp in any park or preserve, or in any building, facility, or parking lot or structure, or on any [City] property."). The ordinance defined "camping" as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence." *Id.*; *cf.* Phoenix City Code Section 23-30(B) (defining camping as using the City's real property "for living accommodation purposes such as sleeping activities, or making preparations to sleep, including the laying down of bedding for the purpose of sleeping, or storing personal belongings"). The second ordinance, Boise City Code § 6-01-05, banned "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof." *Cf.* Phoenix City Code Section 23-48.01 ("It shall be unlawful for any person to use a public street, highway, alley, lane, parkway, sidewalk or other right-of-way . . . for lying, sleeping or otherwise remaining in a sitting position thereon.").

In invalidating these ordinances, the *Martin* Court determined that various Supreme Court precedent stood for the principle "that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's

status or being." *Martin*, 920 F.3d at 616 (citing *Jones v. City of Los Angeles*, 444 F.3d 1118, 1134–35 (9th Cir. 2006), vacated, 505 F.3d 1006 (9th Cir. 2007)). Thus, it followed that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter" because no matter how "sitting, lying, and sleeping" were defined "they are universal and unavoidable consequences of being human." *Id.* at 616–17. "As a result, just as the state [could] not criminalize the state of being 'homeless in public places,'" it could not "criminalize conduct that is an unavoidable consequence of being homeless." *Id.* at 617. However, the court also noted that its holding was a limited one; it "in no way dictate[d] to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id.* Instead, it held "only that so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public." *Id.* (internal punctuation omitted).

Here, the City's ordinances are essentially identical to the ordinances at issue in *Martin*. Despite an unsheltered population exceeding 3,000 residents, Phoenix only has approximately 1,788 shelter beds available for those experiencing homelessness. (Doc. 2 at 3.) Thus, under *Martin*, any enforcement of the Camping and Sleeping Bans against individuals who practically cannot obtain shelter is inconsistent with the Eighth Amendment because such ordinances effectively criminalize conduct that is a consequence of being homeless.

However, *Martin* did not address who bore the burden of establishing whether violations of sleeping and camping bans were voluntary. But, in *Johnson v. City of Grants Pass*, 50 F.4th 787 (9th Cir. 2022), an analogous case, the Ninth Circuit recently noted that "*Martin* did not hold homeless persons bear the burden of demonstrating they are involuntarily homeless." *Id.* at 811 n. 31. Nevertheless, the majority expressly denied that it "shifted the burden to the City to establish the voluntariness of the behavior targeted by

the ordinances." *Id.* at 812 n. 32. In this case, however, where the ordinances provide a criminal sanction, the City has appropriately conceded that it bears the burden of confirming that shelter space is not practically available to an individual before charging that person with violating either of the above ordinances. (Doc. 18 at 11 ("Prior to any criminal enforcement, officers must investigate the individual's circumstances and determine if there is shelter space available.").) Additionally, it is not contested that there are more unsheltered individuals than shelter beds in Phoenix.

Under such circumstances, the City bears the burden of enforcing its ordinances against only those who can practically obtain shelter. Still, the City contends that its concession that officers must make individualized assessments before citing individuals under the ordinances precludes the need for a broad injunction. Nevertheless, the Camping and Sleeping Bans remain unchanged since *Martin.* As the City also concedes, both of the ordinances, while not facially unconstitutional, present likely unconstitutional applications especially when the unsheltered in the city outnumber the available bed spaces. Further, because the problematic ordinances remain unamended, the City's position is "a statement of administrative policy and so could be amended or reversed at any time by the [Phoenix] Chief of Police" or other officials. *Martin*, 920 F.3d at 607. Thus, it does not forestall the Plaintiffs' ultimate likelihood of success on the merits. An injunction will therefore issue barring the City from enforcing the Camping and Sleeping Bans against persons with no practical recourse to housing.[2]

### 2. Fourteenth Amendment Claims

Plaintiffs also demonstrate a likelihood of success on the merits of their Fourteenth Amendment claims regarding the City's activity outside the scope of the enhanced cleanup plan. The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property without due process of laws." U.S. Const. amend. XIV. "Application of this prohibition requires the familiar two-stage analysis: We must first ask

---

[2] The Court has considered the Brief in Opposition of Plaintiffs' Request for Preliminary Injunction by Amicus Freddy Brown (Doc. 33). Although the Court permitted the Clerk of Court to file the Brief, it did not affect the disposition of Plaintiffs' Motion for Preliminary Injunction.

whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'" *Ingraham*, 430 U.S. at 672.

