**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF ARIZONA**
Benjamin L. Rundall, State Bar No. 031661
Jared G. Keenan, State Bar No. 027068
Christine K. Wee, State Bar No. 028535
3707 N. 7th St., Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
brundall@acluaz.org
jkeenan@acluaz.org
cwee@acluaz.org

**SNELL & WILMER** L.L.P.
Edward J. Hermes, State Bar No. 030529
Delilah R. Cassidy, State Bar No. 037407
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: (602) 382-6000
ehermes@swlaw.com
dcassidy@swlaw.com

*Attorneys for Plaintiffs*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
Leah Watson, pending *pro hac vice*
Scout Katovich, admitted *pro hac vice*
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
lwatson@aclu.org
skatovich@aclu.org

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Fund for Empowerment, a nonprofit corporation, in its individual capacity; Faith Kearns, individually; Frank Urban, individually; and Ronnie Massingille, individually, | No. CV-22-02041-PHX-GMS |
| | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELEIF** |
| Plaintiffs, | **CIVIL RIGHTS ACTION (42 U.S.C. § 1983)** |
| vs. | **(JURY TRIAL DEMANDED)** |
| City of Phoenix, a political subdivision of the state of Arizona; Chief Jeri Williams, in her official capacity; Interim Chief Michael Sullivan, in his official capacity; Entities I–X, political subdivisions of the state of Arizona; and John and Jane Does 1–75, in their individual capacities, | |
| Defendants. | |

Plaintiffs, through counsel undersigned, for their Complaint against Defendants, allege as follows:

4860-6678-8680

## **INTRODUCTION**

1.      Since 2010, the number of people experiencing homelessness in the City of Phoenix (the "City" or "Phoenix") has more than doubled.[1]

2.      Meanwhile sustainable solutions, including affordable housing, have lagged far behind. For example, as of the filing of this Complaint, the City has spent less than 10% of the $99.5 million it received from the federal government through the American Rescue Plan Act in order to address homelessness and affordable housing.[2]

3.      Despite allocating $16 million for temporary shelter, heat relief, and additional services for unsheltered individuals in Maricopa County (the "County"), the City has spent less than five percent of these funds to date.[3] Meanwhile, temperatures during the summer averaged 106°F, contributing to the deaths of over one hundred unsheltered individuals.

4.      Notwithstanding the fact that shelters are only a temporary solution to homelessness, the City's efforts to supply temporary shelter fall far short of the need. According to the January 2022 Point-in-Time count, which considerably undercounts the unsheltered population, 2,942 people in Phoenix were temporarily housed in an emergency shelter or transitional housing while 3,096 people in Phoenix remained completely unsheltered.[4]

---

[1]   *Compare* MARICOPA ASS'N OF GOV'TS, 2010 HOMELESS STREET COUNT, https://www.azmag.gov/Portals/0/Documents/MagContent/2010%20Point%20in%20Time%20Count%20for%20AZ-502%20(Municipal%20Street%20Count).pdf?ver=2017-07-07-134153-897 *with* MARICOPA ASS'N OF GOV'TS, 2022 POINT-IN-TIME (PIT) COUNT REPORT 1, https://www.azmag.gov/Portals/0/Documents/MagContent/2022-PIT-Count-Report-Final.pdf?ver=mHByGa3hHNtmeOOfMZxctA%3d%3d.

[2]   *See* Erica Stapleton, Katie Wilcox & John Tanet, *"Building housing isn't a quick process": Phoenix weighs in on millions in COVID relief money for homelessness that hasn't been spent*, 12 NEWS, https://www.12news.com/article/news/local/arizona/the-cost-of-crisis-phoenix-struggles-with-a-homelessness-crisis-after-covid/75-bd422dcb-4663-4b98-8f71-11aea9e76bda (last updated Sept. 1, 2022, 6:17 PM).

[3]   *American Rescue Plan Act—Affordable Housing & Homelessness*, CITY OF PHX., https://stories.opengov.com/phoenixaz/published/CcabFkLY8 (last visited Nov. 24, 2022).

[4] *See* 2022 POINT-IN-TIME (PIT) COUNT REPORT, *supra* note 1, at 4–5.

4860-6678-8680

5.      Since 2020, the unsheltered subset of the homeless population[5] in the County, which includes Phoenix, grew by 34%. This means that the total number of unsheltered people in the County surpasses the number of this population in shelters (5,029 to 3,997).[6]

6.      Black, Indigenous, and other people of color ("BIPOC" people) are disproportionately affected by this crisis. In the County, Black people "experience homelessness at a rate 3.9 times greater than their share of the general population." The Indigenous proportion of the homeless population in the County "is more than twice its share of the general population."[7]

7.      Many unsheltered persons congregate on the west side of downtown Phoenix in an area known as the "Zone." The Zone is near the Human Services Campus which has provided wrap-around human services to help those in crisis achieve stability since 2005.[8]

8.      The City has responded to this growing epidemic of homelessness by directing the City of Phoenix Police Department ("PPD") to wage a campaign of raids called "clean sweeps" to target those experiencing homelessness.[9]

9.      These raids by PPD criminalize, punish, and scatter this population based on their status as unsheltered despite the City's knowledge that these individuals have nowhere else to go given the dearth of affordable housing and emergency shelter space.[10]

---

[5] The condition of being unsheltered denotes the lack of physical shelter, while 'homeless' refers to the lack of permanent housing experienced by people living in cars, temporary shelters, or with friends.

