Justin S. Pierce (State Bar #022646)
Aaron D. Arnson (State Bar # 031322)
Trish Stuhan (State Bar # 027218)
Stephen B. Coleman (State Bar # 021715)
**PIERCE COLEMAN PLLC**
7730 East Greenway Road, Suite 105
Scottsdale, Arizona 85260
Tel. (602) 772-5506
Fax (877) 772-1025
Justin@PierceColeman.com
Aaron@PierceColeman.com
Trish@PierceColeman.com
Steve@PierceColeman.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Fund for Empowerment, *et al.*,<br><br>    Plaintiffs,<br>v.<br><br>City of Phoenix, *et al.*,<br><br>    Defendants. | Case No.: CV-22-02041-PHX-GMS<br><br>**DEFENDANTS' MOTION TO MODIFY PRELIMINARY INJUNCTION AND MOTION FOR EXPEDITED CONSIDERATION AND EMERGENCY STATUS CONFERENCE** |

**INTRODUCTION**

In the seminal work *Catch-22*, Joseph Heller wrote of a protagonist facing a scenario from which there was no escape because of mutually conflicting obligations. The City of Phoenix (the "City") has found itself ensnared in a legal Catch-22. On the one hand, the City faces a preliminary injunction that restricts the use of enforcement tools for addressing a sprawling homeless encampment. On the other hand, it is grappling with the recent entry, on September 20, of an incompatible permanent injunction that requires the removal of all tents and temporary shelters from the downtown area by November 4, 2023 — a Herculean and possibly unattainable task under any circumstances, but one that is doubly unachievable given the tensions between the opposing injunctive

1

requirements.[1] Thus, the City may be forced to choose between violating one injunction or the other, with either outcome leading to sanctions—a situation not dissimilar to the choice between foregoing sleep or being criminally charged.

Although this dilemma alone warrants revisiting and clarifying the terms of this Court's injunction, recent developments in applicable case law all but compel reconsideration. Specifically, an intervening amendment to the Ninth Circuit's decision in *Johnson v. Grants Pass* has recognized that courts may fashion reasonable time, place, and manner restrictions on camping/sleeping. *See* 72 F. 4th 868, 877 (9th Cir. 2023). As applied to this case, *Johnson* provides the Court with latitude to permit enforcement of anti-camping laws within the City to allow for compliance with the state court injunction, so long as the impacted residents are provided alternate shelter *or allowed elsewhere on public land* within the jurisdictional boundaries. *Johnson* thus enables the Court to refashion its injunction to allow exceptions for limited enforcement actions in certain geographic areas or during specific timeframes that do not deprive an unsheltered person of a place to sleep on public land. This action would alleviate the Catch-22 while still protecting the rights of unsheltered persons, as defined in *Johnson*.

Finally, time is of the essence given the short window for compliance demanded by the state court. Therefore, the City respectfully requests that the Court address this matter on an expedited basis. The City further requests an emergency status conference.

## FACTUAL BACKGROUND

On December 15, 2022, this Court issued an Order granting in part and denying in part Plaintiffs' request for a preliminary injunction. *See Fund for Empowerment v. City of Phoenix*, No. CV-22-02041-PHX-GMS, 2022 WL 18213522, at *9 (D. Ariz. Dec. 15, 2022). The Court denied large parts of the Plaintiffs' request and ruled that the City's enhanced cleanup plan for the area surrounding the Human Services Campus ("HSC") downtown, located near 12th Avenue and Madison, referred to by Plaintiffs as the "Zone," could

---

[1] The City has appealed that injunction.

proceed as planned for December and that the City could continue to lawfully engage in its regular public health and safety activities.

The Order enjoined the City from: (1) enforcing its Camping and Sleeping Bans against individuals who practically cannot obtain shelter as long as there are more unsheltered individuals in the City than there are shelter beds available; (2) seizing property of the unsheltered without providing prior notice at the property's location that the property will be seized unless the City has an objectively reasonable belief that it is abandoned, an immediate threat to public health or safety, or evidence of a crime or contraband; and (3) destroying seized property without maintaining it in a secure location for no less than 30 days, absent an immediate threat to public health and safety. *Id*.

