**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF ARIZONA**
Jared G. Keenan, State Bar No. 027068
Christine K. Wee, State Bar No. 028535
2712 N. 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
E-Mail: jkeenan@aclu.org
          cwee@aclu.org

**ZWILLINGER WULKAN PLC**
Benjamin L. Rundall, State Bar No. 031661
Alexis Eisa, State Bar No. 038702
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
Telephone: (602) 962-2969
E-Mail: ben.rundall@zwfirm.com

*Attorneys for Plaintiffs*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
Leah Watson, admitted *pro hac vice*
Scout Katovich, admitted *pro hac vice*
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
E-Mail:     lwatson@aclu.org
               skatovich@aclu.org

**GOODWIN PROCTER LLP**
Andrew Kim, admitted *pro hac vice*
Courtney L. Hayden, admitted *pro hac vice*
Collin M. Grier, admitted *pro hac vice*
Madeline Fuller, admitted *pro hac vice*
1900 N Street, N.W.
Washington, D.C. 20036
Telephone: 202-346-4000
E-Mail:
          AndrewKim@goodwinlaw.com
          CHayden@goodwinlaw.com
          CGrier@goodwinlaw.com
          MFuller@goodwinlaw.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Fund for Empowerment, a nonprofit corporation, in its individual capacity; Ronnie Massingille, individually; Mohamed Sissoho, individually; Dyrwood Moore, individually; Faith Kearns, individually; Frank Urban, individually; Timothy James, individually; Sherdina Carr, individually; Papy Abdul Idrissa, individually; and Jason Rich, individually,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>City of Phoenix, a political subdivision of the state of Arizona; Rachel Milne, individually, and in her official capacity as the Director of the Office of Homeless | No. CV-22-02041-PHX-GMS<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CIVIL RIGHTS ACTION (42 U.S.C. § 1983)**<br><br>**(JURY TRIAL DEMANDED)** |

Solutions; and Michael Sullivan
individually, and in his official capacity as
Interim Chief of the Phoenix Police
Department, Entities I-X, political
subdivisions of the state of Arizona; and
John and Jane Does 1-75, in their
individual capacities,

Defendants.

Plaintiffs, through counsel undersigned, for their Complaint against Defendants, allege as follows:

## INTRODUCTION

1.      Phoenix is one of the epicenters of the homelessness crisis gripping the United States. Since 2010, the number of people experiencing homelessness in the city of Phoenix has more than doubled, and the crisis shows no sign of abating.[1]  The number of people experiencing chronic homelessness in Maricopa County (the "County") increased by 103% from 2017 to 2023.[2] Meanwhile, instead of taking responsibility for its role in creating this crisis, Defendant the City of Phoenix (the "City") has continued to exacerbate the problem by punishing its thousands of unhoused residents.[3]

---

[1]  *Compare* Maricopa Ass'n of Gov'ts, *2010 Homeless Street Count*, https://www.azmag.gov/Portals/0/Documents/MagContent/2010%20Point%20in%20Time%20Count%20for%20AZ-502%20(Municipal%20Street%20Count).pdf?ver=2017-07-07-134153-897 (recording approximately 1,750 unhoused individuals) *with* Maricopa Ass'n of Gov'ts, *2023 Point-in-Time (PIT) Count Report* 4, https://azmag.gov/Portals/0/Homelessness/PIT-Count/2023/2023-PIT-Count-Report-Final.pdf?ver=8CRzv7xw28C-V2G0sMdKfw%3D%3D (recording over 3,333 unhoused individuals).

[2] *2023 Point-in-Time (PIT) Count Report, supra* note 1 at 3.

[3]  Throughout this complaint the terms "unhoused," "homeless," and "experiencing homelessness" denote individuals who meet the federal law definition of homelessness. *See* 42 U.S.C. § 11302; 24 C.F.R. § 582.5. The use of the term "unsheltered" refers to

2.      Every year, a growing number of Phoenix residents find themselves unable to afford a home. This is largely due to skyrocketing housing costs. From 2017 to 2023, the median rent in Phoenix increased by 54%.[4] Because Phoenix does not have sufficient shelter, many of those who find themselves unhoused have no choice but to take to the city's streets and other public areas. Indeed, in 2023, over half of Maricopa County's unhoused population was unsheltered.[5]

3.      From the elements alone, these individuals face brutal conditions. In the summer, for example, temperatures average over 100 degrees Fahrenheit and can soar up to 119 degrees.[6] Between June 30 and July 30 of 2023, Phoenix experienced a record-breaking 31 consecutive days over 110 degrees Fahrenheit.[7] The summer sun bakes the asphalt, concrete, and other surfaces that make up the city's public areas, making scarce any places of refuge. As a result, hundreds of unsheltered individuals, who are at high risk of exposure to the elements because they have nowhere else to go, die each year from heat-related illnesses.[8]

4.      As if these conditions alone were not bad enough, unhoused individuals who involuntarily sleep in Phoenix's public areas also face harassment and mistreatment by the

---

individuals who are experiencing homelessness and reside in a place that it not intended for human habitation (e.g., streets, cars, etc.).

[4] Alex Horowitz and Tushar Kansal, *Restrictive Zoning is Raising Housing Costs and Homelessness in Arizona*, Pew Charitable Trusts (Dec. 7, 2023), https://www.pewtrusts.org/en/research-and-analysis/articles/2023/12/07/restrictive-zoning-is-raising-housing-costs-and-homelessness-in-arizona.

[5] *Point-In-Time Homelessness Count*, Maricopa Ass'n of Gov'ts., https://azmag.gov/Programs/Homelessness/Data/Point-In-Time-Homelessness-Count (last visited April 28, 2024).

[6] *Phoenix Hit 110 Degrees on 54 Days in 2023, Setting Another Heat Record,* PBS News Hour (Sept. 10, 2023, 10:57 a.m.), https://www.pbs.org/newshour/nation/phoenix-hit-110-degrees-on-54-days-in-2023-setting-another-heat-record.

[7] *See* Jack Healy, *Phoenix's Month in Hell: A 31-Day Streak of Record Heat* Ends, N.Y. Times (July 31, 2023), https://www.nytimes.com/2023/07/31/us/phoenix-heat-july.html

[8] *Phoenix Hit 110 Degrees on 54 Days in 2023,* supra note 6.

City in violation of their constitutional rights. People who do nothing more than lay down on the City's streets because they have nowhere else to rest their heads are threatened, detained, fined, and arrested for violating city ordinances or state law. The City also takes or destroys the few personal effects these unhoused individuals have, leaving no opportunity to retrieve those effects.

5.     The City's answer to the homelessness crisis has been to have the Phoenix Police Department ("PPD") cite, arrest, and detain people for merely existing on the city's streets, targeting unhoused individuals for enforcement of the City's ordinances against sleeping and "camping"[9] in public, and using other statutes and ordinances like those prohibiting trespassing as a subterfuge for forcing unhoused individuals out of the city. These statutes and ordinances make it unlawful to sleep anywhere in the City at any time. For involuntarily unhoused[10] individuals, who have no choice but to live and sleep in public, these statutes and ordinances essentially make it a crime to exist within Phoenix's city limits.

6.     The City created the Office of Homeless Solutions ("OHS") in 2022. OHS was originally intended to create transparency about the city's homelessness crisis. OHS was also tasked with creating and implementing a storage policy and system for items taken by the City from those who are unhoused, but has failed to adhere to the announced procedure. Instead, OHS has worked hand-in-hand with PPD to ratify and systematically

---

[9] The City's "camping" prohibition prohibits the use of "the real property of the City" for "sleeping activities," so it may as well be a sleeping ban. *See* Phx., Ariz. City Code § 23-30.

[10] The term "involuntarily unhoused" is synonymous to the term "involuntarily homeless," as defined by the Ninth Circuit. See *Johnson v. City of Grants Pass*, 72 F.4th 868, 875 n.2 (9th Cir. 2023), *cert. granted*, 144 S. Ct. 679 (2024) ("Persons are involuntarily homeless if they do not 'have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free.'" (citing *Martin v. City of Boise*, 920 F.3d 584, 617 n.8 (9th Cir. 2019))).

conduct "clean sweeps," which are raids that target people experiencing homelessness and violate their constitutional rights.[11]

7.    The City's enforcement of these laws criminalizes, punishes, and scatters the homeless population based on their status as unsheltered. The City conducts raids of homeless encampments despite knowing that these individuals have nowhere else to go, given the dearth of affordable housing and emergency shelter space.[12]

8.    But the City does not stop at criminalizing residents based on their unsheltered status. The City and its agents also indiscriminately and irretrievably seize, impound, and destroy unsheltered individuals' personal property and survival gear without notice, cause, or a warrant.

