EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Fund for Empowerment, et al.,)
                             )
               Plaintiffs,   )  2:22-cv-02041-GMS
                             )
v.                           )
                             )  Phoenix, Arizona
City of Phoenix, et al.,     )  March 29, 2024
                             )  3:03 p.m.
               Defendants.   )
_____)


**BEFORE:  THE HONORABLE G. MURRAY SNOW, CHIEF JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**


**MOTION TO DISMISS**


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                              *A P P E A R A N C E S*

2

3    ON BEHALF OF PLAINTIFFS:

4         AMERICAN CIVIL LIBERTIES UNION
          BY:  **Benjamin L. Rundall, Esq.**
5              **Jared G. Keenan, Esq.**
          2712 N. 7th Street
6         Phoenix, Arizona 85006

7    ON BEHALF OF DEFENDANT CITY OF PHOENIX:

8         PIERCE COLEMAN, PLLC
          BY:  **Aaron Dean Arnson, Esq.**
9         7730 E. Greenway Road
          Suite 105
10        Scottsdale, Arizona  85260

11   ON BEHALF OF THE INTERVENORS:

12        TULLY BAILEY, LLP
          BY:  **Ilan Wurman, Esq.**
13        11811 N. Tatum Boulevard
          Unit 3031
14        Phoenix, Arizona  85028

15

16

17

18

19

20

21

22

23

24

25

```
 1   and in the news generally.  So I think a lot of the focus has
 2   been on the Zone, but our case has always been about the
 3   entire City of Phoenix and we believe that these actions are
 4   still ongoing throughout the City.
 5           As far as the Zone, obviously, we've asked for a
 6   Rule 16 conference; but we're in contact with our clients.  We
 7   still go down to the Zone.  The Human Service Campus, which
 8   has changed its name, is still in the Zone.  It's our belief
 9   and understanding that the City is still telling people to go
10   to the Zone or taking people to the Zone.
11           So I don't think that -- in terms of the Zone, I
12   don't think that necessarily changes the equation before the
13   Court in terms of this Motion to Dismiss on standing.  I think
14   standing is still appropriate, and even thinking about the
15   Zone, well, sure, if the Zone was the only place in the City,
16   Your Honor, where plaintiffs' rights could be violated, I
17   think then standing might have to be reevaluated; but that's
18   not true.  That's never been true.  Plaintiffs have always
19   claimed that anywhere in the City of Phoenix they might have
20   their rights violated.
21           THE COURT:  What do I do about policies that have
22   been promulgated since you filed this lawsuit that as far as I
23   know are permanent policies by the City of Phoenix?
24           MR. RUNDALL:  Sure.  I think we can go back to any
25   city or any entity that's challenged on an injunction, Your
```

1    Honor.  The case law is fairly clear that sometimes those

2    entities want to change the policies and tell the Court,

3    "We're not doing that anymore.  We're not engaging in that

4    behavior anymore."

5            First off, Your Honor, we don't think that's true.

6    That's why we haven't voluntarily dismissed our complaint.

7    That's why we want to conduct discovery and we want to have

8    the opportunity to conduct discovery; but, two, even if that

9    were true, even if the policies changed, it's still

10   appropriate for this Court to make determinations about the

11   behavior that occurred so that it can ensure that that doesn't

12   happen in the future.

13           Your Honor, I would also note that in terms of

14   plaintiffs' complaint, obviously, we've alleged other claims

15   against the City that are largely unaddressed by the

16   intervenors and that includes our Fourth Amendment claim, the

17   *Lavan* claim.

18           They talked a little bit about it at the hearing;

19   but, again, at this point in terms of the Motion to Dismiss,

20   it feels like they're trying to insert their interpretation of

21   fact or interpretations of fact in their favor instead of

22   looking at the complaint and in our complaint I -- again, Your

23   Honor, I don't think anything has changed.

24           Sure, the City has cleared out the Zone; but

25   plaintiffs still contend that the City engages in a process of

1  taking people's property in violation of the Fourth Amendment,

2  and that risk still applies to the members of Fund for

3  Empowerment.  It still applies to Ronnie.

4          THE COURT:  I mean, I agree with you except for my

5  one concern is the City did set forth a policy.  It was a

6  policy that was set forth in terms of the cleanout of the

7  Zone, but I had the impression that the policy also was

8  citywide in terms of the seizure of property of those who were

9  unhoused.