In *Lavan v. City of Los Angeles*, the Ninth Circuit held that the Fourteenth Amendment protected the unabandoned property of unsheltered individuals. 693 F.3d 1022, 1031–32 (9th Cir. 2012). The Court upheld the district court's injunction, which prohibited the taking of any property in "Skid Row absent an objectively reasonable belief that it is abandoned, presents and immediate threat to public health or safety, or is evidence of a crime, or contraband," and required that after the taking of such property, the City maintain it in a secure location for at least 90 days. *Lavan*, 797 F. Supp. 2d at 1020. The Ninth Circuit declined to carve out an exception for unsheltered persons' unattended property or property left in public in violation of local ordinances. 693 F.3d at 1031–32. In this case, the City does not appear to challenge that unsheltered persons' possessions are "property" within the ambit of the Fourteenth Amendment. The City accepts that the unabandoned property of unsheltered individuals is subject to the Fourteenth Amendment due process requirements.[3] "As such, before the city can seize and destroy Plaintiffs' property, it must provide notice and an 'opportunity to be heard at a meaningful time and in a meaningful manner,' except in 'extraordinary situations where some valid governmental interest is at stake that justifies the postponing of the hearing until after the event.'" *Lavan*, 797 F. Supp. 2d at 1016–17.

To succeed on the merits then, Plaintiffs must demonstrate that: (1) the City seized their property; (2) the City did so absent basic procedural due process requirements such as notice and an opportunity to be heard; and (3) the taking was conducted pursuant to a government policy or custom that may be fairly said to represent the official policy of the City, *Monell v. Dep't of Social Servs. Of City of New York*, 436 U.S. 658, 695 (1978).

Plaintiffs state in their affidavits that on numerous occasions their property has been

---

[3] The City explained at the preliminary injunction hearing that it recognized *Lavan* requires notice and procedural safeguards against property loss.

taken and destroyed by City personnel, and they were provided no opportunity to retrieve it. More specifically, Plaintiffs state that they have had the following items taken and/or destroyed by Phoenix police: an Arizona ID card, a Visa card, tents, blankets and bedding, birth certificates, medications, and clothing. (Doc. 2-1 at 3-4, 7.) Most, if not all, of these incidents occurred outside the Zone. (Doc. 2-1 at 3, 7.) In response, at the preliminary injunction hearing, the City explained its practices related to unsheltered persons' property outside the Zone. In light of the Plaintiffs' testimony, the City's explanation of its practices shows that there is a likelihood that the City has taken Plaintiffs' property without notice and an opportunity to be heard, as required by the Fourteenth Amendment.

First, it is not clear that the City provides notice to individuals before seizing their property. At the preliminary injunction hearing, the City represented that when it receives a call regarding an unsheltered individual or their property, it is routed through the "CARES" process, which is an interdepartmental process that handles issues related to homelessness. Next, a member of the neighborhood outreach team is sent to assess the property and situation. If an individual is not present the team member leaves a flyer on the property, indicating that the team was called and attempting to connect the individual with the proper resources. Importantly, the flyer does not inform the individual that if they do not respond to the notice or fail to remove their property, it will be taken. Nevertheless, at an unspecified time, if the team does not hear from the individual, either police or other City personnel returns to the property's location, and if it is unattended, the property is seized. If the property provides some method of identifying the owner, the City uses that identification to attempt to find the owner. But otherwise, as a general rule, when the property is seized, it is not held but destroyed.

The City appears to allege that because this process involves attempts to reach the individual, it complies with the Fourteenth Amendment's notice requirements. Attempting to contact an individual about services available to them is not the same as informing the individual that if her property is left unattended, it will be seized and destroyed. The Fourteenth Amendment, at a bare minimum, requires the latter. In *Lavan*, the district court

indicated that notices of forthcoming cleanups that were posted on street signs "at a very high level with small print, obscured by foliage or taped over," were inadequate to provide notice that property would be taken if left unattended. 797 F. Supp. 2d at 1017. In this case, a notice that the CARES team was called and is attempting to connect the individual to services is similarly unlikely to constitute adequate notice that the person's property is likely to be seized or destroyed.