[6] *See* 2022 POINT-IN-TIME (PIT) COUNT REPORT, *supra* note 1, at 1, 4–5.

[7] JEFF OLIVET & DONALD WHITEHEAD, RACIAL EQUITY PARTNERS , RACE AND HOMELESSNESS IN MARICOPA COUNTY, ARIZONA: EXAMINING THE INTERSECTIONS 2, 7 (2021), https://azmag.gov/Portals/0/Documents/MagContent/DRAFT-Maricopa-Racial-Equity-Report.pdf?ver=2021-02-04-154206-543.

[8] *See* Melissa Blasius, *How Phoenix decides what's trash vs. property during controversial homeless camp sweeps*, ABC15, https://www.abc15.com/news/local-news/investigations/how-phoenix-decides-whats-trash-vs-property-during-controversial-homeless-camp-sweeps (last updated Mar. 6, 2022, 9:51 AM); *About*, HUMAN SERVICES CAMPUS, https://hsc-az.org/about/ (last visited November 28, 2022).

[9] Blasius, supra note 8.

[10] *See* Madeline Ackley, *Phoenix still criminalizes homelessness, despite court ruling, protesters say* (Jan. 9, 2020, 9:13 AM), https://www.azmirror.com/2020/01/09/phoenix-still-criminalizes-homelessness-despite-court-ruling-protesters-say/.

10.     But the City does not stop at criminalizing residents based on their unsheltered status. PPD officers performing raids also indiscriminately seize, impound, and destroy unsheltered individuals' personal property and survival gear without cause or a warrant.

11.     During these raids, unsheltered individuals (including Plaintiffs Faith Kearns, Frank Urban, and Ronnie Massingille) have lost clothing, survival equipment, medication, items of sentimental value (like photographs of loved ones), and, perhaps most inexplicably, vital records and identifying documents—like birth certificates and reference letters—which are crucial to procuring jobs, benefits, and housing. These documents can be almost impossible for someone with no fixed address to replace.[11]

12.     In sum, rather than confront its housing crisis head-on and invest in sustainable solutions to homelessness, the City is terrorizing the very people it should be helping. The City is knowingly penalizing unsheltered residents for engaging in unavoidable human activities like sleeping and sheltering from the elements. Additionally, it is unlawfully seizing and destroying their personal property in an attempt to push the unsheltered out of the City all to avoid implementing alternative solutions which could provide relief to unsheltered individuals.[12]

## JURISDICTION & VENUE

13.     Plaintiffs bring this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties

---

[11] *See* Bailey Miller, *'It is simply inhumane': Phoenix homeless advocates criticize city sweeps of encampments*, FOX 10 PHX. (Dec. 29, 2021), https://www.fox10phoenix.com/news/it-is-simply-inhumane-phoenix-homeless-advocates-criticize-city-sweeps-of-encampments.

[12] To be clear, Plaintiffs do not expect nor request this Court to resolve the housing crisis or rewrite legislation; Plaintiffs are simply invoking protections they are guaranteed under the United States Constitution.

4860-6678-8680

of the United States, and under 28 U.S.C. § 1343(a), which gives district courts jurisdiction over actions to secure civil rights extended by the United States Government.

15.     Declaratory relief is authorized by 28 U.S.C. §§ 2201-02.

16.     The events that gave rise to the Complaint occurred in Maricopa County, Arizona in the District of Arizona. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b).

**PARTIES**

17.     Plaintiff Fund for Empowerment ("FFE") is an incorporated nonprofit charity operating in the County that commonly expends time, energy, effort, and resources on behalf of the unsheltered population. FFE's mission is to build community resources for the unsheltered population via direct services, capacity-building training, and project support. FFE helps protect and advocate for the dignity, rights, and choices of Arizonans experiencing homelessness or housing insecurity. FFE commits its efforts toward goals affirmed and raised by unsheltered individuals. FFE emphasizes the voices of the unsheltered to expose root causes of homelessness and to create ways of living in which everyone has a safe place they can call home.

18.     Plaintiffs Faith Kearns and Frank Urban are members of FFE and graduates of FFE's Houseless Leadership Project, which empowers unsheltered individuals with coping mechanisms and resources to achieve stability for themselves and others who are experiencing housing insecurity.

19.     Plaintiff Faith Kearns ("Ms. Kearns") is a chronically unsheltered individual who resides in Maricopa County, Arizona. Ms. Kearns has directly experienced the raids performed by the City and PPD which have resulted in the destruction of her personal property.

20.     Plaintiff Frank Urban ("Mr. Urban") has been chronically unsheltered off and on since 2000 in Maricopa County, Arizona. Mr. Urban has received criminal citations from PPD for trespassing, obstructing a thoroughfare, and simply standing on the sidewalk in

connection to his unsheltered status. Mr. Urban has directly experienced the raids performed by the City and PPD which have resulted in the destruction of his personal property.