In a parallel state court lawsuit, *Freddy Brown et al. v. City of Phoenix*, the Maricopa County Superior Court issued a preliminary injunction in favor of plaintiffs on March 27, 2023, which required the City to take the following actions, among others, in the area known as the "Zone":

1. Abate the nuisance in the downtown area by removing tents, biohazards, drug paraphernalia, and trash from the public right-of-way; and

2. Stop individuals from committing offenses against the public order.

Under Advisement Ruling at 22, Freddy Brown, et al. v. City of Phoenix, No. CV2022-010439 (Maricopa Cnty. Superior Ct. Mar. 27, 2023).

The Superior Court subsequently entered a Permanent Injunction ordering that the abatement be complete by November 4, 2023.

Compliance with this order requires the ability to enforce laws—to allow law enforcement to use their discretion to address public health and safety issues in homeless encampments.

The City has taken painstaking and methodical steps to develop administrative procedures for conducting enhanced clean-ups of the Zone (as mandated by the state court), while simultaneously complying with the terms of this Court's injunction. The enhanced engagement process focuses on one block at a time and begins with notice and outreach

weeks prior to any attempt to clean. On the day of the engagement, City staff and contractors match unsheltered residents with appropriate resources and services and offer each resident of the block shelter. Following outreach, remaining unsheltered persons move their tents and other items to allow the sidewalks to be cleaned. The City's detailed procedures require notice and storage of possessions left unattended on public property. Following each enhanced engagement, the affected block is then closed to public camping.

The City sets this timeline so that there is sufficient time to provide adequate notice to individuals living in the area to be cleaned, and so that the City can begin coordinating with its non-profit partners. Specifically, the City conducts enhanced engagements roughly every three weeks. [July 10, 2023 Permanent Inj. Hr'g Tr. at 212:9–213:4, attached as Exhibit 1]

The City's rationale for this timeline is as follows: The total number of shelter beds within the City has decreased over the last decade. Notwithstanding the City's more recent successful efforts to open hundreds of new beds in shelters, existing shelter space in the City-wide homeless service system "is essentially full every night aside from the turnover of people who might be exiting the shelter." [*Id.* at 214:16–24; *see also* Oct. 27, 2022 Prelim. Hr'g Tr. at 128:14–22, attached as Exhibit 2] Furthermore, the unsheltered population in the HSC area is not stagnant, and so people come and go from the area at a rate that is largely outside of the City's control. [Permanent Inj. Hr'g Ex. 71, at 19, attached as Exhibit 3]

If the City were to move at a quicker pace, the small amount of available shelter space that exists would likely immediately disappear, without space to accommodate individuals who are displaced. [July 10, 2023 Permanent Inj. Hr'g Tr. at 212:14–213:4] Conducting enhanced engagements at a rate of roughly every three weeks allows time for more shelter space to open up as people transition out of the shelters, thus making room for a new group of individuals who are currently residing in the areas where enhanced engagements are happening. [*Id.* at 214:25–215:9]

Ensuring the availability of shelter space during enhanced engagements is necessary, given that (1) nearly all of the unsheltered who are residing on the street have nowhere else (*i.e.*, are involuntarily homeless), and (2) the City is bound by this Court's preliminary

injunction. *Fund for Empowerment*, No. CV-22-02041-PHX-GMS, 2022 WL 18213522, at *9 ("[T]he City, its agents and employees, are preliminarily enjoined from… [e]nforcing the Camping and Sleeping Bans against individuals who practically cannot obtain shelter as long as there are more unsheltered individuals in Phoenix than there are shelter beds available.").

The City faces a number of challenges, including fluctuating numbers of unsheltered persons, lack of affordable and Section 8 housing, substance abuse, street feeding, and evictions that make it difficult to estimate a "hard end date" for when the City should be able to accommodate all unsheltered residents of the HSC area somewhere other than on the street. [July 11, 2023 Permanent Inj. Hr'g Tr. at 148:3–20, 159:15–20, attached as Exhibit 4]

**ARGUMENT**

Given the above-noted legal and practical constraints, conducting enhanced engagements at a rate of approximately every three weeks is "ambitious, but doable"—*i.e.*, an aggressive but realistic timeframe to clean and close streets in the HSC area to public camping and comply with this Court's Order. [*Id.* at 148:8–20, 245:14–20]

Notwithstanding the foregoing, on September 20, 2023, the state court entered a permanent injunction that requires the City to "abate the nuisance it presently maintains on the public property in the Zone, including the removal of all tents and other makeshift structures by November 4, 2023." Under Advisement Ruling at 26, Freddy Brown, et al. v. City of Phoenix, No. CV2022-010439 (Maricopa Cnty. Superior Ct. September 20, 2023). Thus, the trial court has provided the City with less than seven weeks to relocate hundreds of homeless persons while maintaining compliance with this Court's preliminary injunction.