9.    During these raids, unsheltered individuals, including Plaintiffs and members of Plaintiff Fund For Empowerment ("FFE") have lost clothing, survival equipment, medication, items of sentimental value (like photographs of loved ones), and, perhaps most inexplicably, vital records and identifying documents—like birth certificates and reference letters—which are crucial to procuring jobs, benefits, and housing. These documents can be almost impossible for someone with no fixed address to replace.[13]

10.   The City's raids also place unsheltered individuals, including Plaintiffs and members of Plaintiff FFE, at greater risk of heat-related illness and death. Even when temperatures exceed 90 degrees, the City often provides mere minutes for people to gather

---

[11]  At various times, the City has used other terms, including "enhanced cleanups," "encampment cleanups," and "enhanced engagements," to describe this policy, custom, or practice.

[12]  *See* Madeline Ackley, *Phoenix Still Criminalizes Homelessness, Despite Court Ruling, Protesters Say*, AZ Mirror, (Jan. 9, 2020, 9:13 a.m.), https://www.azmirror.com/2020/01/09/phoenix-still-criminalizes-homelessness-despite-court-ruling-protesters-say/.

[13]  *See* Bailey Miller, *'It Is Simply Inhumane': Phoenix Homeless Advocates Criticize City Sweeps of Encampments*, FOX 10 Phx. (Dec. 29, 2021, 4:22 p.m.), https://www.fox10phoenix.com/news/it-is-simply-inhumane-phoenix-homeless-advocates-criticize-city-sweeps-of-encampments.

their belongings and flee the area. The stress and physical exertion this causes can prove dangerous in such high temperatures, especially for elderly and disabled individuals. The raids also often target individuals in shaded areas, forcing them out of relatively cool areas to wander through the City in the direct sun. And the City's destruction of survival equipment, like tents or tarps that provide some protection from the sun, also increases unhoused individuals' exposure to dangerous temperatures.

11.     All told, instead of confronting its housing crisis head-on and investing in sustainable solutions to homelessness, the City is terrorizing the very people it should be helping. The City is knowingly penalizing unsheltered residents for engaging in unavoidable human activities like sleeping and sheltering from the elements. It has also weaponized "clean sweeps" to drive unhoused people from Phoenix by making the city's public areas unlivable. The City has made its message to unhoused individuals clear: engaging in sleep and other essential life activities on the city's public grounds will lead to detention, arrest, displacement, and the loss of the individual's personal effects. The City's actions are unconstitutional, especially in light of the fact that many of the affected individuals, including Plaintiff FFE's members and individual Plaintiffs here, have no choice but to live in the city's public areas, as the City has fallen well short of its responsibility to provide adequate shelter to meet the needs of its unhoused population.[14]

## JURISDICTION & VENUE

12.     Plaintiffs bring this action for declaratory, injunctive, and monetary relief pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties

---

[14] To be clear, Plaintiffs do not expect or request this Court to resolve the housing crisis, make policy decisions, or rewrite legislation; Plaintiffs are simply invoking protections they are guaranteed under the United States Constitution.

of the United States, and under 28 U.S.C. § 1343(a), which gives district courts jurisdiction over actions to secure civil rights extended by the United States Government.

14.    Declaratory relief is authorized by 28 U.S.C. §§ 2201-02.

15.    The events that gave rise to the Complaint occurred in Maricopa County, Arizona in the District of Arizona. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b).

## PARTIES

16.    Plaintiff Fund for Empowerment ("FFE") is an incorporated nonprofit charity operating in the County that commonly expends time, energy, effort, and resources on behalf of the unsheltered population. FFE's mission is to build community resources for the unsheltered population via direct services, capacity-building training, and project support. FFE helps protect and advocate for the dignity, rights, and choices of Arizonans experiencing homelessness or housing insecurity. FFE commits its efforts toward goals affirmed and raised by unsheltered individuals. FFE's members include both the currently and formerly unhoused, including specifically people who are involuntarily unhoused, as well as allies looking to support unhoused people who lack shelter. FFE emphasizes the voices of the unsheltered to expose root causes of homelessness and to create ways of living in which everyone has a safe place they can call home.

17.    Plaintiff Ronnie Massingille is currently involuntarily unhoused and lives in Phoenix, Arizona. Mr. Massingille cannot practically obtain shelter, much less a fixed, regular, and adequate nighttime residence. Although Mr. Massingille is sometimes able to obtain a shelter bed at St. Vincent de Paul, on most nights, he must sleep on the street. Mr. Massingille has received criminal citations from PPD for sleeping and camping in public and has directly experienced the raids performed by the City and PPD which have resulted in the destruction of his personal property.

18.    Plaintiff Mohamed Sissoho is currently involuntarily unhoused and lives in Phoenix, Arizona. Mr. Sissoho cannot practically obtain shelter, much less a fixed, regular,

and adequate nighttime residence. Mr. Sissoho's property was destroyed during sweeps conducted by the City. Mr. Sissoho has also been cited by the City for sleeping in public.

19.     Plaintiff Dyrwood Moore is currently involuntarily unhoused and lives in Phoenix, Arizona. Mr. Moore cannot practically obtain shelter, much less a fixed, regular, and adequate nighttime residence. Mr. Moore has had his property destroyed during sweeps conducted by the City and has been repeatedly harassed by the PPD for sleeping in public places.

20.     Plaintiff Faith Kearns is a chronically unsheltered individual who resides in Maricopa County, Arizona. Ms. Kearns has directly experienced the raids performed by the City and PPD, which have resulted in the destruction of her personal property.

21.     Plaintiff Frank Urban has been chronically unsheltered off and on since 2000 in Maricopa County, Arizona. Mr. Urban has received criminal citations from PPD for trespassing, obstructing a thoroughfare, and simply standing on the sidewalk in connection to his unsheltered status. Mr. Urban has directly experienced the raids performed by the City and PPD, which have resulted in the destruction of his personal property.

22.     Plaintiff Timothy James is currently involuntarily unhoused and lives in Phoenix, Arizona. Mr. James cannot practically obtain shelter, much less a fixed, regular, and adequate nighttime residence. Mr. James has been cited multiple times by the City of Phoenix within the past month for sleeping and lying down in public spaces.

23.     Plaintiff Sherdina Carr is currently involuntarily unhoused and lives in Phoenix, Arizona. Ms. Carr cannot practically obtain shelter, much less a fixed, regular, and adequate nighttime residence. Ms. Carr has been threatened her with citation or arrest.

24.     Plaintiff Papy Abdul Idrissa is currently involuntarily unhoused and lives in Phoenix, Arizona. Mr. Idrissa cannot practically obtain shelter, much less a fixed, regular, and adequate nighttime residence. Mr. Idrissa is often harassed by PPD for being unhoused, nearly on a daily basis.

25.     Plaintiff Jason Rich is currently involuntarily unhoused and lives in Phoenix, Arizona. Mr. Rich cannot practically obtain shelter, much less a fixed, regular, and adequate

nighttime residence. Mr. Rich has been cited for violation of City ordinances. Mr. Rich does not believe there is anywhere safe for him to sleep in Phoenix.

26. Defendant City of Phoenix is a political subdivision of the state of Arizona that acts through its employees, agents, and independent contractors. PPD is a department or division of the City that acts with the City's authority.

26. Defendant Michael Sullivan ("Chief Sullivan") resides or works in Maricopa County, Arizona.

27. Chief Sullivan is the Interim Chief of Police for the PPD with ultimate authority to control, and responsibility for, the actions of its officers and agents. Chief Sullivan also has the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the PPD. Chief Sullivan is named herein in his official capacity.

28. Defendant Rachel Milne ("Director Milne") resides or works in Maricopa County, Arizona.

29. Director Milne is the Director of the OHS with ultimate authority to control, and responsibility for, the actions of its employees and agents. Defendant Milne also has the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the OHS. Defendant Milne is named herein in her official capacity.

## GENERAL FACTUAL ALLEGATIONS

### Background

30. The number of residents experiencing homelessness in Phoenix has more than doubled since 2010 according to Point-in-Time ("PIT") counts commissioned by the Maricopa Association of Governments.[15]

---

[15] *See 2010 Homeless Street Count*, *supra* note 1.