10          It does seem to me that if the City is promulgated

11  and trained on the policy, it does weigh in to whether or not

12  there is a likelihood of violation sufficiently established in

13  the complaint as it stands now.  Do you want to address that?

14          MR. RUNDALL:  I do, Your Honor.  You can tell that I

15  do.  I think that's a great point, Your Honor, and that's why

16  we want discovery to proceed.  It's very possible that the

17  City's gonna provide the information demonstrating that

18  they've significantly changed their policies and practices and

19  that now there's not a substantial likelihood of risk that

20  plaintiffs alleged, but we're not there and we don't agree

21  that that's the case.

22          That's why we filed for the Rule 16 conference, Your

23  Honor.  We want to engage in discovery so that we can explore

24  those claims and see what's going on.  The City coming up here

25  today or saying to the news media, "Hey, we've changed our

1  policies and now the plaintiffs are no longer at risk of these

2  types of violations," that just doesn't cut it at this stage.

3  We should be able to do discovery to see what's going on.

4        And to be fair, Your Honor, I could pull out

5  declarations from people we've collected who are currently

6  unhoused and they will tell you that's not true, that their

7  property is still being destroyed.  It's not being stored, as

8  this Court ordered pursuant to the injunction, and that

9  they're being cited for sleeping or camping outside.

10        Your Honor, the last issue that I want to address is

11  I think that we have to look at the intervenors' initial

12  concerns when they asked to join permissively in this case,

13  and it was about their State Court case and public nuisance

14  case; and as they, you know, say in their reply, that case has

15  been resolved.

16        So I don't think that there's anything preventing us

17  from now moving this case forward.  The injunction you issued

18  and modified in October, no party has moved to stay that

19  injunction.  Even when *Grants Pass* was taken up on cert by the

20  Supreme Court, the City did not move to stay your injunction.

21        If *Grants Pass* is decided by the Supreme Court and

22  significantly changes the standing requirements for the

23  plaintiffs, I will admit, Your Honor, we might have to come

24  back and then look at standing at that time.

25        THE COURT:  What if *Grants Pass* undercuts the

 1   current view in the Ninth Circuit of the meaning of the Eighth

 2   Amendment?

 3           MR. RUNDALL:  Say that one more time, Your Honor.

 4           THE COURT:  What if it undercuts the meaning of the

 5   Eighth Amendment as currently interpreted by the Ninth

 6   Circuit?

 7           MR. RUNDALL:  Well, Your Honor, I'm smiling and

 8   you're smiling because I think we both know that if the

 9   Supreme Court makes the determination that fundamentally

10   changes standing under the Eighth Amendment for these types of

11   claims, well, plaintiffs' Eighth Amendment claim may

12   significantly change, if not be subject to dismissal.

13           THE COURT:  Like might evaporate.

14           MR. RUNDALL:  It might evaporate, Your Honor, but

15   does that change the Fourth Amendment claims under *Lavan*?

16   Does that change the create a danger claim?

17           THE COURT:  If you have affidavits from either

18   members of Fund for Empowerment or from the plaintiffs

19   themselves who indicate that their property has recently been

20   destroyed or taken without notice, why don't you file them.

21           MR. RUNDALL:  Your Honor, thank you for that

22   question.  When we were here last time, you said, "Plaintiffs,

23   you're allowed to come back to us, but I want you to make sure

24   that you have all of your evidence lined up," and we want to

25   do that; but we think that there's critical information that

1              *REPORTER'S CERTIFICATION*

2

3              I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 12th of

12   April, 2024.

13
                                     ____s/Teri Veres____
14                                   TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Fund for Empowerment, et al.,)
                            )
           Plaintiffs,  )  NO. 2:22-cv-02041-GMS
v.                     )
                         )  Phoenix, Arizona
City of Phoenix, et al.,   )  December 14, 2022
                         )  3:05 p.m.
          Defendants. )
_____)

BEFORE:  THE HONORABLE G. MURRAY SNOW, CHIEF JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**PRELIMINARY INJUNCTION HEARING**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                        A P P E A R A N C E S