Additionally, even if the City's practices constituted adequate notice, it conceded that it does not provide individuals with an opportunity to be heard after their property is taken. The City acknowledged that outside the scope of the enhanced cleanup plan that it intends to execute in the Zone, unsheltered individuals are not afforded an opportunity to retrieve their seized property, and often, it is destroyed. Even a small window of time to retrieve one's property may be insufficient. *Lavan*, 797 F. Supp. 2d at 1017 (rejecting the notion that 72 hours to retrieve one's property at the dump is sufficient opportunity to be heard). Here, there is, apparently, no time at all; and even if there was, such a time period does not appear to be communicated to unsheltered persons before, during, or after the taking of their property.

The City relies on several cases addressing whether Plaintiffs are likely to succeed on the merits of similar claims in light of facially constitutional standard operating procedures. *See, e.g.*, *Shipp v. Shaaf*, 379 F. Supp. 3d 1033 (N.D. Cal. 2019); *Murray v. City of Philadelphia*, 481 F. Supp. 3d 461 (E.D. Pa. 2020). These cases are not applicable, however, where the City does not offer any consistent policy for how it determines whether an item is abandoned, and where, once the item is seized, it is destroyed without notice. To be clear, the Fourteenth Amendment violation is not the absence of a written policy. It is the existence of an unwritten practice that the City acknowledged does not afford unsheltered individuals notice as to when their property will be deemed abandoned and taken, nor an opportunity to retrieve those items before they are destroyed. Thus, in light of the Plaintiffs' declarations, and the City's failure to introduce evidence to the contrary, Plaintiffs can demonstrate a likelihood of success on the merits of their Fourteenth

Amendment claims.

The Court's analysis of Plaintiffs' past injuries does not account for the City's new enhanced cleanup plan or abandoned property procedure because these plans were developed to apply outside the scope of Plaintiffs' injuries. To the extent the City uses the new plans to argue that Plaintiffs' past injuries are unlikely, it is not disputed that the plans were not in place at the time of the alleged injuries and will not cover the City's conduct outside the Zone. Thus, the City cannot argue that the forthcoming plan rebuts or invalidates the Plaintiffs' past injuries outside of the Zone.

However, to the extent the Plaintiffs challenge the enhanced cleanup plan itself as the City intends to execute it in the Zone, they have not met their burden to demonstrate a likelihood of success on any claim that it is unconstitutional. At the preliminary injunction hearing, Plaintiffs raised various concerns with the enhanced cleanup plan, such as the length of the initial waiting period before beginning the cleanup, inadequate assistance to help unsheltered persons move their property, the tagging of property and leaving it for seven days to determine if it is abandoned, and the thirty-day window to retrieve property after it is deemed abandoned and removed. Plaintiffs conceded that they did not provide any authority to support a holding that 90 days is the constitutional standard for the holding of property or that 30 days is constitutionally insufficient. They also did not provide authority to suggest that seizing property after it has been tagged with a notice that it will be deemed abandoned in seven days is constitutionally insufficient under the Fourth or Fourteenth Amendment.

The policy presently applicable only in the Zone closely aligns with *Miralle v. City of Oakland* and *Sullivan v. City of Berkeley*. In those cases, the district courts found that plaintiffs did not have a likelihood of success on the merits when the cities intended to conduct cleanups and seize seemingly abandoned property pursuant to their written procedures. *Miralle*, No. 18-cv-06823, 2018 WL 6199929 (N.D. Cal. Nov. 28, 2018); *Sullivan*, No. C17-06051, 2017 WL 4922614 (N.D. Cal. Oct. 31, 2017). Those procedures included an initial 72 hours' notice that property would be seized and storage of the

property for between 14 to 90 days after it was seized. *Miralle*, 2018 WL 6199929, at *3; *Sullivan*, 2017 WL 4922614, at *6. In *Sullivan*, the Court recognized that these notice and waiting periods "approximately mirror[ed] the requirements imposed by [the *Lavan*] injunction." 2017 WL 4922614, at *6. Here, the same holds true. The seven-day waiting period adopted by the City exceeds that of *Sullivan* and *Miralle*, and the Plaintiffs provide no evidence relating to the insufficiency of a 30-day retrieval period as opposed to a 90-day retrieval period. Moreover, the Plaintiffs do not establish that the City intends to violate this plan for cleanups in the Zone. Thus, the Plaintiffs do not establish a likelihood of success or serious question on the merits for a challenge to the policy's constitutionality.