21.     Plaintiff Ronnie Massingille ("Mr. Massingille") is currently unsheltered and lives in Phoenix, Arizona. Mr. Massingille has received criminal citations from PPD and has directly experienced the raids performed by the City and PPD which have resulted in the destruction of his personal property.

22.     Defendant City of Phoenix is a political subdivision of the state of Arizona that acts through its employees, agents, and independent contractors. PPD is a department or division of the City that acts with the City's authority.

23.     At the time of the incidents described in Plaintiffs' Complaint, Defendant Jeri Williams ("Defendant Williams") resided and worked in the County.

24.     At all times material hereto, Defendant Williams was the acting Chief of Police for the PPD with ultimate authority to control, and responsibility for, the actions of PPD officers and agents. Defendant Williams also had the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the PPD. Defendant Williams is named herein in her official capacity.

25.     Defendant Michael Sullivan ("Defendant Sullivan") resides or works in Maricopa County, Arizona.

26.     At all times material hereto, Defendant Sullivan is the Interim Chief of Police for the PPD with ultimate authority to control, and responsibility for, the actions of its officers and agents. Defendant Sullivan also has the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the PPD. Defendant Sullivan is named herein in his official capacity.

27.     Entities "I-X" and "Jane and John Does" are fictitious entities and unknown persons who are properly included as parties to this lawsuit to assert or defend the claims asserted herein but whose true identities are unknown. Plaintiffs will seek to amend this Complaint when and if the true identities of such people or entities become known.

## GENERAL FACTUAL ALLEGATIONS

### Background

28.    The number of residents experiencing homelessness in Phoenix has nearly doubled since 2010 according to Point-in-Time ("PIT") counts commissioned by the Maricopa Association of Governments ("MAG").[13]

29.    This increase directly relates to the City's lack of affordable housing for residents that has only been exacerbated by the COVID-19 pandemic.[14]

30.    Without an adequate supply of affordable housing, people can become unsheltered after disruptions in household income caused by job loss, medical bankruptcy, mental illness, divorce, or domestic violence.

31.    In 2010, about 1,750 unsheltered individuals were reported as experiencing homelessness in the PIT by MAG.[15]

32.    In 2020, the number of unsheltered individuals experiencing homelessness in the City increased to 2,380, according to the PIT.[16]

33.    In 2022, that number has further increased to 3,096.[17]

34.    Problematically, despite an unsheltered population exceeding 3,000 individuals, the City only has approximately 1,788 shelter beds available for those who are experiencing homelessness.[18]

---

[13] A PIT count is "an annual street and shelter count to determine the number of people experiencing homelessness in Maricopa County during a given point in time." *See Point-In-Time Homeless Count*, MARICOPA ASS'N OF GOV'TS, https://azmag.gov/Programs/Homelessness/Data/Point-In-Time-Homeless-Count (last accessed Nov. 28, 2022); 2010 HOMELESS STREET COUNT, *supra* note 1; 2022 POINT-IN-TIME (PIT) COUNT REPORT, *supra* note 1, at 1.

[14] Median home prices in Phoenix metro area grew by over 200% during the past decade, while the median income has grown only 16%. The average monthly rent in Phoenix also climbed 60% in the last decade.

[15] *See* 2010 HOMELESS STREET COUNT, *supra* note 1.

[16] *See* MARICOPA ASS'N OF GOV'TS, 2020 POINT-IN-TIME (PIT) COUNT REPORT 4, https://azmag.gov/Portals/0/Documents/MagContent/PIT-Count-Report-2020.pdf?ver=AiZpbG6pLfFUL6eOkvmc9A%3d%3d.

[17] *See* 2022 POINT-IN-TIME (PIT) COUNT REPORT, *supra* note 1, at 4.

[18] *See* *Strategies to Address Homelessness*, CITY OF PHX. (Feb. 3, 2021), https://www.phoenix.gov/humanservices/homelesshelp#:~:text=Currently%2C%20there%20are%20approximately%201%2C800,in%20the%20city%20of%20Phoenix.

35.     Although the Phoenix City Council approved rezoning to allow an additional 275 beds at Arizona's largest shelter, Central Arizona Shelter Services in the Human Services Campus, the increase remains inadequate to shelter the unsheltered population in Phoenix.

36.     Moreover, while emergency shelters can temporarily accommodate some people experiencing homelessness, they are not an adequate response to Phoenix's rapid increase in unsheltered residents. Research shows that the most effective way to end chronic homelessness is to provide permanent supportive housing on a housing-first basis.[19]

37.     Despite those experiencing homelessness in Phoenix having nowhere else to go, for years the City has engaged in "clean sweeps" which target the unsheltered population.

### The City's Raids

38.     For at least the past two years, the City has engaged in raids it calls "clean sweeps" of areas occupied by unsheltered individuals and those experiencing homelessness.

39.     During these raids, unsheltered individuals (including Plaintiffs and those served by FFE) are roused from sleep by PPD officers in the early morning hours and told to pack up their blankets, tents, and all their personal belongings.

40.     Some of these raids occur as early as 3:00 AM.

41.     The City directs the PPD and "clean-up" crews to remove property.

42.     Unsheltered individuals (including Plaintiffs and those served by FFE) typically have just minutes to gather their personal possessions and belongings before the raid begins.