Based on available housing options for the homeless, it is simply not possible to consistently conduct enhanced engagements (*i.e.*, cleanups of small, targeted areas coupled with the provisioning of appropriate services and shelter for each of the unsheltered residents in those areas) more than once every three weeks without potentially overwhelming existing shelters and running afoul of this Court's Order.  However, this is precisely what is required for the City to comply with the state court's injunction, which requires the City to clear the "Zone," of unsheltered residents and their belongings by November 4, 2023.

The City risks being held in contempt of the state court order if it cannot meet the imposed deadline, or contempt of this Court's preliminary injunction if it is too ambitious in its efforts to satisfy the state court's requirements. This dilemma alone warrants revisiting the preliminary injunction to reconcile the unnavigable tensions between the dueling court orders.

Fortunately, the Ninth Circuit's amended decision in *Johnson* provides some light at the end of the tunnel. In the original decision, which was issued prior to this Court's entry of a preliminary injunction, the Ninth Circuit stated: "The formula established in *Martin* is that the government cannot prosecute homeless people for sleeping in public if there "is a greater number of homeless individuals in [a jurisdiction] than the number of available" shelter spaces. *Johnson v. City of Grants Pass*, 50 F.4th 787, 795 (9th Cir. 2022) (alteration in original). Thus, the court seemed to adopt either a mathematically driven restraint on enforcement, or at least one that depended on individualized inquiry tied to the number of available shelter beds: if the number of homeless individuals exceeds the available shelter beds, or alternatively, if there is no shelter bed for an individual to go to, public sleeping bans are unenforceable.

However, in the amended decision, which post-dated this Court's preliminary injunction, the Ninth Circuit excised this language and replaced it with a more flexible recitation of the law: "Pursuant to *Martin*, it is an Eighth Amendment violation to criminally punish involuntarily homeless persons for sleeping in public if there are no other public areas *or* appropriate shelters where those individuals can sleep*." Johnson*, 72 F. 4th at 877 (emphasis added) ("Naturally, our holding does not cover individuals who do have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it.")."

Thus, *Johnson*, as amended, recognizes that anti-camping and sleeping ordinances may be enforced so long as there are alternative *public spaces*—not just "beds in shelters"—where unsheltered persons may reside. Although the Ninth Circuit declined to provide further guidance on this issue, multiple district courts had previously concluded that "the

6

government may evict or punish sleeping in public in some locations, provided there are other lawful places within the jurisdiction for involuntarily homeless people to sleep. *Id*. at n. 33; *see Shipp v. Schaaf*, 379 F.Supp.3d 1033, 1037 (N.D. Cal. 2019) ("However, even assuming (as Plaintiffs do) that [eviction from a homeless encampment by citation or arrest] might occur, remaining at a particular encampment on public property is not conduct protected by Martin, especially where the closure is temporary in nature."); *Aitken v. City of Aberdeen*, 393 F.Supp.3d 1075, 1082 (W.D. Wash. 2019) ("Martin does not limit the City's ability to evict homeless individuals from particular public places."); *Gomes v. Cnty. of Kauai*, 481 F.Supp.3d 1104, 1109 (D. Haw. 2020) (holding the County of Kauai could prohibit sleeping in a public park because it had not prohibited sleeping on other public lands); *Miralle v. City of Oakland*, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018) (holding the City could clear out a specific homeless encampment because "Martin does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option."); *Le Van Hung v. Schaaf*, 2019 WL 1779584, at *5 (N.D. Cal. Apr. 23, 2019) (holding Martin does not "create a right for homeless residents to occupy indefinitely any public space of their choosing."). The amended *Johnson* decision confirms these sensible interpretations of the law.