31.     This increase directly relates to the City's lack of affordable housing for residents that was exacerbated by the COVID-19 pandemic.[16]

27.     Sustainable solutions to this spike in homelessness, including affordable housing, have lagged far behind, in large part because of the City's inaction. For example, when this lawsuit was filed in November 2022, the City had spent less than 10% of the $99.5 million it received from the federal government through the American Rescue Plan Act ("ARPA") in order to address homelessness and affordable housing.[17] The City still has not spent more than half of the ARPA funds it budgeted for these purposes.[18]

28.     Without an adequate supply of affordable housing, Phoenix residents can easily become unsheltered after disruptions in household income caused by job loss, medical bankruptcy, emergency, mental illness, divorce, or domestic violence.

29.     Black, Indigenous, and other people of color are disproportionately affected by the homelessness crisis. In Maricopa County, Black people make up 28% of the unhoused population, but only 6% of the general population. The Indigenous proportion of the homeless population in the County is more than twice its share of the general population.[19]

---

[16] Median home prices in Phoenix metro area have risen over 216% since 2000, while the median income has grown only 48%. It is estimated that by 2025 only a third of the area's population will be able to afford a home. Belinda Luscombe, *Why Phoenix—of All Places—Has the Fastest Growing Home Prices in the U.S.*, TIME Business, (May 3, 2022, 1:30 p.m.), https://time.com/6170497/phoenix-fastest-growing-home-prices/. This increase has also caused a corresponding increase in rental prices. *Id.*

[17] *See* Erica Stapleton, Katie Wilcox & John Tanet, *"Building Housing Isn't a Quick Process": Phoenix Weighs in on Millions in COVID Relief Money for Homelessness That Hasn't Been Spent*, 12 News (Aug. 29, 2022), https://www.12news.com/article/news/local/arizona/the-cost-of-crisis-phoenix-struggles-with-a-homelessness-crisis-after-covid/75-bd422dcb-4663-4b98-8f71-11aea9e76bda.

[18] *American Rescue Plan Act—Affordable Housing & Homelessness*, City of Phx., https://stories.opengov.com/phoenixaz/published/CcabFkLY8 (last visited Apr. 28, 2024).

[19] *See 2023 Point-in-Time (PIT) Count Report*, *supra* note 1, at 2.

32.     Notwithstanding the fact that shelters are only a temporary solution to homelessness, the City's efforts to supply temporary shelter fall far short of the need. According to the January 2022 Point-in-Time count, which considerably undercounts the unsheltered population, 2,942 people in Phoenix were temporarily housed in an emergency shelter or transitional housing while 3,096 people in Phoenix remained completely unsheltered.[20] By 2023, according to the Point-in-Time count, the number of unsheltered people in Phoenix increased to 3,333, while the number of people in Phoenix temporarily housed in an emergency shelter or transitional housing increased to 3,569.[21]

33.     From 2020 to 2022, the unsheltered subset of the homeless population in the County, which includes Phoenix, grew by 34%. This means that the total number of unsheltered people in the County surpasses the number of this population in shelters (5,029 to 3,997).[22]

34.     While the 2023 Maricopa County Point-in-Time count identified 9,642 people experiencing homelessness on a single night,[23] almost 31,000 people experienced homelessness in Maricopa County over the course of the 2023 calendar year.[24] There are only 4,700 total shelter beds in Maricopa County.[25] As the Maricopa Association of

---

[20] Maricopa Ass'n of Gov'ts, *2022 Point-in-Time (PIT) Count Report* 4-5, https://azmag.gov/Portals/0/Documents/MagContent/2022-PIT-Count-Report-Final.pdf.

[21] *2023 Point-in-Time (PIT) Count Report, supra* note 1 at 4.

[22] *See 2022 Point-in-Time (PIT) Count Report*, *supra* note 20, at 1, 4-5.

[23] *2023 Point-in-Time (PIT) Count Report supra* note 1 at 1. Of the 9,642 individuals who experienced homelessness in Maricopa County at the time of the 2023 Point-in-Time count, 4,734 were sheltered and 4,908 were unsheltered.

[24] *Homeless Trends Report: October-December 2023*, Maricopa Reg'l Continuum of Care, https://azmag.gov/Portals/0/Homelessness/Reports/2023-Q4-Homelessness-Trends-Report.pdf (last visited Apr. 23, 2024).

[25] *Overview of Homelessness*, Maricopa Ass'n of Gov'ts, https://azmag.gov/Programs/Homelessness/Overview-of-Homelessness#:~:text=In%20total%2C%20there%20are%20over,different%20partners%20across%20the%20region (last visited Apr. 28, 2024).

Governments itself concedes, "the region does not have enough shelter beds to meet the need of people experiencing homelessness throughout the county."[26]

39.     For its part, Phoenix only had 1,492 shelter beds available at the end of 2021.[27] According to the City, in 2022 and 2023, Phoenix added 1,072 shelter beds,[28] which means that the city had, at most, 2,564 beds by the end of 2023—still not nearly enough to provide shelter to the nearly 7,000 unhoused residents identified in the 2023 Point-in-Time count.[29]

40.     Despite the already inadequate number of shelter beds available, OHS announced that it closed the "Temporary Haven," operated by Central Arizona Shelter Services ("CASS"), which "served 73 unique individuals," and also reported that "[o]ther temporary lodging sites are slated for closure in the next few months and into fall 2024."[30]

40.     Many shelters are also inaccessible to people with certain disabilities or limited to individuals that meet certain eligibility requirements, and thus are not available to everyone experiencing homelessness in Phoenix. This leaves many with no alternative to existing and sleeping in public, as the shelters without such criteria have limited space with rare availability.

41.     Moreover, while emergency shelters can temporarily accommodate some people experiencing homelessness, they are not an adequate response to Phoenix's rapid

---

[26] *Id.*

[27] City of Phoenix, *Strategies to Address Homelessness: Task Force Recommendations to the City Manager* 14 (2022), https://www.phoenix.gov/humanservicessite/Documents/Task%20Force%20Recommendations%20to%20the%20City%20Manager-Final.pdf.

[28] *Office of Homeless Solutions*, City of Phx. https://www.phoenix.gov/solutions (last visited Apr. 28, 2024).

[29] The 2023 Point-in-Time Report identified 3,569 people in Phoenix who were temporarily housed in an emergency shelter or transitional housing and 3,333 individuals who were completely unsheltered. *2023 Point-in-Time (PIT) Count Report*, *supra* note 1 at 4-5.

[30] See City of Phoenix, *Office of Homeless Solutions Program Report*, *in General Information Packet* 3, 4 (Apr. 18, 2024), https://www.phoenix.gov/cityclerksite/City%20Council%20Meeting%20Files/4-18-24%20General%20Info%20Packet-FINAL.pdf.

increase in unsheltered residents. For example, providing someone who is involuntarily unhoused with a shelter bed or motel room for one night does not resolve their status as involuntarily unhoused. Research shows that the most effective way to end chronic homelessness is to provide permanent supportive housing on a housing-first basis.[31]

42.   Without access to shelter or affordable housing, many experiencing homelessness in Phoenix, including the Plaintiffs, those served by FFE, and members of FFE, have nowhere else to go. They are involuntarily unhoused.

**The City's Raids**

43.   For at least the past three years, the City has had a policy, custom, or practice of systematically conducting raids it calls "clean sweeps" of areas occupied by unsheltered individuals and those experiencing homelessness.

44.   During these raids, it is a City policy, custom, or practice to rouse unsheltered individuals (including Plaintiffs, those served by FFE, and FFE members) in the early morning hours and order them to pack up their blankets, tents, and all their personal belongings.

45.   Plaintiffs, FFE's members, and other individuals who are served by FFE are not provided notification of when these raids will occur.

46.   Some of these raids occur as early as 3:00 AM.

47.   The City directs the PPD, Environmental Services, and other City agencies and contractors acting as "clean-up" crews, to remove property.

48.   Unsheltered individuals (including Plaintiffs, those served by FFE, and FFE members) typically have just minutes to gather their personal possessions and belongings before the raid begins. Because mere minutes are not enough time to gather and relocate possessions (particularly for people with disabilities), the inevitable result of the City's raids

---

[31] *See, e.g.*, U.S. Interagency Council on Homelessness, *ALL IN: The Federal Strategic Plan to Prevent and End Homelessness* 42 (Dec. 2022)., https://www.usich.gov/sites/default/files/document/All_In.pdf.

is that people permanently lose any property they cannot immediately carry away with them.

49.     The PPD, City workers, and/or "clean-up" crews begin indiscriminately removing and destroying any items that individuals have been unable to gather and move in the short time allowed.