 2

 3    ON BEHALF OF PLAINTIFFS:

 4         AMERICAN CIVIL LIBERTIES UNION, FOUNDATION OF ARIZONA
           BY:   Benjamin L. Rundall, Esq.
 5               Jared G. Keenan, Esq.
           3707 N. 7th Street
 6         Suite 235
           Phoenix, Arizona 85014
 7
           SNELL & WILMER, LLP
 8         BY:   Delilah R. Cassidy, Esq.
                 Edward J. Hermes, Esq.
 9         1 E. Washington Street
           Suite 2700
10         Phoenix, Arizona  85004-2556

11    ON BEHALF OF DEFENDANTS:

12         PIERCE COLEMAN, PLLC
           BY:   Aaron Dean Arnson, Esq.
13               Trish Stuhan, Esq.
           7730 E. Greenway Road
14         Suite 105
           Scottsdale, Arizona  85260
15

16

17

18

19

20

21

22

23

24

25
```

1                          *I N D E X*

2

3    **WITNESSES:**          **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

4    *RACHEL MILNE*
     By Ms. Cassidy                  13
5    By Ms. Stuhan                                    22

6    *SCOTT HALL*
     By Mr. Arnson        54
7

8    *RONNIE LEE MASSINGILLE*
     By Mr. Keenan        77
9

10   *BRIAN FREUDENTHAL*
     By Mr. Arnson        83
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1   Q.   This plan, it only applies in the Zone; is that correct?

2   A.   This plan for abandoned property was specific for our

3   pilot program for our cleanups in and around the Human

4   Service's campus, yes.

5   Q.   All right.

6            THE COURT:  You know what, Ms. Milne, we do allow

7   witnesses to unmask.  So you get the privilege alone in the

8   courthouse today.

9            THE WITNESS:  Okay.

10           THE COURT:  Make sure that everybody can understand

11  you.

12           THE WITNESS:  Okay.

13           THE COURT:  Now, I took your last answer to be

14  "yes," basically, that policy only applies in the Zone?

15           THE WITNESS:  Yes, for a specific -- the enhanced

16  cleanups around the Human Service campus.

17           THE COURT:  Yeah, thank you.

18  BY MS. CASSIDY:

19  Q.   You state in your declaration that you -- that the plan

20  is designed to provide adequate notice; is that correct?

21  A.   Correct.

22  Q.   What does "adequate notice" mean?

23  A.   So we would want anyone who was in the affected area to

24  know that this cleanup was coming and to be well aware of what

25  was gonna happen on the day of, the services available to them