### 3. Fourth Amendment Claims

The Plaintiffs also establish a likelihood of success on the merits of their Fourth Amendment claims as to the City's activity outside the scope of the enhanced cleanup plan. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). However, a seizure is only unlawful if it is unreasonable. U.S. Const. amend. IV. To assess the reasonableness of a seizure, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 125. Additionally, it is clear that "the Fourth Amendment protects possessory and liberty interests even when privacy rights are not implicated." *Lavan*, 693 F.3d at 1028. In other words, "a reasonable expectation of privacy is not required to trigger Fourth Amendment protection against seizures." *Id.*

To prevail on their Fourth Amendment claims, Plaintiffs need to make a showing that: (1) the City seized their personal effects; (2) the seizure was unreasonable, that is, that the importance of the governmental interests alleged to justify the intrusion warranted the nature and quality of the intrusion on the individual's Fourth Amendment interests, *Lavan*, 797 F. Supp. 2d at 1013; and (3) the seizure was conducted pursuant to a government policy

or custom that may be fairly said to represent the official policy of the City, *Monell*, 436 U.S. at 695.

Plaintiffs have demonstrated a likelihood that their property was seized by Defendants. Unquestionably, when state actors seize unabandoned property from unsheltered individuals such as "legal papers, shelters, and personal effects, . . . [they] meaningfully interfere[] with [the owners'] interests in that property." *Lavan*, 693 F.3d at 1030. As noted above, the City does not contest that wholly separate from the enhanced cleanup plan currently only applicable in the Zone, it takes and destroys property, including survival items and personal documents. If the City alleges that it does so only when property is abandoned, it is not clear how, if at all, it makes the determination that property is abandoned. "Abandonment is determined by the intent of the owner and the 'inquiry should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property." *Lavan*, 797 F. Supp. 2d at 1013 (quoting *United States v. Nordling*, 804, F.2d 1466, 1469 (9th Cir. 1986)). Additionally, "the homeless often arrange their belongings in such a manner as to suggest ownership[;] . . . the property belonging to homeless persons is reasonably distinguishable from truly abandoned property." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559 (S.D. Fla. 1992). Therefore, without any explanation as to how the City makes such a determination, the Court cannot say it has a practice of only seizing abandoned property.

Because the City likely engages in seizures of unsheltered persons' unabandoned property, "[n]o more is necessary to trigger the Fourth Amendment's reasonableness requirement." *Lavan*, 693 F.3d at 1030. To determine reasonableness, the Court balances the "invasion of Plaintiff's possessory interests in their personal belongings with the City's reasons for taking the property." *Lavan*, 797 F. Supp. 2d at 1015. The City offers justifications such as addressing nuisances, public safety, and health hazards for taking unsheltered persons' property. (Doc. 18 at 14.) The City certainly has the power and responsibility to conduct activities to protect public health and safety. But here the invasion of the Plaintiffs' possessory interests outweighs the City's asserted justification. There is

no indication that the City only seizes items deemed to be health or public safety hazards, which would align with their purported justifications. To the contrary, Plaintiffs assert that they had primarily survival-related items taken, such as clothing, tents, medications, and identification documents. (Doc. 2-1 at 3-7.)

Additionally, even if the seizure of some unsheltered individuals' property is initially lawful under the Fourth Amendment, "an otherwise lawful seizure 'at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition against unreasonable seizures.'" *Lavan*, 797 F. Supp. 2d at 1016 (quoting *Jacobsen*, 466 U.S. at 124). In this case, even if public health or safety justified the initial taking of some or all of the unsheltered individuals' items, that seizure becomes unlawful when the City "forever depriv[es] an owner of his or her interests in possessing the property without recourse." *Id.* Thus, even if it is reasonable to take some or all property that poses a health or safety risk, it is unreasonable to indiscriminately destroy the property that does not constitute such a hazard without justification. *Lavan*, 693 F.3d at 1030 ("[E]ven if the seizure of the property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable."); *see also San Jose Charter of Hells Angels Motorcycle Club v. San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) ("The destruction of property by state officials poses as much of a threat, if not more, to people's right to be secure in their effects as does the physical taking of them."). As such, Plaintiffs have demonstrated that they are likely to succeed on the merits of their Fourth Amendment claims.