43.     Because mere minutes are not enough time to gather and relocate possessions (particularly for people with disabilities), the inevitable result of the City's raids is that people permanently lose any property they cannot immediately carry away with them.

---

[19] *See, e.g.*, *Homelessness Resources: Housing and Shelter*, SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., https://www.samhsa.gov/homelessness-programs-resources/hpr-resources/housing-shelter (last accessed Nov. 28, 2022).

44.    Once individuals move from the location where they were sleeping, the PPD and "clean-up" crews indiscriminately remove and destroy any remaining items.

45.    Removal is performed with rakes, garbage bags, loaders, and sometimes a disposal truck.

46.    These raids commonly result in the loss and destruction of personal property owned by those experiencing homelessness.

47.    Individuals (including Plaintiffs and those served by FFE) also frequently experience destruction of items difficult to replace such as personal IDs, photographs of family members and loved ones, and in one case, even a set of teeth.[20]

48.    Plaintiffs were never provided notification of when these raids would occur.

49.    Upon information and belief, the purpose of these raids is to discourage individuals experiencing homelessness from sleeping in the City and to push them to other surrounding municipalities surrounding Phoenix in the County.

50.    Upon information and belief, the City has used these raids to address the rise in those experiencing homelessness to divert criticism for failing to adequately provide both emergency and permanent housing.

51.    It is expected these raids will begin to intensify in a homeless encampment near 12th Avenue and Madison Street nicknamed "the Zone." This is because of a lawsuit filed against the City in Arizona State Court. *See Brown v. City of Phoenix*, CV2022-010439 (2022) (the "Brown Lawsuit"). This case was brought by individuals with property in or around the Zone and alleges Defendants have allowed for the creation of a public nuisance.

**The City's Weaponization of Statutes and Ordinances to Criminalize Homelessness**

52.    During the City's raids, police often issue mass criminal citations under the Arizona Revised Statutes and City Ordinances.

53.    The City has cited individuals for violation of Arizona Revised Statute § 13-2906 (the "Jaywalking Law"), Phoenix City Code § 23-30 (the "Camping Ban"), and Phoenix City Code § 23-48.01 (the "Sleeping Ban").

---

[20] *See* Blasius, *supra* note 8.

54.     The Jaywalking Law prohibits a person from "obstructing a highway or other public thoroughfare if the person…[h]aving no legal privilege to do so, recklessly interferes with the passage of any highway or public thoroughfare by creating an unreasonable inconvenience or hazard." Ariz. Rev. Stat. § 13-2906(1).

55.     The Jaywalking Law is cited indiscriminately by the City against unsheltered individuals during raids to discourage basic activities such as sleeping and walking.

56.     The Camping Ban provides: "It shall be unlawful for any person to camp in any park or preserve, or in any building, facility, or parking lot or structure, or on any property adjacent thereto, that is owned, possessed and controlled by the City…." Phx., Ariz., CITY CODE § 23-30(A).

57.     According to the City, camping means "to use real property of the City for living accommodation purposes such as sleeping activities, or making preparations to sleep, including the laying down of bedding for the purpose of sleeping, or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities." Phx., Ariz., CITY CODE § 23-30(B).

58.     As indicated in the City's definition of the term "camp," the Camping Ban punishes and criminalizes the act of sleeping by unsheltered individuals within the City.

59.     The Camping Ban is commonly cited by the City against unsheltered individuals during raids to discourage basic human activities such as sleeping.

60.     The Sleeping Ban provides: "It shall be unlawful for any person to use a public street, highway, alley, lane, parkway, sidewalk or other right-of-way, whether such right-of-way has been dedicated to the public in fee or by easement, for lying, sleeping or otherwise remaining in a sitting position thereon, except in the case of a physical emergency or the administration of medical assistance." Phx., Ariz., CITY CODE § 23-48.01.

61.     The Sleeping Ban is broad and prohibits sleeping on areas of City property otherwise unused by pedestrians.

62.    The Sleeping Ban is commonly cited by the City against unsheltered individuals during raids to discourage universal and unavoidable human activities such as sleeping.

63.    The use of these statutes and ordinances by the City are intended to criminalize homelessness.

64.    Despite neighboring municipalities amending their policies and halting enforcement of similar ordinances, the City has continued to enforce its unconstitutional ordinances even when housing and temporary shelter are not practically available to its homeless residents.

65.    The city of Tempe, for example, admitted enforcement of its camping ban would be unconstitutional.

66.    The city of Glendale amended its ordinance to prevent imposing criminal sanctions on camping "when no alternative shelter is available." Glendale, Ariz., CITY CODE § 25-90.

67.    Meanwhile, Phoenix has continued to enforce its Camping Ban and refused to amend its Camping Ban or Sleeping Ban.

68.    Upon information and belief, the City cites individuals with violations of these (and other) statutes/codes to discourage individuals experiencing homelessness from sleeping in the City and to push them to other surrounding municipalities in the County.

69.    Upon information and belief, the City uses these statutes and ordinances in place of finding humane solutions for those experiencing homelessness within the City.

**Plaintiff Faith Kearns' Experience**

70.    Ms. Kearns was born and raised in Arizona and attended Washington High School in the city of Glendale.

71.    Due to various medical issues and the costs associated with medical care, she has been chronically unsheltered since approximately 2008.