There is a compelling reason for this Court to modify the injunction, consistent with *Johnson*, to allow the City to enforce the Camping Ban (Phoenix City Code § 23-30) and the Sleeping Ban (Phoenix City Code § 23-48.01) in the Zone, provided those displaced may either be moved to a shelter or other indoor facility or to an alternative public, outdoor space. Otherwise, the City is facing an untenable predicament in which it essentially must choose which court order to defy. In light of *Johnson*'s clarifications, the City should be given the same latitude to enforce the Camping and Sleeping Bans in the way it has the authority to enforce other reasonable time, place, and manner restrictions on camping and sleeping on public property, so long as other sleeping options are available. Enforcing such laws in limited geographic areas or during specified time periods does not prevent residents experiencing homelessness from sitting, sleeping, or lying elsewhere in City limits.

This Court's injunction is overbroad under the amended *Johnson* opinion, as its plain language appears to forbid geographically or temporally limited enforcement actions that do not leave an individual with nowhere else to go, which was the motivating concern in the *Martin* decision. *Martin v. City of Boise*, 920 F.3d 584, 590 (9th Cir. 2019) (Berzon, J., concurring). Nothing in the Constitution or Ninth Circuit precedent requires the City to surrender its streets, sidewalks, and other public areas to encampments and thereby abdicate its responsibility to provide clean, safe, and accessible public space to all residents. *Martin*'s "holding is a narrow one" that does not "allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id.* at 617.

Notably, the requested amendment would facilitate more rapid compliance with the State Court's permanent injunction, while still ensuring that all unsheltered persons will have a place to reside, whether that be a shelter bed (which is the City's strong preference) or an alternative public location within the jurisdiction that will accommodate tents or other temporary shelter from the elements.  This outcome would be an appropriate balance of the competing interests at issue.  Moreover, allowing other reasonable enforcement measures is not only consistent with current jurisprudence, but will provide the City with much-needed flexibility to address safety and health hazards without sacrificing the rights of unsheltered persons.

## CONCLUSION AND REQUEST FOR RELIEF

Wherefore, the City moves the Court to modify the Court's Order (Doc. 34) as follows:

1. Permitting the City to close the area Plaintiffs refer to as the "Zone" to camping by November 4, 2023, in order to achieve compliance with the Superior Court's order in *Brown et al. v. City of Phoenix*, requiring the abatement of a public nuisance.
2. Permitting the City to enforce the Camping and Sleeping Bans, provided that those displaced may either be moved to a shelter or other indoor facility or to an alternative public, outdoor space; close areas to public camping and sleeping; and

impose reasonable time, place, and manner restrictions on such activities, so long as other shelter is available, whether in congregate settings, hotels, safe outdoor spaces (*i.e.*, campgrounds) established by the City, or on other property that is otherwise available to the public or camping or sleeping.

3. Confirming that, consistent with the Ninth Circuit's amended decision in *Johnson*: (a) "shelter" encompasses both indoor and outdoor shelter options; and (b) if the City can show that there is somewhere else for an unsheltered person to go, then the Order does not prohibit enforcement.

Finally, considering the extraordinarily short timeline for compliance, the City respectfully moves the Court for expedited consideration of this matter and requests that the Court set an emergency status conference.

RESPECTFULLY SUBMITTED this 9th day of October 2023.

**PIERCE COLEMAN PLLC**

By: /s/ Justin S. Pierce
Justin S. Pierce
Aaron D. Arnson
Trish Stuhan
Stephen B. Coleman
7730 East Greenway Road, Suite 105
Scottsdale, Arizona 85260
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 9th, 2023, I electronically transmitted this document to the Clerk's Office using the ECF System for filing, causing a copy to be electronically transmitted to the following ECF registrants:

American Civil Liberties Union Foundation of Arizona
Jared G. Keenan
Christine K. Wee
jkeenan@acluaz.org
cwee@acluaz.org

| | |
|---|---|
| 1 | Zwillinger Wulkan PLC |
| 2 | Benjamin L. Rundall |
|   | ben.rundall@zwfirm.com |
| 3 | |
| 4 | *Attorneys for Plaintiffs* |
| 5 | Stephen W. Tully |
|   | Michael Bailey |
| 6 | Ilan Wurman |
| 7 | stully@tullybailey.com |
|   | mbailey@tullybailey.com |
| 8 | iwurman@tullybailey.com |
|   | *Attorneys for Intervenors* |
| 9 | |
| 10 | |
|    | By: /s/ *Judy Wilkening* |
| 11 | |