50.     Removal is performed with rakes, garbage bags, loaders, and sometimes a disposal truck.

51.     These raids commonly result in the loss and destruction of personal property owned by those experiencing homelessness. Some of these items are necessary for survival, including tents, shades for heat relief, sleeping bags, medication, and blankets.

52.     Because of these raids, individuals (including Plaintiffs, those served by FFE, and FFE members) frequently experience destruction of items difficult to replace such as personal IDs, photographs of family members and loved ones, and, in one case, even a set of teeth.

53.     Upon information and belief, the purpose of these raids is to discourage individuals experiencing homelessness from sleeping in the City and to push them to other surrounding municipalities surrounding Phoenix in the County.

54.     Upon information and belief, the City's policy is to use these raids to address the rise in those experiencing homelessness to divert criticism for failing to adequately provide both emergency and permanent housing.

**The City's Weaponization of Statutes and Ordinances to Criminalize Homelessness**

55.     During the City's raids, which are conducted in accordance with the City and PPD's policies, practices, and customs, police officers often issue criminal citations under the Arizona Revised Statutes and City Ordinances.

56.     The City has cited individuals for violations of Phoenix City Code § 23-30 (the "Camping Ban"), Phoenix City Code § 23-48.01 (the "Sleeping Ban"), Phoenix City Code § 23-85.01 and Arizona Revised Statutes § 13-1501 et seq. (together with Phoenix City Code § 23-85.01, the "Trespassing Bans").

57.     The Camping Ban provides: "It shall be unlawful for any person to camp in any park or preserve, or in any building, facility, or parking lot or structure, or on any property adjacent thereto, that is owned, possessed and controlled by the City . . . ." Phx., Ariz., City Code § 23-30(A).

58.     According to the City, camping means "to use real property of the City for living accommodation purposes such as sleeping activities, or making preparations to sleep, including the laying down of bedding for the purpose of sleeping, or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities." *Id.* § 23-30(B).

59.     As indicated in the City's definition of the term "camp," the Camping Ban punishes and criminalizes the act of sleeping by unsheltered individuals within the City.

60.     The Camping Ban is commonly cited by the City against unsheltered individuals during raids to discourage basic human activities such as sleeping.

61.     The Sleeping Ban provides: "It shall be unlawful for any person to use a public street, highway, alley, lane, parkway, sidewalk or other right-of-way, whether such right-of-way has been dedicated to the public in fee or by easement, for lying, sleeping or otherwise remaining in a sitting position thereon, except in the case of a physical emergency or the administration of medical assistance." *Id.* § 23-48.01.

62.     The Sleeping Ban is broad and prohibits sleeping on areas of City property otherwise unused by pedestrians.

63.     The Sleeping Ban is commonly cited by the City against unsheltered individuals during raids to discourage universal and unavoidable human activities such as sleeping.

64.     The Trespassing Bans prohibit:

a) Entering or remaining unlawfully on any real property after a reasonable request to leave by the owner or any other person having lawful control over such property, or reasonable notice prohibiting entry.

b) Entering or remaining unlawfully in the right-of-way for tracks, or the storage or switching yards or rolling stock of a railroad company.

c) Entering or remaining unlawfully on any residential structure or fenced commercial yard.

d) Entering or remaining unlawfully in a residential structure or fenced residential yard.

e) Entering any residential yard without lawful authority, looking into the residential structure thereon with the intent to infringe on the inhabitant's right of privacy.

*Id.* § 23-85.01; *see also* A.R.S. § 13-1502 (prohibiting "[k]nowingly entering or remaining unlawfully on any real property after a reasonable request to leave by a law enforcement officer, the owner or any other person having lawful control over such property, or reasonable notice prohibiting entry"); *id.* § 13-1503 (prohibiting "knowingly entering or remaining unlawfully in or on any nonresidential structure or in any fenced commercial yard"); *id.* § 13-1504 (prohibiting, *inter alia*, "entering or remaining unlawfully on a residential structure" or on a "residential yard").

65.     The City has enforced the Trespassing Bans against unhoused individuals, including Plaintiffs, members of FFE, and those served by FFE, for merely standing, sitting, lying, or sleeping in public spaces.

66.     These statutes and ordinances apply city-wide, meaning that there is no place in the City where unsheltered individuals can sleep or simply exist without breaking the law.

67.     Violation of these ordinances is a Class 1 misdemeanor, punishable by a fine up to $2,500 per violation and imprisonment of up to six months.  *See* Phx. Ariz. City Code § 1-5.[32]

---

[32] Violation of the Arizona Trespassing Ban is a Class 3 Misdemeanor punishable by a fine up to $500 or imprisonment up to 30 days. *See* A.R.S. § 13-802(C); A.R.S. § 13-707(A)(3).

74.    The City is imposing fines on individuals, including Plaintiffs, individuals served by FFE, and FFE members, for violating these statutes and ordinances even though they lack culpability because they have nowhere else to sit, lie, or sleep.

75.    Despite this Court's preliminary injunction (ECF No. 119) prohibiting the City from enforcing the Camping and Sleeping Bans against "homeless persons for sleeping in public if there are no other public areas or appropriate shelters where those individuals can sleep," (ECF No. 119 at 3) the City has nevertheless continued to enforce those prohibitions against individuals who are involuntarily unhoused and practically cannot obtain shelter and who do not have access to any public place or appropriate shelter where they can safely or legally sleep or simply exist.

76.    The City has also circumvented the preliminary injunction by enforcing the Trespassing Bans against involuntarily unhoused individuals who practically cannot obtain shelter or access to any public place where they can sleep or carry out essential life activities without risking violation of the Camping, Sleeping, or Trespassing Bans (or any other City ordinances), for acts of so-called "trespass" that amount to little more than sleeping or living on public property.

77.    The City's policy, practice, or custom is to use these statutes and ordinances to criminalize homelessness, including by enforcing them against people who are involuntarily unhoused.

78.    Despite neighboring municipalities amending their policies and halting enforcement of similar ordinances, the City has continued its policy, practice, or custom of enforcing its ordinances in an unconstitutional manner even when housing and temporary shelter are not practically available to its unhoused residents.

79.    The city of Tempe, for example, admitted enforcement of its camping ban against unhoused people would be unconstitutional.

80.    The city of Glendale amended its ordinance to prevent imposing criminal sanctions on camping "when no alternative shelter is available." Glendale, Ariz., City Code § 25-90.

81.     The City of Phoenix, by contrast, has not amended its Camping Ban, Sleeping Ban, or its Trespassing Ban and continues to pursue its policy, practice, or custom of enforcing these laws against involuntarily unhoused individuals who practically cannot obtain shelter and who do not have access to any public place they can legally sleep, lie, stand, or sit in public, even though this Court has imposed an injunction prohibiting the City from doing so.[33]

82.     Upon information and belief, the City has a policy, practice, or custom of issuing citations to individuals for violations of these (and other) statutes/codes to discourage individuals experiencing homelessness from sleeping in the City and to push them to other surrounding municipalities in the County.

83.     Upon information and belief, the City has a policy, practice, or custom of using these statutes and ordinances in place of finding humane solutions for those experiencing homelessness within the City.

**Plaintiff Fund for Empowerment's Work on Behalf of the Unsheltered Community**

84.     Since 2018, the Fund for Empowerment has spent monetary resources in support of its mission to help provide education, training, and leadership courses to the unsheltered community to combat policies and practices by the City which target them.

85.     FFE has approximately 200 members, many of whom are currently involuntarily unhoused or chronically at risk of becoming unsheltered.

86.     FFE commonly creates and prints written materials for dissemination to the unsheltered community which include information about their rights under the United States Constitution.

---

[33] Indeed, rather that turn away from criminalization as a "solution" to its homelessness crisis, the City has doubled down, introducing a new camping ban ordinance. *See* Collen Sikora, *Proposed Change to Phoenix's Camping Ordinance Would Ban Camping Within 500 Feet of Certain Places*, 12 News (Apr. 3, 2024, 6:40 p.m.), https://www.12news.com/article/news/local/valley/proposed-camping-ban-near-phoenix-schools-child-care-centers-shelters/75-a8a8234d-b8a3-4062-b2c3-3ceb2e3f9704. Members of FFE expended time and resources advocating against this proposal at City Council hearings.

87.    FFE provides training to the unsheltered community about their rights in response to the raids conducted by the City.