```
 1              THE COURT:  All right.
 2              MR. RUNDALL:  Your Honor, first, as I think you
 3    already mentioned at the beginning of the hearing today, there
 4    is two separate issues when we're talking about sweeps or
 5    raids and property specifically.
 6              So this lawsuit -- we've heard a lot about the Zone,
 7    but it's not just about the Zone.  It's about all four corners
 8    of the City and it's about activities, whether we want to call
 9    them sweeps or raids, that are occurring in other parts of the
10    City.
11              Indeed, if you go through the City defendants'
12    response, they admit that in January of 2022 they stopped
13    doing these types of sweeps in the Zone because of a DOJ
14    investigation.  We haven't gotten in to that DOJ
15    investigation.  I don't think it's relevant for today's
16    hearing, but importantly they didn't stop doing those sweeps
17    in other parts of the City.
18              We provided declarations from five individuals.
19    Some of those individuals know people who were in an
20    unsheltered community.  Some of those individuals work for
21    non-profits within this space.  One of these individuals --
22              THE COURT:  There is one that talks about viewing
23    any -- I think it was November of 2022.  It was the veteran
24    person and he seemed to witness some property being taken.  He
25    doesn't indicate whether it was destroyed.  Didn't seem to me
```

1   representation, Your Honor.

2          THE COURT:  All right, thank you.

3          MR. ARNSON:  Thank you.

4          THE COURT:  Mr. Rundall, go ahead.  Thank you for

5   allowing me to interrupt your argument.

6          MR. RUNDALL:  Yes, of course, Your Honor.

7          In terms of the representations even made just by

8   the City, I think Mr. Massingille's declaration is really

9   important here, Your Honor.  He's currently unsheltered.  In

10  fact, we heard from Mr. Massingille and we heard from some of

11  the folks that are here today that there are sweeps going on

12  today, including a sweep in the Zone where there's caution

13  tape up.

14         That was past our deadline to submit new pictures or

15  evidence, Your Honor, but we just emphatically disagree that

16  they have -- well, first off, they don't have a policy --

17         THE COURT:  Well, let me ask, Mr. Rundall.  What

18  kind of injunction do you want?

19         MR. RUNDALL:  Certainly.

20         THE COURT:  First off, it seems to me -- let's be

21  specific about our arguments.

22         Ms. Milne's testimony suggests to me that at least

23  to the extent that this now is the City policy inside the

24  Zone, I'm not sure that inside the Zone you've got a

25  likelihood of success on a Fourteenth Amendment or even a

1   Fourth Amendment violation.

2          I'll hear you to the contrary, but it certainly

3   seems to me like at least the City does have evidence that

4   they've implemented a procedure that I'm not sure is likely to

5   deprive anybody of property that isn't abandoned or at least I

6   don't see how.  If you have -- inside the Zone.

7          Outside the Zone we've got no evidence at all from

8   the City as to what their policy is, other than the

9   affidavits, somewhat dated, but nevertheless within a relevant

10  time period that indicates that folks have lost property

11  outside the Zone.

12         So my first question to you is:  What kind of

13  injunction do you want for operations outside the Zone?

14         MR. RUNDALL:  Certainly, Your Honor.  I think that

15  an injunction prohibiting the City from engaging in sweeps

16  that displace people from their property outside the Zone

17  would be appropriate.

18         THE COURT:  Well, I'm not inclined to do that

19  because I think the injunction I've already said I'm inclined

20  to enter ought to take care of that to the extent that they

21  can't use the citation -- the criminal law citations as a

22  basis for removal unless they can establish that the person is

23  voluntarily homeless, correct?

24         MR. RUNDALL:  Correct.

25         THE COURT:  So on what other basis -- I mean, I