### B. Likelihood of Irreparable Harm

#### 1. Eighth Amendment Claims

Next, the Court must examine whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "Violations of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Monterey Mech.*

*Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm."). Still, the Plaintiffs must demonstrate that this irreparable harm is "likely" to occur.

Here, the parties have presented four pieces of evidence demonstrating that it is. First, the City issues citations under the Camping and Sleeping Bans, even if enforcement in the Zone has declined in recent years. (Doc. 18 at 2.) Second, the ordinances remain unchanged after *Martin*. Third, the City does not have enough beds to accommodate its unsheltered residents. Fourth, Plaintiffs are chronically unsheltered individuals and an organization that advocates on behalf of unsheltered individuals.

When taken together, these facts suggest that as long as the City enforces the Camping and Sleeping Bans when the unsheltered outnumber available beds without inquiring as to whether individuals can practically obtain shelter, unconstitutional applications are likely. As mentioned above, there is not enough shelter space for every unsheltered person to choose whether to sleep or camp outside. Thus, any enforcement of the Camping and Sleeping Bans against individuals who practically cannot obtain shelter effectively criminalizes homelessness. And where, as is the case here, "Defendants operate[] under the impression that they have authority to detain individuals solely because of their [] status . . . it [is] reasonable for [a] district court to conclude that the Plaintiffs face[] a real possibility that they would again be stopped or detained and subjected to unlawful [action] on the basis of their unlawful presence alone." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Accordingly, like the plaintiffs in *Melendres*, Plaintiffs in this case have sufficiently shown that they "face[] irreparable harm in the form of a deprivation of constitutional rights absent a preliminary injunction." *Id.* "Plaintiffs have shown the likelihood of proving past constitutional violations and there is a potential for continuing violations," in the absence of a requirement that the City be enjoined from enforcing its ordinance against any persons except those that it can demonstrate are practically able to obtain housing. *Lavan*, 797 F. Supp. 2d at 1019.

### 2. Fourth and Fourteenth Amendment Claims

Plaintiffs also establish a likelihood of irreparable harm on their Fourth and Fourteenth Amendment claims with respect to the City's activities outside the scope of the enhanced cleanup plan. As noted above, "an alleged constitutional infringement will often alone constitute irreparable harm. *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991).

Here, the enhanced cleanup plan, which Plaintiffs cannot demonstrate is unconstitutional, only applies in the Zone at scheduled cleanup times. Because Plaintiffs demonstrate a likelihood that their property has been taken outside of the Zone, they establish an alleged constitutional infringement. Further, Plaintiffs have shown that "there is a potential for continuing violations" because although the City focuses its efforts on providing the constitutionally required protections to unsheltered persons' property within the Zone during official cleanups, it does not provide any indication that it seeks to provide those very same protections outside of the cleanups in the Zone. *Lavan*, 797 F. Supp. 2d at 1019 ("Plaintiffs have shown the likelihood of proving past constitutional violations and there is a potential for continuing violations."). Therefore, if Plaintiffs are unsheltered outside of the Zone, they remain subject to the City's practice of taking property without notice and destroying the property without allowing adequate time for the Plaintiffs to retrieve it.

Lastly, the City's argument that this harm is not irreparable because it can be recompensed in economic damages ignores the reality of the Plaintiffs' situations in this case. While it may often be the case that taking a tent, an article of clothing, or bedding, constitutes a chiefly economic injury, in this case, when the City takes those items, it may be taking everything the person owns. Additionally, the Plaintiffs have offered evidence that the Defendants failed to rebut, that the City takes items that are not so easily recovered in economic damages such as medications, birth certificates, personal mementos, and other identification documents necessary to obtaining employment and shelter. Thus, the harm that Plaintiffs face is irreparable.

### C. Balance of the Equities

The balance of hardship also tips in Plaintiffs' favor on their Eighth Amendment Claims. Without a preliminary injunction, Plaintiffs face a continued threat of citation under the Camping and Sleeping Bans. Legally, this threat is a hardship because enforcement of the ordinances against individuals that cannot practically obtain shelter violates their Eighth Amendment rights. Practically speaking, this threat is also a hardship because it creates a sense of fear and instability among the City's most vulnerable residents through no fault of their own.