72.    When she is unsheltered, Ms. Kearns sleeps on Phoenix public streets.

73.    Ms. Kearns has also slept in or around the Zone.

4860-6678-8680

74.     While sleeping within the City as an unsheltered individual, Ms. Kearns has experienced the raids firsthand.

75.     Ms. Kearns describes these sweeps as "raids" because they happened suddenly and without warning in the early morning hours.

76.     Ms. Kearns remembers the raids sometimes happening three to five days per week.

77.     Ms. Kearns remembers the raids increasing during and around holidays.

78.     Ms. Kearns was never provided with a search warrant.

79.     During these raids, Ms. Kearns has had personal possessions and belongings destroyed.

80.     The following was taken from Ms. Kearns by the PPD and City workers during the raids: an Arizona ID card, a Visa Card on which her social security disability income was loaded, tent, blankets, bedding, birth certificate, medications, and clothing.

81.     Ms. Kearns remembers being forced to watch the PDD destroy her items.

82.     Ms. Kearns also remembers receiving citations from the City under the Jaywalking Law, Camping Ban, and Sleeping Ban.

83.     Ms. Kearns has received other citations related to her unsheltered status such as a citation for trespassing.

84.     Ms. Kearns believes the City's raids are designed to push her out of the City.

85.     Ms. Kearns believes the City's use of citations is to criminalize her status as an unsheltered individual.

**Plaintiff Frank Urban's Experience**

86.     Mr. Urban is a resident of Maricopa County and currently resides in Phoenix.

87.     Due to various medical issues, Mr. Urban became chronically unsheltered off and on starting in 2000.

88.     During the time periods when Mr. Urban has been unsheltered, he has slept outside in various parts of the City.

89.     During these times, Mr. Urban has directly experienced the City's raids.

4860-6678-8680

1     90.     Mr. Urban was never provided with a search warrant.

2     91.     During these raids, Mr. Urban has had his possessions thrown away numerous

3 times.

4     92.     In fact, his possessions have been thrown away so many times, it is difficult

5 for him to remember dates for each incident as they all "blend together."

6     93.     Nevertheless, Mr. Urban remembers the following being taken from him and

7 destroyed: an Arizona ID card, tent, blankets, bedding, medications, clothing, food, and

8 water.

9     94.     Mr. Urban remembers raids intensifying around Thanksgiving and Christmas.

10     95.     Mr. Urban also remembers receiving citations from the City under the

11 Jaywalking Law, Camping Ban, and Sleeping Ban.

12     96.     Mr. Urban has received other citations from the City in connection to his

13 status as unsheltered.

14     97.     Mr. Urban believes the City's raids are designed to push him out of the City.

15     98.     Mr. Urban believes the City's use of citations is to criminalize his status as an

16 unsheltered individual.

17                    **Plaintiff Ronnie Massingille's Experience**

18     99.     Mr. Massingille is a resident of Maricopa County and currently resides in

19 Phoenix.

20     100.    Mr. Massingille is currently unsheltered.

21     101.    Mr. Massingille commonly sleeps outside in various parts of the City,

22 including the Zone.

23     102.    While sleeping and encamped, Mr. Massingille has directly experienced the

24 City's raids and the actions of PPD.

25     103.    Mr. Massingille's possessions were seized and thrown away numerous times

26 during raids.

27     104.    He was never provided with a search warrant.

28     105.    Mr. Massingille remembers some of these raids occurring in the Zone.

106.   During and as a result of these raids, Mr. Massingille recalls losing his Arizona identification card, birth certificate, tent, a suitcase, clothes/shoes, skateboards, and medication.

107.   Mr. Massingille has been cited by the City in connection to his unsheltered status.

108.   Mr. Massingille believes the City's raids were designed to push him out of the City.

109.   Mr. Massingille believes the City uses citations to criminalize his status as an unsheltered individual.

110.   As an unsheltered individual in the City, Mr. Massingille lives with a constant fear PPD will arrest him, criminally cite him for sleeping outside, or destroy his property.

**The Fund for Empowerment's Work on Behalf of the Unsheltered Community**

111.   Since 2018, the Fund for Empowerment has spent monetary resources in support of its mission to help provide education, training, and leadership courses to the unsheltered community to combat policies and practices by the City which target them.

112.   FFE commonly works within the City, including the Zone.

113.   FFE's membership includes those who are unsheltered.

114.   FFE commonly creates and prints written materials for dissemination to the unsheltered community which include information about their rights under the United States Constitution.

115.   FFE provides training to the unsheltered community about their rights in response to the raids conducted by the City.

116.   FFE provides training to the unsheltered community about their right to sleep outside in connection to the City's use of ordinances to criminalize sleeping.

117.   FFE would not have to expend these resources on behalf of its members if the City stopped conducting raids and using laws and ordinances to criminalize homelessness.

118.   If FFE did not have to expend resources helping unsheltered individuals understand their rights in response to Defendants raids and criminal citations, FFE could

spend resources training unsheltered individuals to become their own advocates in requesting resources from the City for housing and shelter.

119.   If FFE did not have to expend resources helping unsheltered individuals, FFE could also distribute more water and food to the unsheltered community during the summer months. FFE could also provide more supplies to the unsheltered community which would improve individuals' quality of life.