88.    FFE conducts bi-weekly sessions for the purpose of encouraging unsheltered people to advocate for themselves. Dozens of unsheltered people living in Phoenix attend these meetings.

89.    Due to the City's raids, a substantial portion of these meetings has been dedicated to identifying resources for unsheltered people impacted by the raids.

90.    FFE provides training to the unsheltered community about their right to sleep outside in connection to the City's use of statutes and ordinances to criminalize sleeping.

91.    Since 2020, FFE has had to divert its resources to providing replacement safety items, such as tents and water, to individuals whose property was seized by the City during sweeps. FFE does this because unsheltered individuals may become ill if they do not have access to shade or water and are exposed to heat because of a sweep.

92.    FFE would not have to expend these resources on behalf of its members if the City stopped conducting raids and using statutes and ordinances to criminalize homelessness.

93.    If FFE did not have to expend resources helping unsheltered individuals understand their rights in response to Defendants raids and criminal citations, FFE could spend resources training unsheltered individuals to become their own advocates in requesting resources from the City for housing and shelter.

94.    If FFE did not have to expend resources helping unsheltered individuals understand their rights in response to Defendants raids and criminal citations, FFE could also distribute more water and food to the unsheltered community during the summer months. FFE could also provide more supplies to the unsheltered community which would improve individuals' quality of life.

**FFE Members' Experiences**

95.    Plaintiff Timothy James is a resident of Phoenix, an FFE member, and an involuntarily unhoused individual.

96.     On March 29, 2024, PPD threatened to issue a citation against Mr. James for sleeping on the ground.

97.     During this encounter, PPD officers followed Mr. James and repeatedly instructed him to take his belongings with him, or else face a citation.

98.     In April 2024, PPD cited Mr. James multiple times for violations of the Trespassing Ban under Phoenix City Code § 23-48.01.

99.     Plaintiff Sherdina Carr is a resident of Phoenix, an FFE member, and an involuntarily unhoused individual.

100.    PPD threatened to issue a citation against Ms. Carr for sleeping on the ground and directed her to move.

101.    PPD officers followed Ms. Carr to her new location on a different block, and, under threat of citation, forced her to walk for over an hour to avoid receiving a citation from them.

102.    Plaintiff Papy Abdul Idrissa is a resident of Phoenix, an FFE member, and an involuntarily unhoused individual.

103.    PPD threatened to issue a citation against Mr. Idrissa for sleeping on the ground and directed him to move.

104.    PPD officers followed Mr. Idrissa to his new location on a different block. Mr. Idrissa walked for more than an hour to be out of PPD's sights, and to no longer be subject to PPD's threats of a citation.

105.    Plaintiff Faith Kearns is a resident of Phoenix and an FFE member and has been chronically unsheltered since approximately 2008. While sleeping within the City as an involuntarily unhoused individual, Ms. Kearns has experienced the City's "clean sweeps," or raids, firsthand.

106.    During one such raid, the PPD officers took Ms. Kearns' Arizona ID card, a Visa Card on which her social security disability income was loaded, tent, blankets, bedding, birth certificate, medications, and clothing.

107.   Ms. Kearns also received citations from the City under the Camping Ban, and Sleeping Ban, and Trespassing Ban.

108.   Plaintiff Frank Urban is a resident of Phoenix and an FFE member and has been chronically unsheltered off and on since 2000.

109.   While sleeping outside as an involuntarily unhoused person in various parts of the City, Mr. Urban has directly experienced the City's raids.

110.   During the raids, PPD officers took Mr. Urban's Arizona ID card, tent, blankets, bedding, medications, clothing, food, and water.

111.   Mr. Urban also received citations from the City under the Camping Ban and Sleeping Bans.

**Plaintiff Ronnie Massingille's Experience**

112.   Mr. Massingille is a resident of Maricopa County and currently resides in Phoenix.

113.   Mr. Massingille is currently involuntarily unhoused.

114.   Mr. Massingille commonly sleeps outside in various parts of the City.

115.   While sleeping and encamped, Mr. Massingille has directly experienced the City's raids and the actions of PPD.

116.   Mr. Massingille's possessions were seized and thrown away numerous times during the City's sweeps.

117.   He was never provided with a search warrant.

118.   During the sweeps, PPD officers took Mr. Massingille's Arizona ID card, birth certificate, tent, a suitcase, clothes/shoes, skateboards, and medication.

119.   As an unsheltered individual in the City, Mr. Massingille lives with a constant fear PPD will arrest him, criminally cite him for sleeping outside, or destroy his property.

**Plaintiff Mohamed Sissoho's Experience**

120.   Plaintiff Mohamed Sissoho is a resident of Phoenix.

121.   Mr. Sissoho is currently involuntarily unhoused.

122.   Mr. Sissoho has unsuccessfully sought a shelter bed multiple times.

123.   In November 2022, Mr. Sissoho was at the corner of Jefferson Street and 11th Avenue when PPD conducted a raid.

124.   Mr. Sissoho received no advance notice that PPD or the City would be conducting a raid or any sort of operation.

125.   During this raid, PPD seized and destroyed Mr. Sissoho's property without his consent and without a warrant.

126.   Specifically, PPD seized Mr. Sissoho's tent, sleeping bags, food stamps, social security card, letters, and jewelry.

127.   PPD did not inform Mr. Sissoho how he could reclaim his property or even where it was being taken.

128.   Mr. Sissoho has not been able to recover the property that PPD seized from him.

129.   Without his tent, it has been hard for Mr. Sissoho to protect himself from the sun and sweltering heat.

130.   In October 2023, Mr. Sissoho was sleeping in the area near 12th Avenue and Madison Street (formerly known as "the Zone"). Mr. Sissoho recalls the City conducting a sweep in the early morning hours starting around 6:00 AM.  Mr. Sissoho recalls being roused by PPD officers who forced him, under threat of citation with the Trespassing Bans, to move elsewhere.

131.   During this sweep, the City cited Mr. Sissoho for a violation of the Trespassing Bans.

132.   During this sweep, the City took the majority of his items, including his tent, clothes, and other survival items. Mr. Sissoho was never given information about how to recover these items. Because of the City's sweeps, Mr. Sissoho only carries with him those items that he can tuck into the sides of his wheelchair.

133.   In April 2024, PPD threatened Mr. Sissoho with a citation for sleeping in his wheelchair in public.

134. PPD forced Mr. Sissoho to move elsewhere but did not provide Mr. Sissoho any assistance or information on services, resources, or shelters.

135. Mr. Sissoho is worried about the approaching summer and how he will survive the increasing heat without a tent (which provided shade to him).

**Plaintiff Dyrwood Moore's Experience**

136. Plaintiff Dyrwood Moore is a resident of Phoenix, Arizona.

137. Mr. Moore is currently involuntarily unhoused.

138. In September 2023, Mr. Moore was living on Monroe Street, near the CASS Shelter when PPD conducted a raid without prior warning.

139. Mr. Moore was not present during the September 2023 raid. He would not have left his belongings in and near his tent if he had received notice ahead of the raid.

140. The City confiscated or destroyed Mr. Moore's belongings without providing him with a means to retrieve them.

141. Specifically, PPD seized Mr. Moore's tent, clothes, barbeque grill, bicycle, and shoes.

142. Mr. Moore has not been able to retrieve his personal property since the City's confiscation.

143. In March 2024, Mr. Moore was living near the corner of N. 22nd Avenue and West Portland Street when PPD conducted a raid without prior warning.

144. Mr. Moore was not present during the March 2024 raid, but left his belongings in and near the tent where he was staying.

145. The City confiscated or destroyed Mr. Moore's belongings without providing him with a means to retrieve them.

146. Specifically, PPD seized Mr. Moore's tent, shade for heat protection, disability documentation, blankets, clothes, food, and water.

147. On March 14, 2024, Mr. Moore contacted OHS to see if he would be able to recover his belongings.

148.   OHS has not responded to Mr. Moore's inquiry. He remains without the belongings that PPD took from him during the March 2024 raid.

149.   Without his tent and shade for heat protection, it has been difficult for Mr. Moore to stay out of the direct sun.

150.   The increased heat experienced by Mr. Moore has at times caused him to feel faint and exhausted. As temperatures increase, he worries that the loss of his tent and shade will cause him to become ill.

**Plaintiff Faith Kearns' Experience**

151.   Ms. Kearns is a resident of Phoenix, Arizona.

152.   Due to various medical issues and the costs associated with medical care, she has been chronically unsheltered since approximately 2008.