```
 1    suppose they might have other bases, other criminal law
 2    violations that they might be able to use to remove somebody
 3    and I'm disinclined to have an injunction that sweeps so
 4    broadly that it would take into account other bases other than
 5    those statutes.  Do you understand -- other than the
 6    ordinances that are constitutionally problematic.
 7              Do you understand what I'm saying?
 8              MR. RUNDALL:  Yes, your Honor.
 9              THE COURT:  And do you understand how the
10    proposal -- or at least my understanding of your proposed
11    injunction sweeps too broadly?
12              MR. RUNDALL:  I understand --
13              THE COURT:  It does seem to me, though -- I am -- I
14    am concerned on the basis of the record as it now exists as it
15    pertains to what happens to the property of somebody outside
16    the Zone when -- when it is taken by the City and I would be
17    welcome -- I would welcome any suggestions you have that would
18    be injunctive relief as it pertains to property taken into the
19    City's possession outside the Zone.
20              So do you have a suggestion for me?
21              MR. RUNDALL:  I do, Your Honor, and I think perhaps
22    looking at Lavan v. City of Los Angeles and the injunction
23    that was awarded by the District Court there may be helpful.
24              If I might read, Your Honor?
25              THE COURT:  Sure.
```

UNITED STATES DISTRICT COURT

 1   then go to the next proper resource.

 2           Sometimes it goes to the Streets Department if it's

 3   on that kind of property, sometimes Public Works.  Sometimes

 4   it will go to PD if it's on private property and we have to

 5   work on those type of issues.  So it all depends on what type

 6   of property the issue is on.

 7   Q.   Okay.

 8           THE COURT:  So, Mr. Hall, is there any set number of

 9   days that a property has to be tagged before it can be taken

10   by the City?

11           THE WITNESS:  There is not.

12           THE COURT:  Okay.  Is there any notice when the

13   property is taken about what the person can do to retrieve the

14   property?

15           THE WITNESS:  No, Your Honor, there is not.

16           THE COURT:  Thank you.

17   BY MR. ARNSON:

18   Q.   Okay.  Once the property -- I guess my final questions --

19   and I'll confer with Ms. Stuhan to see if we have anything

20   further.

21           THE COURT:  Can I have one more question?

22           MR. ARNSON:  Yes, yes, yes, please.

23           THE COURT:  Is there any differentiation between the

24   types of property involved?  For instance, are these legal

25   papers?

1                THE WITNESS:  Yes.

2                THE COURT:  Is there birth certificates as opposed

3    to, I don't know, empty food containers or something like

4    that?  Is there any differentiation?

5                THE WITNESS:  Yes, Your Honor.  The outreach teams

6    try to identify through different varieties of -- try and

7    identify whose property it might be through medication

8    bottles, paperwork that has any kind of identifying names and

9    trying to connect through that way, because we also do have a

10   sophisticated information system that most homeless service

11   providers enter data into, which is called HMIS.

12               So if we can find a name for an individual, we can

13   look them up in there and see if the individual is at a

14   shelter or any other place like that to help us engage with

15   them.

16               THE COURT:  All right.  So when the City of Phoenix

17   takes the property, what does it do with it?

18               THE WITNESS:  Out in that community after that time

19   it would be disposed of if there's no --

20               THE COURT:  Okay.  So if you come out and you take

21   the property, you destroy the property?

22               THE WITNESS:  Yes.

23               THE COURT:  Okay, thank you.

24               THE WITNESS:  Can I make one amendment to that, if I

25   may?

 1   determinative on the constitutional standard.

 2            THE COURT:  So let me tell you what concerns me --

 3            MS. STUHAN:  Sure.

 4            THE COURT:  -- and you can address it.

 5            It sounded to me like there is not a consistent

 6   policy concerning how long a property has to be un --

 7   unclaimed before it is seized and destroyed.

 8            Did I miss something?

 9            MS. STUHAN:  Your Honor, I think that in terms of

10   the notice, as Mr. Hall testified, they do -- because there's

11   not the high concentration, it's individual --

12            THE COURT:  Well, let me step back.  Let me step

13   back --

14            MS. STUHAN:  Yeah.

15            THE COURT:  -- and make sure we're both on the same

16   page.  Notice for me is a separate issue right now.

17            MS. STUHAN:  Okay.

18            THE COURT:  I'm just talking about the number of

19   days before the City can take property and I did -- I think I

20   understood Mr. Hall to say there is no set number of days

21   before property can be taken.

22            MS. STUHAN:  Your Honor, I agree with that.  I think

23   that what --

24            THE COURT:  And I think -- okay, I'm sorry.  Let me

25   let you finish.

 1              COURTROOM DEPUTY:  Thank you.  Please raise your

 2    right hand.

 3    *(Witness is sworn.)*

 4              THE WITNESS:  I do affirm.

 5              THE COURT:  Thank you.  Please take our witness

 6    stand.

 7                        DIRECT EXAMINATION

 8    BY MR. KEENAN:

 9    Q.   Good afternoon, Mr. Massingille.

10    A.   Good afternoon.

11    Q.   Are you currently unsheltered?

12    A.   I am.

13    Q.   And do you currently live unsheltered in the City of

14    Phoenix?

15    A.   I do.

16    Q.   Are you familiar with the Zone?

17    A.   I am.

18    Q.   Were you near the Zone yesterday?

19    A.   I was.

20    Q.   And what did you observe yesterday at the Zone?