Admittedly, issuing an injunction will also impose hardships on the Defendants if they wish to continue easily enforcing the ordinances. The injunction requires the City to determine whether individuals are voluntarily homeless before citing them under the Camping and Sleeping Bans. Such assessments will be fact-specific and could prove inherently difficult to administer; they might also require the City to increase its coordination with shelters or allocate more resources to addressing homelessness. However, Defendants concede that they are constitutionally obligated to shoulder such hardships. (Doc. 18 at 11 ("Prior to any criminal enforcement, officers must investigate the individual's circumstances and determine if there is shelter space available.").) Thus there are no real equities to balance. If the City wishes to enforce its ordinances, it must comply with the Constitution in doing so.

The balance of the equities also tips toward the Plaintiffs on their property-related claims as to the City's activities outside the scope of the enhanced cleanup plan. In the absence of an injunction, Plaintiffs face a likelihood that any or all of their belongings could be seized or destroyed pursuant to the City's practices. The City, on the other hand, is minimally harmed by an injunction. Importantly, it retains authority to engage in the actions it has a legitimate interest in. Namely, it "will still be able to lawfully seize and detain property, as well as remove hazardous debris and other trash." *Lavan*, 797 F. Supp. 2d at 1019. The City will only be prevented from engaging in actions it has no legitimate interest in, that is, "*unlawfully* seizing and destroying personal property that is not

abandoned without providing any meaningful notice and opportunity to be heard." *Id.* Additionally, to whatever extent a requirement to provide notice and maintain seized property for 30 days can be seen as a hardship to the City, it has demonstrated the willingness and ability to establish such a protocol within the Zone. (Doc. 18-1 at 6.) The potential administrative burden on the City associated with expanding those protections outside the Zone does not outweigh the Plaintiffs' interests in ensuring their unabandoned property is not indiscriminately destroyed, whatever city block it may be found on.

### D. Public Interest

Finally, the Plaintiffs have shown that a preliminary injunction is in the public interest with respect to their Eighth Amendment claims. Although the public's interest in enforcing the Camping and Sleeping Bans is legitimate, this interest is not sufficient to overcome the fact that the Constitution protects unsheltered individuals from statutes that "effectively punish them for something for which they may not be convicted under the [E]ighth [A]mendment—sleeping, eating and other innocent conduct." *Martin*, 920 F.3d at 617. Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights," especially where a party is among "those most in need of [constitutional] protections." *Melendres*, 695 F.3d at 1002; *Cobine v. City of Eureka (Cobine II)*, No. C 16-02239 JSW, 2016 WL 1730084, at *7 (N.D. Cal. May 2, 2016).

Further, entering a narrow injunction preventing unlawful seizures and destruction of property is also in the public interest. The injunction does not prevent the City from moving forward with its facially constitutional enhanced cleanups of the Zone or lawfully engaging in its regular public health and safety activities. Therefore, the public is not harmed by an injunction requiring basic constitutional protections for unsheltered persons' property.

## CONCLUSION

Accordingly, all four *Winter* factors tilt in Plaintiffs' favor on their claims, except the likelihood of success on their challenge to the constitutionality of the City's enhanced cleanup plan within the Zone. Thus,

**IT IS THEREFORE ORDERED** that the Motion for Preliminary Injunction (Doc. 2) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that the City, its agents and employees, are preliminarily enjoined from doing any of the following:

1. Enforcing the Camping and Sleeping Bans against individuals who practically cannot obtain shelter as long as there are more unsheltered individuals in Phoenix than there are shelter beds available;
2. Seizing any property of the unsheltered without providing prior notice at the property's location that the property will be seized, unless the agent or employee has an objectively reasonable belief that it is (a) abandoned, (b) presents an immediate threat to public health or safety, or (c) is evidence of a crime or contraband; and
3. Absent an immediate threat to public health or safety, destroying said property without maintaining it in a secure location for a period of less than 30 days.

**IT IS FURTHER ORDERED** that if property is seized pursuant to a belief that it was abandoned or after the City provides notice that it intends to seize the property, the City, its agents and employees, are further required to provide a notice at the location from which the property was seized, calculated to be readily seen by any owner of the property, describing how and where to retrieve the property and the deadline for retrieving it.

Dated this 16th day of December, 2022.

_____
G. Murray Snow
Chief United States District Judge