**The City's Latest Planned "Sweeps"**

120.   On November 15, 2022, the Phoenix New Times reported the City and the PPD plan to restart their raids/sweeps in the Zone.[21]

121.   The City plans to start what it calls "enhanced sweeps" which will commence in December 2022.

122.   It is believed these sweeps are the result of the Brown Lawsuit.

123.   During these raids/sweeps, Defendants intend to direct the PPD to block roads and remove people from their tents and makeshift shelters.

124.   Upon information and belief, the City intends to destroy the property of the unsheltered community during these sweeps.

125.   Upon information and belief, the City's only reason for performing these sweeps is in response to the *Brown* lawsuit brought by Phoenix residents which requests relief which would violate the constitutional rights of the unsheltered community.[22]

---

[21] *See* Katya Schwenk, *Phoenix Prepares to Restart Controversial Cleanups of Homeless Encampment*, PHX. NEW TIMES (Nov. 15, 2022, 3:57 PM), https://www.phoenixnewtimes.com/news/phoenix-prepares-to-restart-controversial-cleanups-of-downtown-homeless-encampment-14879886.

[22] *See* Melissa Blasius, *Lawsuit aims to force Phoenix homeless camp abatement*, ABC15, https://www.abc15.com/news/local-news/lawsuit-aims-to-force-phoenix-homeless-camp-abatement (last updated Aug. 11, 2022, 6:18 PM)

4860-6678-8680

1

## CLAIMS FOR RELIEF

2

### Count One

3

### (Fourth Amendment Violation—Unlawful Seizure)

4

### (42 U.S.C. § 1983)

5

### (All Defendants)

6

126.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

7

127.   At all times relevant to the allegations in this Complaint, Defendants acted

8

under color of state law.

9

128.   Under the Fourth Amendment to the United States Constitution, Plaintiffs

10

have the right to be secure in their persons against unreasonable seizures.

11

129.   A seizure of property occurs under the Fourth Amendment when there is some

12

meaningful interference with an individual's possessory interests in that property;

13

meaningful interferences include destruction of property. *See United States v. Jacobsen*,

14

466 U.S. 109, 113 (1984).

15

130.   Property includes photographs, identification papers, portable electronics,

16

and even potentially abandoned property. *See Lavan v. City of Los Angeles*, 693 F.3d 1022,

17

1030 (9th Cir. 2012).

18

131.   Here, Defendants have engaged and will continue to engage in targeted raids

19

of areas occupied by the unsheltered community.

20

132.   During these raids, Defendants unreasonably seize and destroy property

21

regardless of its condition, its apparent value, and/or whether or not it has been voluntarily

22

abandoned.

23

133.   Plaintiffs Ms. Kearns, Mr. Urban, and Mr. Massingille (and other unsheltered

24

people who are members of FFE) have experienced destruction of their personal items by

25

Defendants including the destruction of photographs, identification papers, camping

26

equipment, and other unabandoned personal items within the past two years.

27

134.   Plaintiffs have seen the destruction of personal items of other unsheltered

28

individuals including items deemed abandoned by Defendants within the past two years.

4860-6678-8680

135.   By seizing and destroying Plaintiffs' property, Defendants meaningfully and permanently interfered with Plaintiffs' possessory interest in their property and unlawfully seized Plaintiffs' property.

136.   At no time did Defendants provide a warrant to seize Plaintiffs' property.

137.   Seizures without a warrant are presumptively unconstitutional.

138.   Defendants engage in warrantless seizures of property when no exception to the warrant requirement applies.

139.   Plaintiffs have a possessory interest in their property under the Fourth Amendment.

140.   A reasonable official in Chief Williams and Interim Chief Sullivans' positions would have known that seizing and destroying Plaintiffs' property constitutes a violation of the Fourth Amendment.

141.   Plaintiffs' loss of property was the direct and proximate cause of Defendants' seizure and destruction of their property.

142.   The acts of Defendants were intentional and deprived Plaintiffs of their rights, privileges, liberties, and immunities secured by the Constitution of the United States.

<u>**Count Two**</u>

**(Fourteenth Amendment Violation – Deprivation of Property without Due Process)**

**(42 U.S.C. § 1983)**

**(All Defendants)**

143.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

144.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

145.   Under the Fourteenth Amendment, "the government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008).

146.   Violation of city ordinances does not constitute a waiver of due process interests in a previously recognized property interest.

147.   The property of those experiencing homelessness is "property" within the meaning of the Fourteenth Amendment, meaning a government entity "must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them." *Lavan*, 693 F.3d at 1032.

148.   Here, Defendants have engaged and will continue to engage in raids that targeted the unsheltered community living within the City.

149.   Defendants employed these raids without adequate notice to Plaintiffs.

150.   During these raids, Defendants seized and destroyed Plaintiffs' property without affording them adequate notice their property would be seized or destroyed.

151.   For Plaintiffs, this property is what they rely on for survival. It is all they have. Compared with that extremely high interest in their property, any administrative burden on the City to provide additional process to prevent erroneous deprivation is low.

152.   Plaintiffs' property was not seized in connection with prosecution or investigation of any crime.

153.   Defendants destroyed Plaintiffs' property without affording them a post-deprivation process for challenging the seizure of their property.