153.   When she is unsheltered, Ms. Kearns sleeps on the public streets of Phoenix.

154.   While sleeping within the City as an unsheltered individual, Ms. Kearns has experienced the raids firsthand. Based on Ms. Kearns' recollection, the raids occurred about three to five days per week, with an uptick during and around holidays.

155.   During the City's raids, Ms. Kearns has had personal possessions and belongings destroyed.

156.   During the City's raids, PPD and other City workers took the following from Ms. Kearns: an Arizona ID card, a Visa Card on which her Social Security disability income was loaded, tent, blankets, bedding, birth certificate, medications, and clothing.

157.   Ms. Kearns watched as PPD and other City workers destroyed these items, among others.

158.   Ms. Kearns never received a search warrant for the property that the City seized through its agents.

159.   Ms. Kearns also remembers receiving citations from the City under the Jaywalking Law, Camping Ban, and Sleeping Ban.

160.   Ms. Kearns has received other citations related to her unsheltered status such as a citation for trespassing.

1    161.    Ms. Kearns believes the City's raids are intended to push her out of the City.

2                    **Plaintiff Frank Urban's Experience**

3    162.    Mr. Urban is a resident of Maricopa County and currently resides in Phoenix.

4    163.    Due to various medical issues, Mr. Urban became chronically unsheltered off

5    and on starting in 2000.

6    164.    During the time periods when Mr. Urban has been unsheltered, he has slept

7    outside in various parts of the City.

8    165.    During these times, Mr. Urban has directly experienced the City's raids.

9    These raids intensified around Thanksgiving and Christmas.

10    166.    During the City's raids, Mr. Urban has had his possessions thrown away

11    numerous times. Specifically, PPD and other City workers took from him and destroyed:

12    an Arizona ID card, tent, blankets, bedding, medications, clothing, food, and water.

13    167.    Mr. Urban never received a search warrant for the property that the City

14    seized through its agents.

15    168.    Mr. Urban also recalls receiving citations from the City under the Camping

16    Ban and Sleeping Ban.

17    169.    Mr. Urban has received other citations from the City in connection to his

18    unsheltered status.

19                    **Plaintiff Timothy James's Experience**

20    170.    Mr. James is a resident of Phoenix, Arizona.

21    171.    Mr. James is currently involuntarily unhoused.

22    172.    Mr. James is constantly forced to move around the city to flee the PPD's

23    persistent harassment and threats against Mr. James for sitting or sleeping in public.

24    173.    On April 3, 2024, PPD cited Mr. James for lying or sitting in public in

25    violation of Phoenix City Code § 23-48.01.

26    174.    On April 12, 2024, Mr. James was at the intersection of Jackson St. and 11th

27    Avenue when PPD cited Mr. James for lying or sitting in public in violation of Phoenix

28    City Code § 23-48.01.

175.    After PPD cited Mr. James, they forced him to move elsewhere.

176.    On April 19, 2024, Mr. James was woken up arrested by PPD for sleeping in public in violation of Phoenix City Code § 23-48.01.

177.    Mr. James spent the night in jail before being released.

178.    PPD did not provide Mr. James with any information on shelters, resources, or services during these encounters.

**Plaintiff Sherdina Carr's Experience**

179.    Ms. Carr is a resident of Phoenix, Arizona.

180.    Ms. Carr is currently involuntarily unhoused.

181.    Ms. Carr walks around the city for hours at a time to escape PPD's harassment and threats.

182.    After the closure of the Zone, Ms. Carr has been forced by PPD to relocate countless times.

183.    Recently, Ms. Carr was trying to find a shaded area to sit down when PPD threatened her with a citation unless she moved elsewhere.

184.    PPD followed Ms. Carr while she was walking around trying to find a new location.

185.    Once Ms. Carr found a new location, PPD immediately threatened her with a citation unless she moved again.

186.    PPD, again, followed her while she walked around and looked for a third location to sit down.

187.    PPD never offered Ms. Carr information on services, shelter, or resources.

**Plaintiff Papy Abdul Idrissa's Experience**

188.    Mr. Idrissa is a resident of Phoenix, Arizona.

189.    Mr. Idrissa is currently involuntarily unhoused.

190.    PPD forces Mr. Idrissa to relocate on a nearly daily basis.

191.    On April 19, 2024, Mr. Idrissa was sitting in a shaded area of a park when PPD threatened Mr. Idrissa with a citation or arrest.

192.    PPD forced Mr. Idrissa to leave the shaded area and relocate to an unshaded area.

193.    Mr. Idrissa then walked to another shaded area where PPD again threatened Mr. Idrissa with a citation and arrest.

194.    PPD continued to follow, harass, and threaten Mr. Idrissa as he walked around trying to find another shaded area to sit.

195.    In February or March 2024, Mr. Idrissa's friend was sleeping in the shade near the CASS Shelter when he was forced to move elsewhere.

196.    Mr. Idrissa's friend relocated to the park at the intersection of 13th Avenue and Van Buren.

197.    That same day, Mr. Idrissa's friend died from sun/heat exposure.

198.    In April 2024, PPD harassed Mr. Idrissa and other unhoused people at a bus stop near 15th Avenue and Fillmore. During this incident, PPD threatened Mr. Idrissa and other unhoused individuals with citations and arrests. PPD then forced these individuals, including Mr. Idrissa, to leave the shaded bus stop, and onto areas unprotected from sun and heat exposure.

**Plaintiff Jason Rich's Experience**

199.    Mr. Rich is a resident of Phoenix, Arizona.

200.    Mr. Rich is currently involuntarily unhoused.

201.    Around January 2024, Mr. Rich was sleeping on a bench when he was woken up by PPD sticking a taser in his back.

202.    While citing and arresting Mr. Rich, PPD seized all his personal property and belongings.

203.    Specifically, PPD seized Mr. Rich's medications, hygiene supplies, cellphone, identification, and backpack.

204.    PPD did not let Mr. Rich inquire as to where his belongings were being taken.

205.    During this incident, PPD did not provide Mr. Rich with any information on services, resources, or shelters.

206. After being released, PPD has often harassed Mr. Rich for sitting or lying in public.

207. PPD has forced Mr. Rich to move late at night under the threat of a citation or arrest.

208. Around February 2024, Mr. Rich was near CASS around 5:00 a.m. when PPD began patrolling the area and citing unhoused persons.

209. PPD threatened Mr. Rich with a citation for trespassing if he did not leave the area and move elsewhere.

210. PPD did not provide Mr. Rich with any information on services, resources, or shelters during these encounters.

## CLAIMS FOR RELIEF

### Count One

### (Fourth Amendment Violation—Unlawful Seizure)

### (42 U.S.C. § 1983)

### (All Defendants)

211. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

212. At all times relevant to the allegations in this Complaint, Defendants acted under color of state law.

213. Under the Fourth Amendment to the United States Constitution, as incorporated against the states by the Fourteenth Amendment, Plaintiffs have the right to be secure in their persons against unreasonable seizures. A seizure of property occurs under the Fourth Amendment when there is some meaningful interference with an individual's possessory interests in that property; meaningful interferences include destruction of property. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

214. Property includes photographs, identification papers, portable electronics, and even potentially abandoned property. *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012).

215.   Here, Defendants, pursuant to the City's policies, procedures, customs, and/or protocols, have engaged and will continue to engage in targeted raids of areas occupied by the unsheltered community.

216.   During these raids, Defendants unreasonably seize and destroy property regardless of its condition, its apparent value, and/or whether or not it has been voluntarily abandoned.

217.   Individual Plaintiffs as well as other unhoused people who are members of FFE or served by FFE, have experienced destruction of their personal items by Defendants including the destruction of photographs, identification papers, camping equipment, and other unabandoned personal items within the past three years.

218.   Plaintiffs have seen the destruction of personal items of other unsheltered individuals including items deemed abandoned by Defendants within the past three years.

219.   By seizing and destroying the property of the individual Plaintiffs, individuals served by FFE, and FFE members, Defendants meaningfully and permanently interfered with these individuals' possessory interest in their property and unlawfully seized that property.

220.   At no time did Defendants provide a warrant to seize the property of the individual Plaintiffs, individuals served by FFE, or of FFE's members.

221.   Seizures without a warrant are presumptively unconstitutional.

222.   Defendants engage in warrantless seizures of property when no exception to the warrant requirement applies.

223.   Plaintiffs, individuals served by FFE, and FFE's members have a possessory interest in their property under the Fourth Amendment.