21    A.   Well, yesterday at the Zone they had the white trucks out

22    there.  They were moving stuff off the corner and everything.

23    They were not putting anything in yellow tape or anything.

24    They had the white trucks out there.  They had the little mini

25    dozer and they was dumping the material into the back of the

 1  truck.  That was on 9th Street and Jackson.

 2  Q.   When you say "they," who are you referring to?

 3  A.   I'm talking about the City workers and police.

 4  Q.   So you saw Phoenix Police officers in uniform?

 5  A.   Yes, I did.

 6  Q.   And when you say "dozer," what are you describing?

 7  A.   A mini bobcat front end loader which picks up the

 8  material off the ground and dumps it into the back of the

 9  truck.

10  Q.   And what type of truck does it dump the material into?

11  A.   It is a dump truck that's painted white, had the City

12  emblems on it.

13  Q.   Do you recall approximately what time you saw this

14  activity in the Zone yesterday?

15  A.   Can I grab my phone real quick?

16  Q.   Is it -- do you have it on you?

17  A.   Yes, I do.

18  Q.   Will that refresh your memory?

19  A.   It will.  I took a picture of it.

20       MR. ARNSON:  And, Your Honor, the defendants will

21  just request either to see it or a copy or something.

22       THE COURT:  Mr. Massingille --

23       THE WITNESS:  It was approximately around --

24       THE COURT:  -- have you found the picture?

25       THE WITNESS:  Yes, your Honor.

1  *(Witness is sworn.)*

2          COURTROOM DEPUTY:  Thank you.  Please take our

3  witness stand.

4                         DIRECT EXAMINATION

5  BY MR. ARNSON:

6  Q.   Commander Brian Freudenthal?  Brian Freudenthal is your

7  name?

8  A.   Yes.

9  Q.   Thank you.  Commander Freudenthal, you were present in

10  the courtroom for the testimony that Mr. Massingille just

11  gave, were you?

12  A.   Yes, I was.

13  Q.   Okay.  And you heard him testify that on -- that this

14  incident happened yesterday, which would have been November

15  13th, 2022.  Did you hear that?

16  A.   Yes.

17  Q.   Okay.  And you heard that it happened -- I believe it was

18  in the area of 9th Avenue and Jackson.  Is my recollection

19  correct, consistent with yours?

20  A.   That's correct.

21  Q.   Thank you.  Do you have any idea was there something

22  transpiring with respect to police activity on 9th Avenue and

23  Jackson yesterday?

24  A.   So it's a combination.  We were conducting a homicide

25  investigation that occurred, and we have evidence that it

 1   occurred on the southwest corner of 9th Avenue and Jackson

 2   where those police cars were parked.

 3          So we were part of that and then we were also --

 4   because of that homicide, obviously, some of the crew out

 5   there was concerned for their safety.

 6   Q.   Okay.  And I know you haven't seen the video, but if it's

 7   appropriate I can represent that in that video, in at least

 8   one of the pictures, there was some yellow caution tape around

 9   the area.

10          Do you recall police putting up yellow caution tape

11   around the area?

12   A.   So I was out there prior to the caution tape being put up

13   there; but, yes, there was caution tape put up there.  We've

14   had a series of fires.  As you can see from the video, there

15   is a building there.  We had three fires that actually were up

16   against the building.  We also had a fire on -- in that exact

17   location where a tree went up in flames.

18          So a lot of that property is burnt property.  It had

19   been burnt in fires.  We had done outreach in there for a

20   couple weeks prior to -- I'm sorry, not we, but Scott Hall and

21   Rachel and Human Services had been doing outreach for a couple

22   weeks prior to that.

23          I believe they contacted at least fifteen

24   individuals out there, most of which had been housed, had been

25   sheltered, and that property was discarded and left behind.

1   Q.   Okay.  So the City was continuing an ongoing

2   investigation?

3   A.   That and obvious safety concerns because that had just

4   occurred.

5   Q.   Okay.  And individuals at some point had to have been --

6   were there unsheltered individuals at some point on that

7   corner that had to be closed?  I'll try that question again.

8          Were there unsheltered individuals whose property --

9   who had to remove their property from the area where you were

10  doing your investigation?

11  A.   From the southwest corner there was property impounded

12  based off of the investigation on the southwest corner,

13  correct.

14  Q.   Okay.

15  A.   But those dump -- those trucks were not related to that

16  investigation.

17  Q.   Okay.  Do you have any idea what those trucks were?

18  A.   I believe they were City of Phoenix street trucks.

19  Q.   Okay.  And what was their purpose of being present on the

20  scene?

21  A.   So they were cleaning up a lot of the burnt, discarded

22  material that was left behind from fires and from camps that

23  were left behind.

24  Q.   I understand.

25          MR. ARNSON:  Okay, I don't think I have further

1                              ***REPORTER'S CERTIFICATION***

2

3                 I, TERI VERES, do hereby certify that I am duly

4 appointed and qualified to act as Official Court Reporter for

5 the United States District Court for the District of Arizona.

6                 I FURTHER CERTIFY that the foregoing pages

7 constitute a full, true, and accurate transcript of all of

8 that portion of the proceedings contained herein, had in the

9 above-entitled cause on the date specified therein, and that

10 said transcript was prepared under my direction and control.

11                 DATED at Phoenix, Arizona, this 25th of

12 January, 2023.

13                                             *s/Teri Veres*

14                                  TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25