154.   It is clearly established Plaintiffs have a right to due process and post-deprivation hearings when their property is unlawfully seized and destroyed.

155.   A reasonable official in Chief Williams and Interim Chief Sullivans' positions would have known that seizing and destroying property without due process of law violates the Fourteenth Amendment.

156.   As a direct and proximate cause of Defendants' unconstitutional acts, Plaintiffs' property was seized and destroyed.

157.   The acts of Defendants were intentional and deprived Plaintiffs of their rights, privileges, liberties, and immunities secured by the Constitution of the United States.

**Count Three**

**(Eighth Amendment—Cruel & Unusual Punishment)**

**(42 U.S.C. § 1983)**

**(All Defendants)**

158.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

159.   The Eighth Amendment to the United States Constitution prohibits the government from inflicting cruel and unusual punishment.

160.   The Eighth Amendment "not only limits the types of punishment that may be imposed and prohibits the imposition of punishment grossly disproportionate to the severity of the crime, but also 'imposes substantive limits on what can be made criminal and punished as such.'" *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019) (quoting *Ingraham v. Wright*, 430 U.S. 651, 667 (1977)).

161.   The Ninth Circuit has made clear that statutes prohibiting sleeping outside implicate the protections of the Eighth Amendment when applied to homeless individuals. *Martin*, 920 F.3d at 615; *see also Johnson v. City of Grants Pass*, 50 F.4th 787, 808–812 (9th Cir. 2022).

162.   Defendant City of Phoenix has enacted ordinances which directly target the act of sleeping by unsheltered individuals who otherwise have no place to sleep.

163.   Phoenix City Code § 23-30(A) makes it unlawful for a person to camp within the City (the Camping Ban).

164.   Phoenix City Code § 23-48.01 makes it unlawful for a person to sleep in any right of way or sidewalk, even if those places are otherwise unoccupied (the Sleeping Ban).

165.   The City commonly uses the Camping Ban, the Sleeping Ban, and other statutes against Plaintiffs to criminalize the act of being homeless and engaging in universal and unavoidable human activities such as sleeping.

166.   Theses statutes and ordinances are enforced by Defendants.

167.   Plaintiffs have been cited under numerous statutes and ordinances by Defendants for the act of sleeping when they had nowhere else to go.

168.   Defendants commonly cite individuals who are unsheltered under these statutes and ordinances, as well as others, during their raids (particularly during the raids conducted outside of the Zone, where there is less public visibility).

169.   By criminalizing basic human activities such as sleeping, Defendants are knowingly and intentionally violating the constitutional rights of the unsheltered community.

170.   It is clearly established Plaintiffs cannot constitutionally be punished for sleeping in public spaces when indoor shelter is not practically available to them.

171.   A reasonable official in Chief Williams and Interim Chief Sullivans' positions would have known that enforcing these ordinances and statutes against the unsheltered population constituted a violation of their Eighth Amendment rights.

172.   As a direct and proximate cause of Defendants' unconstitutional acts, Plaintiffs have been deprived of the basic human right to sleep.

173.   The acts of Defendants were intentional and deprived Plaintiffs of their rights, privileges, liberties, and immunities secured by the Constitution of the United States.

## Count Four

### (Municipal Liability under *Monell*)

### (All Defendants)

174.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein

175.   Defendants were at all times relevant agents of the City vested with the power to control and supervise employees, agents, and contractors of the City.

176.   Upon information and belief, Defendants acted in execution of government policy or custom that may fairly be said to represent the official policy of the City. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).

177.   Defendants' actions were authorized (before and during the fact) and ratified (after the fact) by final policymakers for the City.

4860-6678-8680

178.    Defendants directed every action of their agents, thereby causing the violation of Plaintiffs' rights, and were deliberately indifferent to the fact that their directives would result in the violation of Plaintiffs' rights.

179.    Defendants' customs, policies, and/or practices, and the decisions of its final policymakers were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

180.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' federally protected constitutional rights. Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

181.    Defendants have or should have policies, procedures, practices, and/or customs to govern the raids to prevent the deprivations that occurred. Instead, of using the to penalize Plaintiffs' unsheltered status and destroy Plaintiffs' valued property.

182.    Upon information and belief, Defendant City of Phoenix and the PPD's policies, procedures, practices, and/or customs require agents or employees of the City to refrain from destroying unsheltered Plaintiffs' possessions during such raids.

183.    Upon information and belief, Defendants failed to train or supervise their employees when conducting raids of unsheltered populations such as Plaintiffs, resulting in the criminalization of the Plaintiffs' unsheltered status and destruction of Plaintiffs' property.

184.    As a direct and proximate result of Defendants' acts or omissions pursuant to official government policy, Plaintiffs suffered (without limitation) a deprivation of constitutional rights.

**<u>Count Five</u>**

**(Fourteenth Amendment—State Created Danger)**

**(All Defendants)**

185.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

4860-6678-8680

186.    The due process clause of the Fourteenth Amendment to the United States Constitution prevents Defendants from placing Plaintiffs Ms. Kearn, Mr. Urban, Mr. Massingille (and other unsheltered people served by Plaintiff FFE) in danger by acting with deliberate indifference to a known and obvious danger.