224.   A reasonable official in Interim Chief Sullivan's and Director Milne's position would have known that seizing and destroying Plaintiffs' property and the property of individuals served by FFE and FFE members constitutes a violation of the Fourth Amendment.

225.     Defendants' actions were the direct and proximate cause of Plaintiffs' loss of property and the loss of property of the individuals served by FFE and FFE members.

226.     The acts of Defendants were intentional and deprived Plaintiffs, individuals served by FFE, and FFE members of their rights, privileges, liberties, and immunities secured by the Constitution of the United States.

227.     Plaintiffs are entitled to damages in an amount to be determined by a jury.

**<u>Count Two</u>**

**(Fourteenth Amendment Violation – Deprivation of Property without Due Process)**

**(42 U.S.C. § 1983)**

**(All Defendants)**

228.     Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

229.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

230.     Under the Fourteenth Amendment, "the government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008).

231.     Violation of city ordinances does not constitute a waiver of due process interests in a previously recognized property interest.

232.     The property of those experiencing homelessness is "property" within the meaning of the Fourteenth Amendment, meaning a government entity "must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them." *Lavan*, 693 F.3d at 1032.

233.     Here, Defendants, pursuant to the City's policies, procedures, customs, and/or protocols, have engaged and will continue to engage in raids that targeted the unsheltered community living within the City.

234. Pursuant to the City's policies, procedures, customs, and/or protocols, Defendants employed these raids without adequate notice to Plaintiffs.

235. During these raids, Defendants seized and destroyed Plaintiffs' property and the property of individuals served by FFE and FFE members without affording them adequate notice their property would be seized or destroyed.

236. For Plaintiffs, individuals served by FFE, and FFE members, this property is what they rely on for survival. It is all they have. Compared with that extremely high interest in their property, any administrative burden on the City to provide additional process to prevent erroneous deprivation is low.

237. Plaintiffs' property and the property of individuals served by FFE and FFE members was not seized in connection with prosecution or investigation of any crime.

238. Defendants destroyed Plaintiffs' property and the property of individuals served by FFE and FFE members without affording them a post-deprivation process for challenging the seizure of their property.

239. It is clearly established Plaintiffs and individuals served by FFE and FFE members have a right to due process and post-deprivation hearings when their property is unlawfully seized and destroyed.

240. A reasonable official in Interim Chief Sullivan's and Director Milne's position would have known that seizing and destroying property without due process of law violates the Fourteenth Amendment.

241. Defendants' unconstitutional acts were the direct and proximate cause of the seizure, destruction, and loss of Plaintiffs' property and the property of individuals served by FFE and FFE members.

242. The acts of Defendants were intentional and deprived Plaintiffs and individuals served by FFE and FFE members of their rights, privileges, liberties, and immunities secured by the Constitution of the United States.

243. Plaintiffs are entitled to damages in an amount to be determined by a jury.

**Count Three**

**(Eighth Amendment—Cruel & Unusual Punishment)**

**(42 U.S.C. § 1983)**

**(All Defendants)**

244.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

245.    The Eighth Amendment to the United States Constitution prohibits the government from inflicting cruel and unusual punishment.

246.    The Eighth Amendment "not only limits the types of punishment that may be imposed and prohibits the imposition of punishment grossly disproportionate to the severity of the crime, but also 'imposes substantive limits on what can be made criminal and punished as such.'" *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019) (quoting *Ingraham v. Wright*, 430 U.S. 651, 667 (1977)).

247.    The Ninth Circuit has made clear that statutes prohibiting sleeping outside implicate the protections of the Eighth Amendment when applied to homeless individuals. *Martin*, 920 F.3d at 615; *see also Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023), *cert. granted*, 144 S. Ct. 679 (2024).

248.    Defendant City of Phoenix has enacted ordinances which directly target the act of sleeping by unsheltered individuals who otherwise have no place to sleep.

249.    Phoenix City Code § 23-30(A) makes it unlawful for a person to camp within the City.

250.    Phoenix City Code § 23-48.01 makes it unlawful for a person to lie, sit, or sleep in any public right of way or sidewalk, even if those places are otherwise unoccupied.

251.    Phoenix City Code § 23-85.01 and A.R.S. § 13-1501 et. seq. make it unlawful for a person to remain on property.

252.    The City commonly uses the Camping Ban, the Sleeping Ban, and the Trespassing Bans against Plaintiffs, FFE members, and individuals served by FFE to criminalize the act of being homeless and engaging in universal and unavoidable human activities such as sleeping.

253.   Defendants enforce these statutes and ordinances pursuant to the City's policies, procedures, customs, and/or protocols.

254.   Plaintiffs, individuals served by FFE, and FFE members have been cited under numerous statutes and ordinances by Defendants for the act of sleeping or simply existing in public space when they had nowhere else to go.

255.   Defendants commonly cite individuals who are unsheltered, including those who practically cannot obtain adequate shelter, under these statutes and ordinances, as well as others, during their raids.

256.   By criminalizing basic human activities such as sleeping, Defendants are knowingly and intentionally violating the constitutional rights of the unsheltered community.

257.   It is clearly established Plaintiffs, individuals served by FFE, and FFE members cannot constitutionally be punished for sleeping in public spaces when no indoor shelter or other appropriate, safe, and legal public place is practically available to them.

258.   A reasonable official in Interim Chief Sullivan's position would have known that enforcing these statutes and ordinances against the unsheltered population constituted a violation of their Eighth Amendment rights.

259.   As a direct and proximate cause of Defendants' unconstitutional acts, Plaintiffs, individuals served by FFE, and FFE members have been deprived of the basic human right to sleep.

260.   The acts of Defendants were intentional and deprived Plaintiffs, individuals served by FFE, and FFE members of their rights, privileges, liberties, and immunities secured by the Constitution of the United States.

## Count Four

### (Eighth Amendment—Excessive Fines)

### (All Defendants)

261.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

262. The Eighth Amendment to the United States Constitution prohibits the imposition of excessive fines.

263. The Excessive Fines Clause "limits the government's power to extract payments, whether in case or in kind, as a punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609-10 (1993). A fine violates the Eighth Amendment if it is "grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 336–37 (1998).

264. The Excessive Fines Clause applies to fines assessed by municipalities. *Pimental v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020).

265. To determine whether a fine is unconstitutionally excessive under the Eighth Amendment, courts are not required to consider rigid factors but commonly consider: "(1) the nature and extent of the crime; (2) whether the violation was related to other illegal activities; (3) the other penalties that may be imposed for the violation; and (4) the extent of the harm caused." *U.S. v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1121–22 (9th Cir. 2004) (citing *Bajakajian*, 524 U.S. at 337–40). None of these factors supports the fines imposed by the City against its unhoused population when they have nowhere else to go.

266. Here, Defendant City of Phoenix has imposed fines on Plaintiffs, individuals served by FFE, and FFE members for violation of the Sleeping Ban, Camping Ban, and Trespassing Bans.

267. The fines imposed on Plaintiffs, individuals served by FFE, and FFE members for such violations are grossly disproportional to the gravity of the offense.

268. Sleeping is a basic human need, and Plaintiffs, individuals served by FFE, and FFE members lack culpability for sleeping in a public place when they have nowhere else to go.

269. The City fines individuals, including Plaintiffs, individuals served by FFE, and FFE members even though sleeping on the street is not in furtherance of other illegal activities.

270. Sleeping on the street causes negligible harm to the City.

271.    There is no government purpose for proscribing sleeping on the street when an individual has no other place to go.

272.    Plaintiffs, individuals served by FFE, and members of FFE are unable to afford the fines imposed on them for violation of the Sleeping Ban, Camping Ban, and Trespassing Bans.

273.    In light of the minor nature of the violations and their financial effects on Plaintiffs, individuals served by FFE, and FFE members, the aforementioned fines are punitive in nature and are grossly excessive and disproportional to the behavior for which Defendants are imposing these fines. The dollar amount and enforcement of these penalties constitutes a violation of the Eighth Amendment's Excessive Fines clause, as incorporated by the Fourteenth Amendment.

274.    It is clearly established that excessively fining Plaintiffs, individuals served by FFE, and FFE members for sleeping in public spaces when indoor shelter is not practically available to them is a violation of their constitutional rights.

275.    A reasonable official in Interim Chief Sullivan's position would have known that fining Plaintiffs, individuals served by FFE, and FFE members for sleeping in public spaces when indoor shelter is not practically available constituted a violation of their Eighth Amendment rights.

276.    The acts of Defendants were intentional and violated the constitutional rights of Plaintiffs, individuals served by FFE, and FFE members to be free from excessive fines.