187.    The Zone in downtown Phoenix occupies an area of concrete, asphalt, and rocks unprotected from the sun.



188.    It extends nearly two blocks (approximately 500 feet).

189.    During the summer, temperatures in this area can reach as high as 118ºF.

190.    Because it is generally unprotected from the heat and sun, hundreds of unsheltered individuals die from heat related exposure every summer in the Zone.[23]

191.    Defendants explicitly and implicitly send unsheltered individuals residing and living in the City into the Zone.

192.    Defendants relax raids and enforcement of the Sleeping Ban in the Zone in order to encourage individuals to stay in the Zone.

193.    Defendants actively transport unsheltered individuals into the Zone.

194.    Defendants tell unsheltered individuals to go to the Zone.

---

[23] *See* Anita Snow, *Sweltering streets: Hundreds of homeless die in extreme heat across US*, FOX 10 PHX. (June 20, 2022), https://www.fox10phoenix.com/news/sweltering-streets-hundreds-homeless-die-extreme-heat.

4860-6678-8680

195.   Defendants have told both Plaintiffs Mr. Urban and Ms. Kearns to go to the Zone during encounters.

196.   Defendants push people into the Zone despite knowing the Zone is unprotected from heat-related danger.

197.   Defendants know about the increased heat related deaths in the Zone yet have done nothing to protect or provide any kind of shelter or shade to individuals in the Zone.

198.   Because Defendants actively send unsheltered individuals residing and living in the City into the Zone all year-round, it is over-crowded.

199.   Due to the over-crowding of unsheltered individuals being forced to live in a small, defined place, the risk of contracting infectious diseases is heightened.[24]

200.   As a direct and proximate result of Defendants' actions, Plaintiffs (and those they serve) have been subjected to a heightened risk of harm that severely threatens their bodily security.

201.   As a direct and proximate result of Defendants' actions, Plaintiffs (and those they serve) have been subjected bodily harm including infections and heat stroke.

202.   As a direct and proximate result of Defendants' actions, Plaintiffs have suffered a deprivation of their constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.   Preliminary injunctive relief enjoining:

a.   Defendants from seizing and destroying property of unsheltered individuals residing in the City;

---

[24] *See, e.g.*, Sally Ann Iverson, DVM, MPH et al., *Hepatitis A Outbreak Among Persons Experiencing Homelessness—Maricopa County, Arizona, 2017*, Open Forum Infectious Diseases         S245,         S245         (2017)         (available         at https://academic.oup.com/ofid/article/4/suppl_1/S245/4294288).

b.  Defendants from issuing criminal or civil citations under Phoenix, City Code § 23-30(A) to individuals experiencing homelessness for sleeping in public spaces when no available alternative spaces to sleep exist;

c.  Defendants from issuing criminal or civil citations under Phoenix City Code § 23-48.01 to individuals experiencing homelessness for sleeping in public spaces when no available alternative spaces to sleep exist;

d.  From issuing any other criminal or civil citation to individuals experiencing homelessness for sleeping in public spaces when no available alternative spaces to sleep exist; and,

e.  From conducting raids on spaces occupied by individuals experiencing homelessness, including sweeps which physically move the unsheltered community to unsafe spaces and dispossess them of their property.

B.  Permanent injunctive relief:

a.  Enjoining Defendants from seizing and destroying property of unsheltered individuals residing in the City without due process of law;

b.  Enjoining Defendants from destroying any property unabandoned by unsheltered individuals;

c.  Enjoining Defendants from issuing any criminal or civil citations to individuals experiencing homelessness for sleeping in public spaces;

d.  Enjoining Defendants from conducting raids and taking other actions that cause the displacement of those experiencing homelessness unless individual housing options are available to shelter these individuals;

e.  Requiring Defendants to provide advance notice of their intent to conduct raids; and,

f.  Requiring Defendants to provide shade and other resources to individuals in the Zone to address heat-related deaths in this area.

C.  For Declaratory Relief that:

1                  a.   Phoenix City Code § 23-30(A) is unconstitutional as applied to

2                  unsheltered individuals who are sleeping within the City; and,

3                  b.   Phoenix City Code § 23-48.01 is unconstitutional as applied to unsheltered

4                  individuals who are sleeping within the City.

5      D.     For taxable costs and expenses to the extent permitted by law;

6      E.     For pre- and post-judgment interest to the extent permitted by law;

7      F.     For an award of attorney fees pursuant to 42 U.S.C. § 1988(b); and,

8      G.     Such other relief as may appear just and appropriate.

9      RESPECTFULLY SUBMITTED this 30th day of November, 2022.

AMERICAN CIVIL LIBERTIES UNION
OF ARIZONA

By:    */Benjamin L. Rundall*
Benjamin L. Rundall
Jared G. Keenan
Christine K. Wee
3703 N. 7th St., Suite 235
Phoenix, Arizona 85014

SNELL & WILMER L.L.P.

By:    */Edward J. Hermes*
Edward J. Hermes
Delilah R. Cassidy
One East Washington St, Suite 2700
Phoenix, Arizona 85004-2556

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION.

By:    */Leah Watson*
Leah Watson, pending *pro hac vice*
Scout Katovich, admitted *pro hac vice*
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*Attorneys For Plaintiffs*

4860-6678-8680