277.    Plaintiffs are entitled to damages in an amount to be determined by a jury.

**<u>Count Five</u>**

**(Municipal Liability under *Monell*)**

**(All Defendants)**

278.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

279.    Defendants were at all times relevant agents of the City vested with the power to control and supervise employees, agents, and contractors of the City.

280.     Upon information and belief, Defendants acted in execution of government policy or custom that may fairly be said to represent the official policy of the City. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).

281.     Defendants' actions were authorized (before and during the fact) and ratified (after the fact) by final policymakers for the City.

282.     Defendants directed every action of their agents, thereby causing the violation of Plaintiffs' rights, the rights of individuals served by FFE, and FFE members' rights, and were deliberately indifferent to the fact that their directives would result in the violation of such rights.

283.     Defendants' customs, policies, and/or practices, and the decisions of its final policymakers were the moving force behind Defendants' violation of Plaintiffs' constitutional rights, the constitutional rights of individuals served by FFE, and FFE members' constitutional rights.

284.     Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Plaintiffs' federally protected constitutional rights, the federally protected constitutional rights of individuals served by FFE's, and FFE members' federally protected constitutional rights. Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, such constitutionally protected rights.

285.     Defendants have or should have policies, procedures, practices, and/or customs to govern the raids to prevent the deprivations that occurred. Defendants have instead used or employed policies, procedures, practices, and/or customs that penalize unsheltered individuals for their status and destroy the property of Plaintiffs, individuals served by FFE, and FFE members.

286.     Defendant City of Phoenix and the PPD's policies, procedures, practices, and/or customs should require agents or employees of the City to refrain from destroying unsheltered Plaintiffs' possessions during such raids.

287.   Defendants failed to train or supervise their employees when conducting raids of unsheltered populations such as Plaintiffs, individuals served by FFE, and FFE members, resulting in the criminalization of their unsheltered status and destruction of their property.

288.   As a direct and proximate result of Defendants' acts or omissions pursuant to official government policy, practice, or custom, Plaintiffs, individuals served by FFE, and FFE members suffered (without limitation) a deprivation of constitutional rights.

289.   Plaintiffs are entitled to damages in an amount to be determined by a jury.

## Count Six

### (Fourteenth Amendment—State Created Danger)

### (All Defendants)

290.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

291.   The due process clause of the Fourteenth Amendment to the United States Constitution prevents Defendants from placing Plaintiffs, individuals served by FFE, and FFE members in danger by acting with deliberate indifference to a known and obvious danger.

292.   During the summer, temperatures in Phoenix can reach as high as 119 degrees Fahrenheit.

293.   Without access to shade, temperatures can be even hotter.

294.   Hundreds of unsheltered individuals die from heat related exposure every summer in Phoenix.

295.   Each year, Maricopa County puts out a report on heat-related deaths. The City of Phoenix contributes to the report.[34]

296.   Defendants know that unsheltered individuals, including Plaintiffs, individuals served by FFE, and FFE members, are at high risk for heat related illness and death.

---

[34] *2023 Heat Related Deaths Report*, Maricopa Cnty., https://www.maricopa.gov/ArchiveCenter/ViewFile/Item/5796 (last updated April 2024).

297.    Defendants know that removing unsheltered individuals from shaded areas and destroying items that provide them with protection from the sun, including tents and tarps, increase those individuals' exposure to the sun and their risk of heat-related illness and death.

298.    Defendants make Plaintiffs, individuals served by FFE, and FFE members move from shaded areas protected from the sun under threat of arrest and citation during extremely hot temperatures, despite knowing that being forced to gather and their belongings under these circumstances and leave shaded areas is dangerous to their health.

299.    Defendants confiscate and destroy tents, tarps, and other shade-providing structures used by Plaintiffs, individuals served by FFE, and FFE members to protect themselves from the sun during extremely hot temperatures, despite knowing that depriving these individuals of shade-providing structures under these circumstances is dangerous to their health.

300.    As a direct and proximate result of Defendants' actions, Plaintiffs, individuals served by FFE, and FFE members have been subjected to a heightened risk of heat-related illness or death that severely threatens their bodily security.

301.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered a deprivation of their constitutional rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.    Maintaining current preliminary injunctive relief enjoining:

    a.    Defendants from seizing and destroying property of unsheltered individuals residing in the City;

    b.    Defendants from issuing criminal or civil citations under Phoenix, City Code § 23-30(A) to individuals experiencing homelessness for sleeping in public spaces when no available alternative spaces to sleep exist;

c.   Defendants from issuing criminal or civil citations under Phoenix City Code § 23-48.01 to individuals experiencing homelessness for sleeping in public spaces when no available alternative spaces to sleep exist;

d.   From issuing any other criminal or civil citation to individuals experiencing homelessness for sleeping, sitting, lying, or standing in public spaces when no available alternative spaces to do so exist; and

e.   From conducting raids on spaces occupied by individuals experiencing homelessness, including sweeps which physically move the unsheltered community to unsafe spaces and dispossess them of their property.

B.   Additional preliminary injunctive relief:

a.   Enjoining Defendants from issuing criminal or civil citations under Phoenix City Code § 23-85.01, A.R.S. § 13-1501 et. seq., and Phoenix City Code § 23-48.01. to individuals experiencing homelessness for sleeping, sitting, lying, or standing in a public space when no available alternative spaces to do so exist; and

b.   Enjoining Defendants from imposing fines on individuals experiencing homelessness for sleeping, sitting, lying or standing in a public space when no available alternative spaces to do so exist.

C.   Permanent injunctive relief:

a.   Enjoining Defendants from seizing and destroying property of unsheltered individuals residing in the City without due process of law;

b.   Enjoining Defendants from destroying any property unabandoned by unsheltered individuals;

c.   Enjoining Defendants from issuing any criminal or civil citations to individuals experiencing homelessness for sleeping, sitting, lying, or standing in public spaces;

d.   Enjoining Defendants from conducting raids and taking other actions that cause the displacement of those experiencing homelessness unless appropriate individual housing options are available to shelter these individuals;

e.   Enjoining Defendants from displacing unsheltered individuals from shaded areas, forcing unsheltered individuals to engage in strenuous relocation activities, and destroying unsheltered individuals' sun-protective property, including tents and tarps, during extreme heat;

f.   Enjoining Defendants from imposing fines on individuals experiencing homelessness for sleeping, sitting, lying or standing in a public space when no available alternative spaces to do so exist; and

g.   Requiring Defendants to provide advance notice of their intent to conduct raids.

C.   For Declaratory Relief that:

a.   Phoenix City Code § 23-30(A) is unconstitutional as applied to unsheltered individuals with no practical access to shelter who are sleeping within the City;

b.   Phoenix City Code § 23-85.01 is unconstitutional as applied to unsheltered individuals with no practical access to shelter who are sleeping, sitting, lying, or standing on public property within the City;

c.   A.R.S. § 13-1501 et. seq., is unconstitutional as applied to unsheltered individuals with no practical access to shelter who are sleeping, sitting, lying, or standing on public property within the City; and

      d.     Phoenix City Code § 23-48.01 is unconstitutional as applied to unsheltered individuals with no practical access to shelter who are sleeping, sitting, lying, or standing on public property within the City.

D.    For damages as to Counts One, Two, Four, Five, and Six, according to proof;

E.    For taxable costs and expenses to the extent permitted by law;

F.    For pre- and post-judgment interest to the extent permitted by law;

G.    For an award of attorney fees pursuant to 42 U.S.C. § 1988(b); and

H.    Such other relief as may appear just and appropriate.

RESPECTFULLY SUBMITTED this 29th day of April, 2024.

By: *Jared G. Keenan*

Jared G. Keenan
Christine K. Wee
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA

By: /s/ *Benjamin L. Rundall*

Benjamin L. Rundall
2020 North Central Ave., Suite 675
Phoenix, Arizona 85004-2556

ZWILLINGER WULKAN

By: /s/ *Leah Watson*

Leah Watson, *pro hac vice*
Scout Katovich, *pro hac vice*
125 Broad Street, 18th Floor
New York, New York 10004

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

By: /s/ *Andrew Kim*

Andrew Kim, *pro hac vice*
Collin M. Grier, *pro hac vice*
Madeline Fuller, *pro hac vice*
1900 N Street, N.W.
Washington, D.C. 20036

Courtney L. Hayden, *pro hac vice*
100 Northern Ave.
Boston, MA 02210

GOODWIN PROCTER LLP

*Attorneys for Plaintiffs*